IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SXSW, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:21-CV-00900 |
| | § | |
| FEDERAL INSURANCE COMPANY, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff SXSW, LLC ("SXSW"), brings this action against Defendant Federal Insurance Company ("Federal") and would respectfully show:

**I.      Introduction.**

1.      SXSW seeks a judicial declaration and judgment requiring Federal to defend and indemnify SXSW in a federal class action complaint filed against it after the City of Austin cancelled the 2020 festival due to the COVID-19 pandemic.  *See* Ex. 1, attached (Original Complaint, *Bromley v. SXSW, LLC*, No. 1:20-cv-439 (W.D. Tex.) ("the *Bromley* Complaint").

2.      The *Bromley* Complaint alleges claims that trigger Federal's duty to defend and indemnify SXSW under Directors & Officers and Entity Liability insurance coverage that Federal sold to SXSW.  Federal has wrongly refused to provide coverage in response to SXSW's tender.

3.      SXSW, therefore, files this lawsuit seeking a declaration and judgment that: (1) Federal has a duty to defend Plaintiff in the *Bromley* Complaint and to indemnify SXSW against loss, including defense costs, settlement, or any judgment; (2) Federal has a duty to promptly reimburse SXSW for all defense costs incurred by SXSW in the *Bromley* Complaint in

the past, and to pay SXSW's defense costs going forward in that lawsuit; (3) Federal has breached its contract and its common law and statutory duties of good faith and fair dealing; and (4) Federal is liable to SXSW for actual and treble damages, prejudgment interest and court costs.

## II.   Parties.

4.     Plaintiff SXSW, LLC, is a Texas limited liability company with its principal place of business at 1400 Lavaca Street, Austin Texas.  The citizenships of SXSW, LLC's members, as of the date this lawsuit was filed, October 6, 2021, are listed in Appendix A, which shows that its members as of that date were citizens of California, Connecticut, Delaware, Florida, Massachusetts, Michigan, Nevada, New York, North Carolina, Pennsylvania, Texas, Virginia, Switzerland, and the United Kingdom, and none were citizens of Indiana or New Jersey.  Because the citizenships of SXSW, LLC's members determine its citizenship, and because none of SXSW's members were citizens of Indiana or New Jersey as of October 6, 2021, complete diversity existed between SXSW, LLC, and Federal Insurance Company at the time this lawsuit was filed.

5.     Federal Insurance Company is an Indiana Corporation with its principal place of business in Warren, New Jersey.  It may be served by serving its registered agent for service of process, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-4284.

## III.   Jurisdiction and Venue.

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1391(a)(c), because there is complete diversity of citizenship between SXSW, LLC, and Federal, as shown in Appendix A, and more than $75,000 is in controversy.

7.     Defendant is subject to personal jurisdiction in Texas because the Texas long-arm statute, Texas Civil Practice and Remedies Code § 17.042, et seq., extends to the limits of the Due Process Clause of the Constitution and permits the exercise of personal jurisdiction over a

nonresident defendant, such as Defendant, who has purposefully availed itself of the benefits and protections of Texas by establishing "minimum contacts" with Texas, including contracting by mail or otherwise with Plaintiff with the contract performance to be performed by either party in whole or in part within Texas, and by failing to perform its obligations that were owed in Texas, including the duty to provide a defense to Plaintiff, a Texas resident limited liability company, in a lawsuit filed in Texas, and by further committing a tort in whole or in part in Texas.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business in this district and is subject to personal jurisdiction in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**IV.     Factual Allegations.**

**A.     The Festival.**

8.     SXSW is an annual conference and festival that occurs in March in Austin, Texas, which brings together the global music, film, technology, and education industries to network and showcase new business and creative endeavors.  SXSW expected thousands of people to attend SXSW 2020.

9.     On March 6, 2020, however, the City of Austin, exercising its emergency powers, cancelled the entire event due to the COVID-19 pandemic.  By that time, of course, SXSW had spent a tremendous amount of time and money preparing to host SXSW 2020.

10.     In preparing to host SXSW 2020, the company had curated thousands of conference speakers and musical performances, and hundreds of film screenings. SXSW contracted with numerous venues and hotels, arranged for the travel of presenters and technical operations, engaged hundreds of equipment and service providers, created and printed signage, programs, merchandise, schedules, and much more.

11.     Because SXSW must spend enormous sums of cash to prepare to host a festival, it has a long-standing no-refund policy for credential purchases, which is expressly stated in its Participation and Credentials Terms and Conditions (the "Terms").  After the City cancelled the 2020 event, SXSW invoked this long-standing policy when some attendees requested refunds and credit card chargebacks.  Instead, SXSW offered credential purchasers the opportunity to defer their SXSW 2020 credentials to a future year and the right to purchase credentials for another year at a 50% discount.  Approximately 80% of credential purchasers accepted this offer and granted SXSW a release of claims. Nevertheless, some purchasers asserted claims against SXSW seeking refunds, despite the no-refund policy.

**B.     The Claims.**

12.     One purchaser of SXSW 2020 credentials, Steven Leventhal, retained a lawyer who sent a demand letter dated April 11, 2020, to SXSW, threatening to file a lawsuit against SXSW in Illinois if it did not provide him a full refund (the "Leventhal Demand").

13.     Two other purchasers of SXSW 2020 credentials, Maria Bromley and Kleber Pauta, filed the *Bromley* Complaint in this Court on April 24, 2020, demanding refunds, attorney's fees, and costs.  Ex. 1.  They seek to represent a class of purchasers of wristbands, passes, badges and tickets to SXSW 2020.  *Id*. ¶ 48.  If certified, Leventhal would be a member of the proposed class.

14.     Bromley, a resident of Massachusetts, alleges that she purchased a "Platinum" badge for SXSW 2020 on February 3, 2020.  Ex. 1 ¶¶ 8-9.

15.     Bromley alleges that, upon learning of the cancellation of the Festival, she called SXSW and requested a cash refund, but was told that SXSW does not provide cash refunds.  Ex. 1 ¶ 10-11.  Bromley subsequently emailed SXSW requesting a cash refund.  *Id*. ¶ 13.

16.     On April 1, 2020, Bromley received an email from SXSW offering to defer her Platinum badge for use in the 2021, 2022 or 2023 SXSW festivals plus the right to purchase a second badge at 50% off one of the other years.  Ex. 1 ¶ 13.  Bromley does not allege she accepted the offer, which has expired.

17.     Pauta, a resident of Colorado, alleges that he purchased a SXSW badge on November 25, 2019.  Ex. 1 ¶¶ 14-15.

18.     Pauta alleges that, after learning that SXSW 2020 had been cancelled, he emailed SXSW and requested a cash refund.  Ex. 1 ¶ 17.  SXSW responded on April 23, 2020, that SXSW's "stated registration policy has always been no refunds," and that it therefore would not issue a refund.  *Id*. ¶ 18.

19.     Pauta received SXSW's April 1, 2020, deferral offer but, like Bromley, he does not allege he accepted the offer before it expired.  Ex. 1 ¶ 19.

20.     The *Bromley* Complaint alleges the SXSW festival "consists of multiple 'tracks' of programming related to film, interactive media, music, gaming, conferences and musical performances" and that  attendees are required to purchase wristbands, tickets, passes, or badges to gain access to these programming tracks, known as "Credentials."  Ex. 1 ¶¶ 27-28, 33.

21.     The *Bromley* plaintiffs further allege that "SXSW offers 'Interactive,' 'Film' or 'Music' badges that provide 'primary entry to programming associated with their badge type and … secondary access to most other SXSW events[,]' as well as communal amenities such as food courts, award shows and expositions  ... ."  Ex. 1 ¶ 29.

22.     The *Bromley* Complaint alleges SXSW offers "Platinum" badges, "which grant primary access to all official SXSW events," and that attendees may also purchase Film festival, Music festival or Gaming Expo wristbands.  Ex. 1 ¶¶ 30-31.

23.     The *Bromley* plaintiffs further allege that, in order to purchase SXSW 2020 credentials, they were required to agree to SXSW's Terms.  Ex. 1 ¶ 34 & Ex. A.  They admit that the Terms are governed by Texas law and include a Refund and Revocation Policy ("Refund Policy") stating that SXSW "does not issue refunds under any circumstances" and that "[a]ny and all payments made to SXSW are not refundable for any reason."  *Id.* ¶ 36.

24.     Referencing language in the Refund Policy that "SXSW may, in its sole discretion and at any time determined by SXSW, cancel, revoke, or refuse … Credentials, purchases, and/or hotel reservations made through SXSW," the *Bromley* plaintiffs allege that the Refund Policy, if enforced, would render the contract "an unenforceable, illusory, unilateral option contract."  Ex. 1 ¶¶ 38-39.

25.     The *Bromley* Complaint alleges that, despite "reports of spreading COVID-19 in early 2020, on February 28, 2020, SXSW informed the public that the SXSW 2020 event was 'proceeding as planned' and that despite some cancellations, the event was on par with past years," and continued selling tickets.  Ex. 1 ¶ 42.

26.     The *Bromley* Complaint alleges that SXSW 2020 was scheduled to be held from March 13 to March 22, 2020, but that on March 6, 2020, just before it was scheduled to start, SXSW 2020 "was cancelled due to the COVID-19 pandemic and the City of Austin's local state of emergency declaration."  Ex. 1 ¶¶ 3, 44.  The plaintiffs allege that, by not issuing refunds, "SXSW has, in effect, shifted the burden of the COVID-19 pandemic onto festivalgoers."  *Id.* ¶¶ 44-47.

27.     Based on these facts, the *Bromley* Complaint alleges three causes of action.  First, the plaintiffs allege breach of contract, claiming that SXSW failed to provide them refunds after the City of Austin cancelled SXSW 2020, contending that SXSW's no-refund policy is "unlawful

and unenforceable." *Id*. ¶¶ 54-63.  Second, the plaintiffs allege unjust enrichment, claiming that

SXSW, by not issuing refunds after SXSW 2020 was cancelled, retained "benefits conferred on it

by Plaintiffs and the Class" in a manner that "is unjust and inequitable under the circumstances."

*Id*. ¶¶ 64-68.  Third, the *Bromley* plaintiffs allege conversion, claiming that SXSW, by not

providing refunds, "has, unlawfully and without authorization, assumed and exercised dominion

and control over that property to the exclusion of, or inconsistent with, the rights of Plaintiffs and

the class." *Id*. ¶¶ 69-73.

> **C.     The Policy.**

28.     SXSW purchased from Federal a ForeFront Portfolio 3.0<sup>SM</sup> insurance policy ("the

Policy").  Ex. 2, attached.  The Policy has three coverage parts:  (1) Directors  & Officers and

Entity Liability Coverage; (2) Employment Practices Liability Coverage; and (3) CyberSecurity

Coverage.  *Id*.  At issue in this lawsuit is the Policy's first coverage part, which covers claims made

against SXSW, LLC, as an entity, as well as claims made against SXSW's individual directors and

officers.  *Id*. at 26-47.

29.     The Policy's Directors & Officers and Entity Liability Coverage Part ("Entity

Coverage") provides SXSW, the entity, with the following coverage relevant to this lawsuit,

subject to the Policy's General Terms and Conditions:

> **Insuring Clause (C): Entity Liability Coverage**
>
>> (C)     The Company shall pay, on behalf of an **Organization**, **Loss** on account of
>> a **Claim** first made against the **Organization** during the **Policy Period**, or the
>> extended Reporting Period if applicable.

Ex. 2 at 27 (emphasis in original).

30.     The Policy defines the bolded terms above in pertinent part as follows:

**Organization means** the Parent **Organization** and any **Subsidiary**. **Organization** shall also mean any such entity as a debtor in possession under United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

**Claim** means:

…

        (C)     when used in reference to the coverage provided by Insuring Clause (C), Entity Liability Coverage, any:

            (1) written demand first received by an **Insured** for monetary damages or non-monetary relief, including injunctive relief;

            (2) civil proceeding commenced by the service of a complaint or similar pleading;

…

against an **Organization** for a **Wrongful Act**, including any appeal therefrom;

**Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by:

**…**

        (B)     for purposes of coverage under Insuring Clause (C), Entity Liability Coverage, any **Organization**.

**Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:

        (A)     compensatory damages;

        …

        (D)     judgments, including pre-judgment and post-judgment interest;

        (E)     settlements; and

        **(F)**     **Defense Costs,**

Ex. 2 at 14, 28-31 (emphasis in original).

31.     With respect to Entity Coverage, the Policy contains an exclusion, referred to herein

as the "Contract Exclusion," stating:

The Company shall not be liable for **Loss** on account of any **Claim** against an **Organization**:

(1)     Contract

based upon, arising from or in consequence of any liability in connection with any oral or written contract or agreement to which an **Organization** is a party …

Ex. 2 at 33 (emphasis in original). The Contract Exclusion is itself subject to an exception, referred

to herein as the Contract Exclusion Exception, which provides that "this Exclusion … shall not

apply to the extent that such **Organization** would have been liable in the absence of such contract or agreement." *Id*.

32.    Endorsement/Rider No. 5, which adds a Services Industry Endorsement, replaces Exclusion (B)(6)(c) of the Entity Coverage with an exclusion, referred to herein as the "Professional Services Exclusion," stating:

> (1)    The Company shall not be liable under this Coverage Part for **Loss** on account of any **Claim** based upon, arising from, or in consequence of the rendering of, or failure to render, any **Professional Services** by an **Insured** … .

Ex. 2 at 43.

33.    Elsewhere, the Policy defines "Professional Services" as follows:

> **Professional Services** means services which are performed for others for a fee.

Ex. 2 at 31.

34.    The Policy's "Defense and Settlement" Section VIII states, in pertinent part:

> VIII.    **DEFENSE AND SETTLEMENT**
> (A)    The Company shall have the right and duty to defend any **Claim** covered by this Coverage Part. Coverage shall apply even if any of the allegations are groundless, false or fraudulent.  The Company's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

Ex. 2 at 35.

35.    Paragraph (1) of Endorsement/Rider No. 6 to the Policy's Directors & Officers and Entity Liability Coverage Part provides, in pertinent part, that the Policy's Defense and Settlement Section VIII is deleted and replaced by language set forth in the Endorsement, "[u]nless the **Insured** has tendered the defense of a **Claim** to the Company pursuant to paragraph (3) of this Endorsement…."  Ex. 2 at 45.  Paragraph (3) of that endorsement states:

> Notwithstanding paragraph (1) of this Endorsement, the **Insureds** shall have the option to tender the defense of any **Claim** to the Company by notifying the Company within a reasonable time after such **Claim** is first received by the **Insured**, but in no event later than thirty (30) days after the date such **Claim** is first received by the **Insured**.

Ex. 2 at 46.

36.     The Policy's standard Defense and Settlement Section VIII, set forth in Paragraph 34 above, applies in this case because SXSW timely tendered the defense of the Claims to Federal pursuant to the provisions of paragraph (3) of Endorsement/Rider No. 6 to the Policy's Directors & Officers and Entity Liability Coverage Part.

37.     In addition, the Policy's standard IX Allocation Section applies because SXSW tendered the defense of the Claims to Federal pursuant to the provisions of paragraph (3) of Endorsement/Rider No. 6 to the Policy's Directors & Officers and Entity Liability Coverage Part. Ex. 2 at 46.

38.     Subject to the Policy's $25,000 retention, the Policy's IX Allocation Section, paragraph (A), provides that Federal is responsible for one hundred percent (100%) of SXSW's Defense Costs for a Claim under the Policy's Directors & Officers and Entity Liability Coverage Part, even if SXSW incurs an amount consisting of both Loss that is covered by the Coverage Part and also Loss that is not covered by the Coverage Part.  Ex. 2 at 26, 36.

**D.     The Denial of Coverage.**

39.     After the City of Austin cancelled SXSW 2020, SXSW put Federal on notice of the potential for a claim even before any actual claim was made.

40.     SXSW received the Leventhal Demand on April 15, 2020 and tendered it to Federal on April 16, 2020.

41.     The *Bromley* Complaint was filed on April 24, 2020, and SXSW tendered the defense of the *Bromley* Complaint to Federal on April 27, 2020.

42.     Federal denied coverage in a letter to SXSW on May 18, 2020.  Ex. 3, attached.

43.     Federal asserted two reasons for denying coverage.  First, Federal claimed that the Contract Exclusion excludes coverage for the entire *Bromley* Complaint because "the claimants' allegations are based upon, arise from and are in consequence of liability in connection with a contract to which SXSW is a party."  Ex. 3 at 2.  Federal claimed, without explanation, that the Contract Exclusion Exception "does not apply."  *Id*.

44.     Second, Federal claimed that the Professional Services Exclusion excludes coverage because SXSW "provided a service – scheduling, overseeing, organizing and managing South by Southwest – for which it collected a fee thus precluding coverage."  Ex. 3 at 2.  Federal directed SXSW to put its E&O carrier on notice of the Claim.  *Id.*

45.     Counsel for SXSW's insurance agent responded to Federal on July 8, 2020, explaining that the Contract Exclusion does not preclude coverage for the *Bromley* Complaint because the unjust enrichment and conversion claims seek to impose liability against SXSW in the absence of a contract.  Ex. 4 at 8-10, attached.[1]  Thus, under the Contract Exclusion Exception, the Contract Exclusion does not apply.  SXSW's agent further explained that the Contract Exclusion does not even apply to the *Bromley* Complaint breach of contract claim, because that claim is not based on liability arising under any oral or written contract.  While the *Bromley* plaintiffs allege that there is a contract (SXSW's Terms), and that the Terms' no-refund policy is unenforceable, they do not allege that SXSW *is contractually liable to pay refunds under Terms when a festival is cancelled by a government agency.  Id*. at 10.

---

[1] Under Texas law, an unjust enrichment claim may only be asserted when there is no governing contract. *See Bado Equip. Co.*, *Inc. v. Bethlehem Steel Corp.*, 814 S.W.2d 464, 473 (Tex. App. – Houston [14th Dist.] 1991, no writ) (existence of contract precludes recovery for unjust enrichment).  Likewise, a claim for conversion is a tort claim not founded upon contract.  *Lawyers Title Co. v J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 718 (Tex. App. – Dallas 2014, pet. denied) (conversion requires no proof of contract).

46.     SXSW's agent further explained that the Professional Services Exclusion did not preclude coverage because, under Texas law, "professional services" exclusions only exclude damages that directly stem from the performance of services for others that involve a specialized skill, vocation or training.  Ex. 4 at 10-11.  Texas cases have made clear that "professional services" are not defined by the title or person performing the service, but by the act itself, so that ordinary or administrative acts performed by professionals are not "professional services."   Thus, "professional services" exclusions do not apply to billing, ticket sales, and refund activities which are merely administrative tasks inherent in all businesses.   SXSW organized the festival, determined who should present at the festival, made the travel arrangements for presenters, and made arrangements for the presentations.  These are not professional services, but even if they were, the *Bromley* plaintiffs did not sue SXSW for damages arising from such services.  Rather, they complain that SXSW wrongfully refused to refund their payments.  Ticket sales and refunds are non-professional billing services.  *Id.*  SXSW's agent also noted that Federal's denial letter, after denying coverage, had directed SXSW to file a claim against its E&O carrier, which is also Federal.  *Id.* at 3-4.  But Federal had also denied coverage under its E&O policy based on an exclusion for Professional Services performed *for* an Insured.  *Id.*  In that denial, Federal denied coverage by asserting that the *Bromley* plaintiffs' claims were based on SXSW's performance of "Professional Services" – which it described as scheduling, overseeing, organizing, and managing the Festival – *on its own behalf.*  Ex. 7 at 5.  Federal cannot have it both ways, denying Entity Coverage by claiming the *Bromley* Complaint is based on SXSW's failure to render Professional Services *for others* while denying Professional Services coverage by claiming the *Bromley* Complaint is based on SXSW's failure to render Professional Services *to itself*.

47.     Outside counsel for Federal responded on August 13, 2020, repeating its clam that the Contract Exclusion and the Professional Services Exclusions excuse Federal from providing any defense or indemnification.  Ex. 5, attached.  Counsel for Federal also claimed that SXSW had failed to timely tender the defense to Federal, *id*. at 6, but this claim is refuted by Federal's initial denial letter, which acknowledged that SXSW had tendered the Leventhal Demand and the *Bromley* Complaint on April 16 and April 27, 2020, respectively, well within the 30-day deadline Federal's counsel cites.  *See* Ex. 3 at 1.  In that letter, Federal expressly denied it had a duty to defend, thereby acknowledging that SXSW had tendered the defense to it.  *Id*. at 3.

48.     Federal's refusal to defend and indemnify SXSW is wrongful under Texas law and a breach of its duties under the Policy.

49.     Federal's denial based on the "Professional Services Exclusion" is wrongful for other reasons as well.  First, as noted in Federal's denial letter, the Policy purports to define "Professional Services" as "services which are performed for others for a fee."  That definition, if construed as Federal alleges, would render the term "Professional" superfluous.  Indeed, the word "professional" is ordinarily and commonly understood as referring to someone with specialized knowledge, education and training like a doctor or engineer.  As a matter of law, insurance policies should not be interpreted in such a manner that renders terms superfluous.

50.     Second, Federal's interpretation of "Professional Services" as encompassing "any services" not only makes the word "Professional" superfluous, it also renders the Policy's entity coverage for SXSW illusory.  By interpreting the "Professional Services" exclusion to apply to "any" services and further interpreting "Services" to apply to ordinary billing activities and ticket refund policies, Federal would effectively eliminate *any* entity coverage for SXSW, because all of

its activities and alleged omissions could then be characterized as "Professional Services" subject to the exclusion, no matter how mundane or ordinary.

51.     Federal's purported definition is no definition at all.  Given the lack of a meaningful definition of "Professional Services" in the policy, the Court should look to Texas law, which defines "Professional Services" as a service peculiar to an individual's specialized vocation and performed by that professional using specialized knowledge or training inherent to their profession.  The *Bromley* Complaint is not based on SXSW's provision, or failure to provide, the plaintiffs such specialized services.

52.     Alternatively, it would be proper for the Court to construe the Policy using the "Professional Services" definition provided in the Professional Portfolio policy concurrently issued by Federal to SXSW, which defines "Professional Services" as "event planning, promotional activities, branding, travel agency services, and related services."  Ex. 6 at 23.  It is appropriate to read the Professional Liability policy's definition into the Entity Liability Policy, not only to gain an understanding of the objectively reasonable interpretation of the parties under the circumstances, but also because the Policy's "Service Industry" Endorsement/Rider No. 5 states that "[s]ubject to the provisions of this endorsement, no coverage shall be available for any **Loss** until after any and all coverage available under any policy providing professional liability or errors and omissions coverage has been exhausted."  Ex. 2 at 43.  That is, the "Professional Services" *excluded* from coverage in the D&O and Entity Coverage would fall *within* the coverage provided in the Professional Liability Policy, thus providing coverage as objectively intended by the parties, while avoiding double coverage.  Further, by not applying the exclusion to SXSW's ordinary activities like billing, or refunds – activities are performed by all businesses regardless of any specialized training or education – SXSW's reasonable interpretation prevents the Entity

Liability coverage from being illusory.

53.     At a minimum, SXSW proffers reasonable interpretations of the scope of the Professional Services Exclusion that differ from Federal's interpretation.  When a policy term is susceptible to more than one reasonable interpretation, the court must resolve the ambiguity in favor of the insured.  This rule applies even when the insurer's interpretation may seem more reasonable, so long as the insured's interpretation is not unreasonable.   Here, SXSW's interpretation is not unreasonable and is consistent with Texas law.

54.     Third, even if "professional services" means *all* services, the Professional Services Exclusion does not bar coverage because it is expressly limited to Loss on account of a Claim based upon or arising out of "the rendering of, or failure to render, any **Professional Services** by an **Insured**." Ex. 2 at 43 (underling added).  The exclusion does not bar coverage to the extent the *Bromley* Complaint includes claims arising from the plaintiffs being deprived of services that were to have been provided by others, such as "programming relating to film, interactive media, music, gaming, conferences and musical performances."  Ex. 1 ¶ 27.

55.     The *Bromley* Complaint's unjust enrichment claims is based upon the plaintiffs' paying for, but not being able to attend, including musical performances, film screenings and conference presentations, which were to be rendered by musicians, filmmakers, and others, not by SXSW.  The *Bromley* plaintiffs complain it is "unjust and inequitable under the circumstances" for SXSW to retain the money they paid.  Ex. 1 ¶ 67.  It can be inferred from the *Bromley* Complaint that the plaintiffs are claiming that, despite the work and expenses SXSW incurred preparing for SXSW 2020, it would be unjust for SXSW to retain plaintiffs' payments because the performers and presenters, through no fault of their own, were unable to perform due to the City of Austin cancelling the festival.

56.     In short, the *Bromley* plaintiffs claim it would be unjust for SXSW to retain the Credential payments, not because SXSW did not provide them "Professional Services" of "event planning, promotional activities, branding, travel agency services, and related services," but because SXSW retained their payments despite the plaintiffs being unable to enjoy services that would have been provided *by others* at SXSW 2020.  Therefore, the Professional Services Exclusion does not apply.

57.     The *Bromley* Complaint cites a page on SXSW's website, https://www.sxsw.com/attend/#chart to support the allegation that "SXSW offers 'Interactive,' 'Film' or 'Music' badges that provide 'primary entry to programming associated with their badge type and … secondary access to most other SXSW events[,]' as well as communal amenities such as food courts, award shows and expositions . ..." Ex. 1 ¶ 29.  Although it is clear from the *Bromley* Complaint that SXSW 2020 would consist of performances and presentations to be provided by others, this is further confirmed by the webpage cited by the *Bromley* plaintiffs, which references programming such as "performances from new, developing, and established artists" and provides tabs to click for SXSW 2020 News and to "Explore Announced Programming."  Those links provided a list of the announced presenters, speakers and performers, and news about internationally acclaimed speakers, musical performers, comedians, and filmmakers who would have presented the programming at the Festival and who are obviously not SXSW.  *Id*.

58.     The *Bromley* plaintiffs' unjust enrichment claim is further based on their denial of access to the many non-SXSW services and amenities that would have been part of the experience of attending SXSW 2020.  The *Bromley* Complaint alleges that "[a]fter accounting for travel and room and board, participants who plan to attend the festival in its entirety can expect to spend thousands of dollars." Ex. 1 ¶ 32.  This reflects the plaintiffs' awareness that food and hospitality

services *provided by others* was part of the experience they were unable to enjoy as a result of the City's cancellation of SXSW 2020, making the Professional Services Exclusion inapplicable.

59.     At the time the City of Austin cancelled SXSW 2020, SXSW had already performed much of its services, such as event planning, curating films, music showcases and conference panels, arranging for performers and production equipment, and renting the Austin Convention Center and other area venues.  The *Bromley* plaintiffs are not complaining about SXSW failing to properly perform these services.  Rather, they are complaining that because of the City of Austin's emergency declaration shutting down SXSW 2020, they were deprived of services *from others* that they had expected to enjoy.  For that reason, they want a refund.  Thus, even if the expansive and overly broad definition of "Professional Services" ["services which are performed for others for a fee"] is applied, the Professional Services Exclusion does not bar coverage because the unjust enrichment and conversion causes of action are not grounded upon *SXSW*'s failure to render Professional Services, but instead from the inability of *others* to render services, professional or otherwise.

**V.     Claims.**

**COUNT I.  Declaratory Judgment:  Duty to Defend and Indemnify.**

60.     SXSW incorporates the allegations in the above paragraphs of this Complaint as though fully alleged herein.

61.     An actual bona fide controversy exists between SXSW, on the one hand, and Federal, on the other hand, that requires judicial declaration by this Court of the parties' rights and duties regarding insurance coverage under the Policy.

62.     A valid contract exists between SXSW, LLC, and Federal, namely the Policy.

63.     SXSW fully performed all obligations and conditions under the Policy or is excused from performing the same as a result of Federal's wrongful denial of coverage.

64.     All premiums owed under the Policy have been paid.

65.     The Contract Exclusion does not apply to all claims in the *Bromley* Complaint, and to the extent it does, the Contract Exclusion Exception applies to the unjust enrichment and conversion claims, thus placing SXSW within coverage and requiring Federal to defend and indemnify, if a settlement is reached or a judgment is entered on those claims.  The Professional Services Exclusion does not apply.  Federal therefore owes SXSW a duty to defend the *Bromley* Complaint, and it owes a duty to indemnify SXSW if a settlement is reached or a judgment is rendered under any claim covered by the Policy's Entity Coverage.  Federal has wrongfully denied that it owes any duty to defend the *Bromley* Complaint or indemnify SXSW.  SXSW seeks a declaration to this effect.

## COUNT II.  Breach of Contract

66.     SXSW incorporates the allegations in the above paragraphs of this Complaint as though fully alleged herein.

67.     A valid contract exists between the parties, namely the Policy.

68.     Federal has breached that contract by failing to provide SXSW a defense in the *Bromley* Complaint, and has anticipatorily breached that contract by claiming it has no duty to indemnify any claim made in the *Bromley* Complaint.

69.     SXSW fully performed all the obligations and conditions required to be performed under the Policy, or has been excused from performing them as a result of Federal's breach of its duty to defend.

70.     Federal's breach of contract has proximately caused SXSW damages including, but not limited to, the attorneys' fees, costs, and expenses incurred in the defense of the *Bromley* Complaint.

**COUNT III.  Breach of Implied Covenant of Good Faith and Fair Dealing.**

71.     SXSW incorporates the allegations in the above paragraphs of this Complaint as though fully alleged herein.

72.     Federal at all material times had the duty to act fairly and in good faith to Plaintiff in carrying out their responsibilities under the Policy.

73.     Pursuant to the Policy, Federal has a legal obligation to act fairly and in good faith to SXSW to promptly and reasonably investigate claims against SXSW, and to make reasonable coverage decisions.  As an insurer, Federal owes SXSW an implied covenant of good faith and fair dealing. Federal has breached that implied covenant of good faith and fair dealing by refusing to defend SXSW in the *Bromley* Complaint and to provide necessary coverage(s) owed under the Policy when tendered, and at all material times thereafter, notwithstanding repeated requests to do so.

74.     Federal breached its duty of good faith and fair dealing owed to SXSW by committing, among other things, the following acts and omissions:

a.     Unreasonably refusing to immediately defend SXSW in the *Bromley* Complaint after receipt of tender thereof and repeated communications from SXSW to Federal in violation of the Prompt Payment of Claims Act; and failing to follow the statutory time guidelines for accepting or denying coverage within fifteen business days, which constitutes a violation of Section 542.051 *et. seq.* of the Texas Insurance Code;

b.      Failing to conduct a reasonable investigation and unreasonably withholding monetary payment of the defense;

c.      Failing to give a reasonable interpretation to the provisions of the policies, failing to reasonably apply provisions of the policies to the claims, and unreasonably refusing to acknowledge that the claims asserted against SXSW in the *Bromley* Complaint were and are potentially covered, and failing to timely, promptly and without delay, pay for the reasonable and necessary defense incurred after the tender;

d.      Failing to provide SXSW with any reasonable or justifiable basis for the decision to deny and/or delay the actual participation of the defense of the *Bromley* Complaint; and

e.      Interpreting the provisions of the policies and the factual circumstances so as to resolve ambiguities and uncertainties against SXSW and to favor its own economic interests.

75.     As a result of the bad faith conduct of Federal in this matter, SXSW has incurred substantial attorneys' fees, costs and expenses in defense, repair, loss adjustment, mitigation and investigation and other costs and expenses in response to the *Bromley* Complaint and has been required to bring this Complaint to enforce its rights under the Policy.

76.     SXSW is entitled to recover as damages against Federal, all the aforementioned fees, costs and expenses which it has incurred as a result of the *Bromley* Complaint and the instant action, together with interest thereon, including attorney's fees as set forth in Section 542.060 of the Texas Insurance Code and pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.

77.     SXSW is further entitled to recover as damages against Federal all fees, expenses and costs incurred in this action to enforce its rights under the Policy, plus interest thereon,

according to proof and is entitled to 18% interest and attorney's fees as set forth in Section 542.060 of the Texas Insurance Code.

## COUNT IV.  Violations of the Texas Insurance Code

78.     SXSW incorporates the allegations in the above paragraphs of this Complaint as though fully alleged herein.

79.     Pursuant to Texas law, Federal owes duties under Sections 541.060 and 541.061 of the Texas Insurance Code to refrain from engaging in any unfair or deceptive acts or practices in the business of insurance and to refrain from misrepresenting its insurance policies.

80.     Federal engaged in unfair or deceptive practices in violation of Section 541.060 of the Texas Insurance Code by, among other things:

         a.     misrepresenting to SXSW one or more material facts and/or policy provisions relating to coverage;

         b.     failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which their liability has become clear;

         c.     failing to promptly provide a reasonable explanation of the basis in law or in fact for the denial of SXSW's claim;

         d.     refusing to pay SXSW's claim without conducting a reasonable investigation with respect to those claims and/or

         e.     refusing to conduct a reasonable investigation.

81.     Federal misrepresented its insurance policy in violation of Section 541.061 of the Texas Insurance Code by, among other things:

         a.     making an untrue statement of material fact;

      b.      failing to state a material fact necessary to make other statements made not misleading;

      c.      making a misleading statement; and/or

      d.      failing to disclose a material matter of law.

82.      Federal has failed to accept SXSW's full and entire claim within the statutorily mandated time of receiving all necessary information, in violation of Section 542.056 of the Texas Insurance Code requiring the prompt payment of claims.

83.      Federal failed to timely pay SXSW's claim for covered losses due to its wrongful denial of the policy benefits in violation of Section 542.057 of the Texas Insurance Code.

84.      Federal failed to meet its obligations to pay claims without unduly delay, due to its wrongful denial, in violation of Section 542.058 of the Texas Insurance Code.

85.      SXSW is entitled to recover its actual damages attorneys' fees, costs and expenses in defense, repair, loss adjustment, mitigation and investigation and other costs and expenses in response to the *Bromley* Complaint pursuant to Sections 541.152(a) and 542.060 of the Texas Insurance Code proximately caused by Federal's unfair or deceptive insurance practices.

86.      Because Federal committed the forgoing acts knowingly, SXSW is entitled to an award of three times the amount of its actual damages pursuant to Section 541.152(b) of the Texas Insurance Code.

## VI.    Prayer for Relief.

WHEREFORE, PREMISES CONSIDERED, Plaintiff SXSW, LLC, seeks judgment against Defendant Federal Insurance Company as follow:

1.      Declaring that Defendant had and has a duty to defend and indemnify SXSW in the *Bromley* Complaint under the Policy;

2.      Declaring that Defendant has breached its contractual duties to SXSW under the Policy;

3.      A determination and award of damages consisting of all reasonable defense expenses incurred by SXSW in the *Bromley* Complaint, including any consequential damages;

4.      Awarding prejudgment interest incurring from the date of each defense invoice at the statutory rate of interest, per annum;

5.      Ordering Defendant to pay ongoing reasonable defense expenses within the date of invoice submitted to Defendant;

6.      Declaring that Defendant breached its covenant of good faith and fair dealing;

7.      Awarding damages against Defendant for its breach of its covenant of good faith and fair dealing;

8.      Declaring that Defendant committed unfair or deceptive practices in the insurance business;

9.      Awarding SXSW treble damages pursuant to Section 541.152(b), Tex. Ins. Code, upon a finding by the trier of fact that Defendant knowingly committed unfair or deceptive practices;

10.     Awarding SXSW's reasonable attorneys' fees incurred in this lawsuit in accord with applicable Texas law;

11.     Awarding costs of court herein; and

12.     Such other and further relief deemed just and proper.

Respectfully submitted,

/s/ *Peter D. Kennedy*
Peter D. Kennedy
State Bar No. 11296650
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5764
(512) 536-9908 (Fax)
pkennedy@gdhm.com

David A. Gauntlett (pending *pro hac vice* admission)
California Bar No. 96399
Peter Q. Schluederberg (pending *pro hac vice* admission)
California Bar No. 137995
18400 Von Karman, Suite 300
Irvine, California 92612
(949) 533-1010
(949) 553-2050 (Fax)
dag@gauntlettlaw.com
pqs@gauntlettlaw.com

**ATTORNEYS FOR SXSW, LLC**

**<u>CERTIFICATE OF SERVICE</u>**

I certify that the foregoing was served on counsel for Appellee Federal Insurance Company

by ECF electronic filing on October 31, 2023.

Tony L. Draper                  Paul F. Matousek
Avniel J. Adler                 Walker Wilcox Matousek LLP
Walker Wilcox Matousek LLP      1 North Franklin, Suite 3200
1001 McKinney, Suite 2000       Chicago, Illinois 60606
Houston, Texas 77002

*/s/ Peter D. Kennedy*
Peter D. Kennedy

APPENDIX A

**Members of Plaintiff/Appellant SXSW, LLC, as of October 6, 2021**

- **SXSW Holdings, Inc.** – Texas corporation with its principal place of business in Texas
- **Starr Hill Presents – SX LLC**.  Sole member:
  - **Starr Hill Presents LLC**.  Sole member:
    - **Robert C. Capshaw**, citizen of Virginia.
- **PME Holdings, LLC**.  Members:
  - **PME TopCo, LLC**.  Sole member:
    - **Penske Media Corporation** – Delaware corporation with its principal place of business in California
  - **Eldridge Media Holdings, LLC**.  Members:
    - **SBT Media Holdings, LLC**.  Sole member:
      - **SBT Investors, LLC**.  Sole member:
        - **NZC Capital, LLC**.  Members:
          - **Todd Boehly** – citizen of Connecticut
          - **GWMB Holdings, LLC**.  Sole member:
            - Family Trust of Todd Boehly, citizen of Connecticut
          - **Fayerweather Fund Matterhorn, LP – DE LP**.  Partners:
            - **Joe Fisher** – citizen of Pennsylvania
            - **Stevenson Family Ltd. Partnership – DE LP**.  Partners:
              - **Andrew Stevenson** – citizen of Massachusetts
              - **Howard Stevenson** – citizen of Massachusets
            - **Hansjoerg Wyss Revocable Trust dated 12/16/1997 as amended**.  Sole owner:
              - **Hansjoerg Wyss**, citizen of Switzerland
            - **Hansjorg Wyss 2014 Irrevocable Trust**.  Trustees:
              - **Joseph Sedlack** – citizen of Pennsylvania
              - **Robert Bland** – citizen of Massachusetts
              - **Joseph Fisher** – citizen of Pennsylvania
              - **Andrew Stevenson** – citizen of Massachusetts
            - **Matterhorn GP Management, LLC**.  Sole member:
              - **Hansjoerg Wyss**, citizen of Switzerland
            - **The Rosamund Stone Zander Trust**.  Sole owner:

- o **Rosamund Zander**, citizen of Massachusetts
- ▪ **Ridge Media Holdings, LLC – DE LLC**.  Sole member:
  - • **GEC Finance, LLC**.  Sole member:
    - o **Eldridge Industries, LLC**.  Members:
      - ▪ **SBT Investors, LLC**
        - • *See membership information above.*
      - ▪ **Echidna Capital, LLC**.  Members:
        - • **Anthony Minella and his family trust**, each of whom (including beneficiaries of the trust) are citizens of Connecticut
      - ▪ **Central Valley Administrators, Inc.** – Nevada corporation with its principal place of business in California.
      - ▪ **Bilbao-KCI, LLC**.  Sole member:
        - • **Bilbao Capital, LLC**.  Members:
          - o **SBT Investors, LLC**
            - ▪ *See membership information above.*
          - o **Kansas Common I, LLC**.  Sole member:
            - ▪ **Mark Walter**, citizen of Florida.
      - ▪ **Aribo Investments LLC**.  Sole member:
        - • **Dr. Richard Merkin**, citizen of California
      - ▪ **Palm SBC LLC**.  Sole member:
        - • **Brad Palmer**, citizen of Connecticut
      - ▪ **Kansas Common I, LLC**.  Sole member:
        - • **Mark Walter**, citizen of Florida
      - ▪ **EEH 2017, LLC**.  Members:
        - • **Blaine Hirsch**, citizen of Connecticut
        - • **Caitlin Hribar**, citizen of Connecticut
        - • **Claudia Harrison**, citizen of Connecticut
        - • **Colin O'Rourke Estate**, citizen of Massachusetts
        - • **Duncan Bagshaw**, citizen of Connecticut
        - • **Emily Bachman**, citizen of Connecticut
        - • **Jeff Wilbur**, citizen of Connecticut
        - • **Jill Christie**, citizen of Connecticut
        - • **John Kim**, citizen of New York
        - • **John Klein**, citizen of Connecticut
        - • **John McConnell**, citizen of Connecticut
        - • **Jonathan Bobb**, citizen of California
        - • **Karen Tierney**, citizen of New York
        - • **Kunal Arora**, citizen of New York
        - • **Liz Boudris**, citizen of New York
        - • **Mark DeAngelis**, citizen of Connecticut

- **Ricky Li**, citizen of New York
- **Robert Ott**, citizen of Connecticut
- **SBT Investors, LLC**
  - *See membership information above*
- **Shea Kiernan**, citizen of Connecticut
- **Tim Wickstrom**, citizen of New York
- **Todd Gilbert**, citizen of Connecticut
- **Tom Osterndorf**, citizen of Connecticut
- **EEH 2017-EC, LLC**.  Members:
  - **SBT Investors, LLC**
    - *See membership information above*
  - **EEH 2017, LLC**
    - *See membership information above*
- **Mason Portfolio Trust, LLC**.  Sole member:
  - **EPH, LLC**.  Sole member:
    - **EPH II, LLC**.  Sole member:
      - **EPH Holdings, LLC**.  Sole member:
        - **EPH Holdings II, LLC**.  Sole member:
          - **Eldridge Industries, LLC**
            - *See membership information above*
- **Burton Hill Holdings, LLC**.  Sole member:
  - **Robert L. Patton, Jr.**, citizen of Texas.
- **Domestic Private Equity Investors, LLC**.  Sole member:
  - **Texas Capitalization Resource Group, Inc** – Texas corporation with its principal place of business in Texas
- **WWB Holdings, LLC**.  Members:
  - **John Klein**, citizen of Connecticut
  - **Fulwell 73 Productions, LLP**.  Partners:
    - **Benjamin Boaz Turner** – citizen of the United Kingdom
    - **Gabriel Jeremy Simon Turner** – citizen of the United Kingdom
    - **Leo Daniel Pearlman** – citizen of the United Kingdom
    - **Benjamin Saul Winston** – citizen of the United Kingdom
    - **James Kimberly Corden** – citizen of the United Kingdom
- **Bear Creek Holdings LLC**.  Sole member:
  - **Michael Mahan**, citizen of California
- **Mosaic/DCP Investment LLC**.  Sole member:
  - **Allen Shapiro**, citizen of California
- **AS Gift Trust C** – citizen of California
- **MG Gift Trust** – citizen of California
- **Grosfeld Partners LLC**.  Members:
  - **James Grosfeld Trust under the James Grosfeld Trust Agreement dated 12/16/1988** – citizen of Michigan

- **Nancy Grosfeld Trust under the Nancy Grosfeld Trust Agreement dated 12/16/1988** – citizen of Michigan
- **Jason Grosfeld Trust under the Jason Grosfeld Trust Agreement dated 10/20/2007** – citizen of California

- **Flagstone One Company** – Delaware corporation with its principal place of business in Michigan
- **Flagstone Profit Sharing Plan** – qualified California retirement plan based in California
- **Group M Worldwide, LLC**.  Sole member:
  - WPP plc, a United Kingdom corporation with its principal place of business in London, England, United Kingdom
- **The James S. Kahn, Jr. Trust** (Permitted Transfer from James Kahn) citizen of California
- **The Lisa C. Kahn Trust** (Permitted Transfer from James Kahn) – citizen of California
- **The Stephanie L. Kahn Trust** (Permitted Transfer from James Kahn) – citizen of California
- **The Elliott R. Kahn Trust** (Permitted Transfer from James Kahn) – – citizen of California
- **Tenley Family Trust** (Permitted Transfer from Scott Tenley) – citizen of California
- **GRMRC Holdings, LLC** – Sole member:
  - George Rizk, citizen of Massachusetts
- **JSK/DRK Investments, LTD**.  Texas corporation with its principal place of business in California
- **Lincoln Meadows Associates, LLP**.  Partner:
  - Steven W. Farmer as Trustee of Normal Children Trust – citizen of Colorado
  - **Media RC Texas Partners, L.P.** – Partners:
    - **Media RC Genpar, LLC**. – Members:
      - Lee M. Bass – citizen of Texas
      - Gary W. Reese – citizen of Texas
      - Ardon E. Moore III – citizen of Texas
      - Thomas W. White – citizen of Texas
    - **Texas Limited Partnership** – Partners:
      - All general and limited partners are citizens of Texas
    - **Delaware Limited Partnership** – Partners:
      - All general and limited partners are citizens of Texas
- **Asif Satchu** – citizen of California
- **Mitch Silber** – citizen of New York
- **George Rizk** – citizen of Massachusetts
- **Adam Cohn** – citizen of California
- **Daniel Jacobs** – citizen of California

- **James Glander** – citizen of California
- **Jonathan Golfman** – citizen of California
- **Brye Adler** – citizen of California
- **Mark Phillips** – citizen of Northa Carolina
- **Michael Phillips** – citizen of California

## **EXHIBITS IN SUPPORT OF PLAINTIFF'S AMENDED COMPLAINT**

1.     The *Bromley* Complaint.

2.     ForeFront Portfolio 3.0 policy.

3.     Chubb denial letter no. 1.

4.     SXSW to Chubb denial letter.

5.     Chubb denial letter no. 2.

6.     Chubb Professional Portfolio policy.

7.     Chubb denial letter as to Professional Portfolio policy.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MARIA BROMLEY and KLEBER PAUTA, on behalf of themselves and all others similarly situated, | § § § § | CASE NO. 1:20-CV-439 |
| *Plaintiffs*, | § § | |
| vs. | § § | CLASS ACTION COMPLAINT |
| SXSW, LLC and SXSW HOLDINGS, INC., | § § § | |
| *Defendants*, | § § | **DEMAND FOR JURY TRIAL** |

**PLAINTIFFS' CLASS ACTION COMPLAINT**

Plaintiffs Maria Bromley and Kleber Pauta, individually, and on behalf of all others similarly situated, by and through counsel, bring this action against SXSW, LLC and SXSW Holdings, Inc. Plaintiffs' allegations herein are based upon personal knowledge and belief as to their own acts, upon the investigation of their counsel, and upon information and belief as to all other matters.

**<u>INTRODUCTION</u>**

1.     Plaintiffs bring this action on behalf of themselves and a class of similarly situated purchasers of wristbands, passes, badges and tickets to South by Southwest, an annual festival held in Austin, Texas.

2.     Defendants SXSW, LLC and SXSW Holdings, Inc. (collectively, "SXSW") are the entities that schedule, oversee, organize and manage South by Southwest, which consists of parallel film, interactive media, and music festivals and conferences that take place in mid-March.

1

3.      This year, the South by Southwest Festival was scheduled to be held from March 13 to March 22, 2020. Due to the spread of COVID-19, however, the City of Austin issued an order canceling the 2020 Festival.

4.      After learning of the cancellation, Plaintiffs and other similarly situated purchasers contacted SXSW for refunds. Instead of providing refunds for a festival that did not occur through no fault of Plaintiffs or the Class, SXSW offered only to allow purchasers to use their festival credentials to gain admission to one of the next three South by Southwest Festivals, as well as 50% off the walk-up rate during one of the other subsequent years.

5.      Plaintiffs and the Class do not necessarily plan to attend future Festivals, however, and even SXSW has acknowledged that future Festivals may not occur.

6.      SXSW also has confirmed that it will not provide refunds to Plaintiffs and the Class in connection with the cancellation of the 2020 Festival.

7.      Accordingly, Plaintiffs, on behalf of themselves and all other persons who purchased wristbands, tickets, passes, and badges to the 2020 South by Southwest Festival, bring this action for breach of contract and unjust enrichment in order to recover monies paid for a festival that never occurred.

**PARTIES**

**Plaintiff Maria Bromley**

8.      Plaintiff Maria Bromley is a resident of the Commonwealth of Massachusetts and currently resides in Hingham, Massachusetts.

9.      On or about February 3, 2020, Plaintiff Bromley purchased a "Platinum" badge from SXSW for approximately $1,670, which included $1,600 for registration and $70 for meals and merchandise.

2

Exhibit 1 - Page 3 of 20

10.     Once Plaintiff Bromley learned that the 2020 South by Southwest Festival was cancelled, she contacted SXSW by telephone to request a cash refund.

11.     SXSW's representative advised Plaintiff Bromley that it would not provide cash refunds in connection with the cancellation of the 2020 South by Southwest Festival.

12.     On or about March 9, 2020, Plaintiff Bromley sent an email to Reg@SXSW.com requesting a cash refund for the cancelled event. SXSW has failed to respond to her email.

13.     On or about April 1, 2020, Plaintiff Bromley received a separate email from SXSW offering to defer her badge to use for the 2021, 2022 or 2023 Festival. The email also states that the offer will expire on April 30, 2020.

### Plaintiff Kleber Pauta

14.     Plaintiff Kleber Pauta is a resident of Colorado and currently resides in Denver, Colorado.

15.     On or about November 25, 2019, Plaintiff Pauta purchased a badge from SXSW for approximately $1,020.

16.     On March 6, 2020, Plaintiff Pauta received an email message from SXSW stating that the Festival had been cancelled.

17.     Once Plaintiff Pauta learned that the 2020 South by Southwest festival had been cancelled, he emailed SXSW to request a cash refund.

18.     SXSW did not respond to Plaintiff Pauta's email message until April 23, 2020, when it informed him that its "stated registration policy has always been no refunds[,]" and SXSW would not issue him a refund in connection with the 2020 festival.

19.     On or about April 1, 2020, Plaintiff Pauta received a separate email from SXSW offering to defer his badge to use for the 2021, 2022 or 2023 Festival. The email also states that the offer will expire on April 30, 2020.

### Defendants

20.     SXSW, LLC is a Texas limited liability company with its principal place of business located at 1400 Lavaca Street, Austin, Texas. It may be served with process upon its registered agent for service of process, Sheri Furley at 1400 Lavaca Street, Suite 1100, Austin Texas 78701, or wherever she may be found.

21.     SXSW Holdings, Inc. is a Texas corporation with its principal place of business located in Austin, Texas.  It may be served with process upon its registered agent for service of process, Roland Swenson at 400 Bowie Street, Austin, Texas 78703, or wherever he may be found.

22.     Defendants are collectively referred to herein as "SXSW" or "Defendants."

### JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005, because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and Defendants are citizens of different States.

24.     This Court has personal jurisdiction over SXSW because both SXSW, LLC and SXSW Holdings, Inc. are formed under the laws of the State of Texas, have corporate headquarters located in Austin, Texas, conduct substantial business in the District, and a substantial part of the acts and omissions complained of occurred in the District.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants are headquartered in this district, transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this District. In addition, the agreement into which SXSW entered with Plaintiffs and every member of the Class contains a forum selection clause that vests exclusive jurisdiction over this action "in United States federal and state courts located in Austin, Texas".

## FACTUAL ALLEGATIONS

**The South by Southwest Festival**

26.     SXSW hosts the South by Southwest Festival annually in mid-March, in Austin, Texas.

27.     The Festival consists of multiple "tracks" of programming relating to film, interactive media, music, gaming, conferences and musical performances.

28.     In order to gain admission to the Festival and programming tracks, attendees are required to purchase wristbands, tickets, passes, or badges.

29.     SXSW offers "Interactive," "Film" or "Music" badges that provide "primary entry to programming associated with their badge type and . . . secondary access to most other SXSW events[,]" as well as communal amenities such as food courts, awards shows and expositions.[1] For the 2020 Festival, the cost of each of these badges ranged from $1,020 to $1,395, depending on when the badge was purchased and whether any additional options were purchased.

---

[1] https://www.sxsw.com/attend/#chart

30.     SXSW also offers "Platinum" badges, which grant primary access to all official SXSW events. For the 2020 Festival, the Platinum badge cost approximately $1,700 depending on the purchase date.

31.     Attendees also may purchase Film festival, Music festival or Gaming Expo wristbands, which cost upwards of $225 for the 2020 festival.

32.     After accounting for travel and room and board, participants who plan to attend the festival in its entirety can expect to spend thousands of dollars.

33.     SXSW collectively refers to wristbands, tickets, passes, and badges as "Credentials," and makes them available for purchase through its website.

34.     In order to purchase Credentials, SXSW requires purchasers to agree to its Participation and Credentials Terms and Conditions ("PCT&C"), a copy of which are attached hereto as **Exhibit A**. The PCT&C include several provisions relevant to this action.

35.     The PCT&C contain a choice-of-law provision that states they "are governed by the laws of the State of Texas, without regard to its principles of conflicts of laws[,]" and that "Participant[s] and SXSW [t]hereby irrevocably submit to the exclusive jurisdiction of the United States federal and state courts located in Austin, Texas . . . ." Texas law thus governs the claims of each and every Class member.

36.     The PCT&C also include a "Refund and Revocation Policy" that provides that "SXSW may, in its sole discretion and at any time determined by SXSW, cancel, revoke, or refuse . . . Credentials, purchases, and/or hotel reservations made through SXSW." The Refund and Revocation Policy also states that SXSW "does not issue refunds under any circumstances" and that "[a]ny and all payments made to SXSW are not refundable for any reason[.]"

6

37.     Through the Refund and Revocation Policy SXSW purports to reserve the right to retain any and all monies paid for credentials and passes regardless of whether SXSW elects to put on the festival.

38.     If enforced, however, the Refund and Revocation policy would render the PCT&C an unenforceable, illusory, unilateral option contract that allows SXSW to sell Credentials, cancel the Festival for any or no reason whatsoever, and retain all customer payments while leaving Plaintiffs and the Class without a remedy.

39.     Accordingly, the SXSW Refund and Revocation policy is unlawful, unconscionable and unenforceable.

40.     However, the PCT&C also incorporate a severability clause that states, in pertinent part, that "[i]n the event that any term or provision of these Terms is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other term or provision hereof (which will remain in effect) . . . ." The PCT&C, and its choice of law provision, thus remain enforceable, notwithstanding the invalidity and unenforceability of the Refund and Revocation policy.

**The 2020 South by Southwest Festival**

41.     The 2020 Festival was scheduled to run from March 13, 2020 until March 22, 2020.

42.     Despite reports of COVID-19 spreading during early 2020, on February 28, 2020, SXSW informed the public that the SXSW 2020 event was "proceeding as planned" and that despite some cancellations, the event was on par with past years.[2] SXSW then allowed prospective attendees to continue to purchase tickets.

---

[2] https://twitter.com/sxsw/status/1234612205531934726 (last visited Apr. 22, 2020).

43.     On March 6, 2020, the 2020 Festival was canceled due to the COVID-19 pandemic and the City of Austin's local state of emergency declaration.

44.     On March 12, 2020, in response to mounting requests for refunds by ticketholders due to the cancelled 2020 Festival, SXSW issued a statement stating that no refunds would be provided for 2020 festival ticket purchases.[3]

45.     Instead of providing refunds, SXSW offered the ability to "[d]efer your badge to 2021, 2022, or 2023, and [g]et 50% off the walk-up rate in an alternate year of your choosing between 2021 and 2023[.] This offer is non-transferable and available only to you."[4]

46.     SXSW has acknowledged, however, that it cannot be certain that future festivals will occur.

47.     SXSW has, in effect, shifted the burden of the COVID-19 pandemic onto festivalgoers like Plaintiffs and the Class, individuals who in these desperate times may sorely need the money they paid to SXSW for a festival that never occurred.

## CLASS ALLEGATIONS

48.     Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons in the United States who purchased Credentials for the 2020 South by Southwest festival in Austin, Texas.

Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; and (c) the judge assigned to this matter, the judge's staff, and any member

---

[3] https://www.sxsw.com/news/2020/sxsw-update-registration-deferral-details-and-more/ (last visited Apr. 22, 2020).
[4] *Id.*

8

of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

49. **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class consists of hundreds of thousands of people. The number of Class members can be determined based on SXSW's records.

50. **Commonality**: Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to

    a.   Whether SXSW should be required to provide refunds for its 2020 festival;

    b.   Whether SXSW breached the PCT&C by refusing to issue refunds for the 2020 festival;

    c.   Whether SXSW's Refund and Revocation Policy is severable from the PCT&C;

    d.   Whether SXSW was unjustly enriched by its conduct; and

    e.   Whether SXSW has converted monies Plaintiffs and the Class paid for Credentials.

51. **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and Class members' claims all arise out SXSW's uniform conduct and statements.

52. **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class, and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

53. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by SXSW's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly-situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIOLATIONS ALLEGED

## COUNT I

## BREACH OF CONTRACT

54. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

55. Plaintiffs and the Class entered into a contract with SXSW, which SXSW refers to as the Participation and Credentials Terms and Conditions.

56.     The contract was offered by SXSW and was formed at the time Plaintiffs and the Class accepted it by purchasing their credentials.

57.     Plaintiffs and the Class performed their obligations under the contract by providing payment in consideration for Credentials.

58.     When the 2020 Festival was cancelled, however, SXSW refused to refund Plaintiffs and the Class the purchase price paid for Credentials.

59.     SXSW refused to provide refunds on grounds that the Participation and Credentials Terms and Conditions state that SXSW "does not issue refunds under any circumstances" and that "[a]ny and all payments made to SXSW are not refundable for any reason[.]"

60.     The foregoing "Refund and Revocation Policy" provision on which SXSW relied is unlawful and unenforceable, because enforcing the provision would render SXSW's obligations under the agreement illusory, and thus the Participation and Credentials Terms and Conditions themselves an unenforceable, unilateral option contract.

61.     Because the Refund and Revocation Policy unenforceable, it is severed from the contract, allowing Plaintiffs and the Class to pursue the relief to which they are entitled: a refund of all monies paid to SXSW for Credentials for the 2020 festival.

62.     As a direct and proximate result of SXSW's breach, Plaintiffs and the Class have suffered monetary damages.

63.     Plaintiffs and the Class seek the return of any amounts paid to SXSW for Credentials, as well as attorneys' fees, costs and interest.

## COUNT II

## UNJUST ENRICHMENT

64.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint

65.     Plaintiffs and the Class conferred a direct benefit on SXSW by purchasing Credentials.

66.     SXSW knowingly and willingly accepted and enjoyed the benefits conferred on it by Plaintiffs and the Class.

67.     SXSW's retention of these benefits is unjust and inequitable under the circumstances.

68.     As a direct and proximate result of SXSW's unjust enrichment, Plaintiffs and the Class are entitled to recover the amount each paid to SXSW for their Credentials, as well as attorneys' fees, costs and interest.

## COUNT III

### CONVERSION

69.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint

70.     Plaintiffs and the Class are entitled to a refund of monies paid in exchange for 2020 South by Southwest Festival credentials because the festival was cancelled.

71.     Plaintiffs and the Class have demanded that SXSW return their property

72.     SXSW has refused to issue refunds to Plaintiffs and the Class, and thus has, unlawfully and without authorization, assumed and exercised dominion and control over that property to the exclusion of, or inconsistent with, the rights of Plaintiffs and the Class.

73.     SXSW's conversion has damaged Plaintiffs and the Class in the amount that they paid for 2020 Festival credentials.

74.     Plaintiffs and the Class are entitled to recover the amount each paid to SXSW for their Credentials, as well as attorneys' fees, costs and interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B. Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C. Award actual damages and equitable monetary relief to Plaintiffs and the Class and/or order SXSW to return to Plaintiffs and the Class the amount each paid to SXSW;

D. Award pre-judgment and post-judgment interest on such monetary relief;

E. Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires SXSW to issue refunds to all members of the Class;

F. Award reasonable attorneys' fees and costs; and

G. Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Dated: April 24, 2020

Respectfully submitted,

HOWRY BREEN & HERMAN, L.L.P.

Randy Howry
State Bar No. 10121690
rhowry@howrybreen.com
Sean Breen
State Bar No. 00783715
sbreen@howrybreen.com
James Hatchitt
State Bar No. 24072478
jhatchitt@howrybreen.com
1900 Pearl Street
Austin, Texas 78705-5408
Tel. (512) 474-7300
Fax (512) 474-8557

Joseph G. Sauder
jgs@sstriallawyers.com
Lori G. Kier
lgk@sstriallawyers.com
Joseph B. Kenney
jbk@sstriallawyers.com
SAUDER SCHELKOPF LLC
1109 Lancaster Ave.
Berwyn, PA 19312
Tel. (888)-711-9975
Fax (610) 421-1326

Daniel O. Herrera
dherrera@caffertyclobes.com
Kaitlin Naughton
knaughton@caffertyclobes.com
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
150 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel. (312)782-4880
Fax (312)782-7785

Bryan L. Clobes
bclobes@caffertyclobes.com
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
205 N. Monroe St.

14

Media, PA 19063
Tel. (215) 864-2800
Fax (215) 964-2808

*Attorneys for Plaintiffs and the Class*

# EXHIBIT A

Exhibit 1 - Page 17 of 20

March 13–22, 2020 Austin, TX   ☐ Dates & Deadlines

Attendee Safety    Attend    Housing & Travel    Sponsors    Attendee Hub    Merch    SXSW Official YouTube    SXSWorld®

MENU

# PARTICIPATION AND CREDENTIALS TERMS AND CONDITIONS

SXSW, LLC ("SXSW") is proud to produce our family of events, including SXSW® Conference & Festivals, SXSW EDU® Conference & Festival, and SXSW Gaming ("Event(s)").

These SXSW Participation and Credentials Terms and Conditions (the "Terms") apply to you as a participant in any SXSW Events and any individual who is making a purchase on behalf of ("you" "your" or "Participant"), and such Participant's registration, attendance, participation, enrollment, and/or application for involvement in the Events, including, without limitation, your purchase and/or possession of any SXSW Event entry credential(s) whether physical or digital, such as wristbands for the SXSW Music Festival, SXSW Film Festival, SXSW Gaming (collectively referred to as "Wristbands"), badges, tickets, passes, and giveaways (Wristbands, tickets, passes and badges are collectively referred to as "Credential(s)"). By clicking "accept" below, and/or by obtaining your Credentials you acknowledge and agree to these Terms.

1. **Applicable Terms.** Paragraphs 1-21 below apply in full if Participant is purchasing Credential(s). If Participant is not purchasing Credential(s) and is only applying for a SXSW program, including, without limitation, an awards program, competition, or other opportunity to demonstrate, display or present an original idea, concept or other work, then only Paragraphs 1-3; 9-21 below apply to Participant.

2. **Official SXSW Credentials and Applications.**
     a. Credentials. SXSW and its agents and representatives are the sole creators, sellers and distributors of SXSW Credentials. Any Credential(s) not created by and legally acquired from SXSW or its authorized agents or representatives will be considered fraudulent and invalid, and subject to revocation. SXSW reserves the right to pursue any and all legal action available against any person or entity involved in the actual or attempted creation, dissemination or use of an unauthorized Credential.
     b. Applications. Any application to participate in SXSW must be submitted through cart.sxsw.com. Any applications not located on cart.sxsw.com do not constitute official SXSW applications.

3. **Refund & Revocation Policy.** No SXSW application fees are refundable. All Credentials are the sole property of SXSW. SXSW may, in its sole discretion and at any time determined by SXSW, cancel, revoke, or refuse from any individual or company the following: Credentials, purchases, and/or hotel reservations made through SXSW. SXSW will not be responsible for any penalty, fee, loss, or expense that might result from such action.
     a. SXSW does not issue refunds under any circumstances. Any and all payments made to SXSW are not refundable for any reason, including, without limitation, failure to use Credentials due to illness, acts of God, travel-related problems, acts of terrorism, loss of employment and/or duplicate purchases. SXSW will not issue refunds for Credentials that have been revoked.
     b. Unused Credentials have no monetary value and cannot be credited to future years or events. SXSW will not issue refunds or credits due to failure to redeem a discount coupon during the registration process. Discounted prices are based on the date payment is received in the SXSW office.
     c. Lost or stolen Credentials will not be replaced. In the event Credentials are lost or stolen, new Credentials will need to be purchased at the full price in effect at that time for a Participant's continued access to the Events, including, without limitation, showcases, parties and conference content.
     d. Use of a Credential by anyone other than the authorized individual will result in revocation of the Credential without a refund.
     e. Before February 14, 2020, SXSW will change the Participant name on SXSW EDU and SXSW Platinum, Interactive, Film, and Music Credentials (other than Wristbands) for a processing fee of $125 per Credential. On or after February 14, 2020, the processing fee will be $175 per Credential. Wristbands are non-transferable. Name changes will not be made after a Credential has been issued.

4. **Credentials are Non-Transferable.** SXSW Credentials are issued to, can be picked up by, and used by only the Participant named in the registration. Credentials are non-transferable after they have been picked up.

5. **Wearing Credentials is Required for Entry.** For security reasons, and to allow entry into SXSW Event(s), Participant must wear, possess and present their Credential as follows: badges must be on the SXSW-issued lanyard around Participant's neck while participating in Events, Wristbands must be securely affixed to the Participant's wrist and remain on the Participant's wrist throughout the SXSW Events, and digital Credentials must be presented by the Participant on a digital device in their possession. No other laminates may be worn on the SXSW lanyard for the badge to be valid. If a Credential is not worn or presented correctly by a Participant, SXSW

Participation & Credentials Terms | SXSW Conference & Festivals     https://www.sxsw.com/attend/participation-credentials-terms-conditions/

Case 1:20-cv-00433-SH Document 51 Filed 04/24/23 Page 48 of 171

Exhibit 1 - Page 18 of 20

March 13–22, 2020 Austin, TX  ☐ Dates & Deadlines

Attendee Safety    Attend    Housing & Travel    Sponsors    Attendee Hub    Merch    SXSW Official YouTube    SXSWorld®

MENU

venue capacity and age restrictions in compliance with state and local laws. Age restrictions and capacity are specific to each venue. Venues may each have their own restrictions limiting entry with certain foods, beverages, or other items such as chairs or bags that are non-transparent or do not fit specified dimensions. Wristbands are valid Credentials for specific Events applicable to the Wristband type, but will not afford the Participant access to: the SXSW Trade Show, conference and keynote sessions, or other SXSW conference activities, unless SXSW specifies otherwise.

7. **Credentials Cannot be Prizes.** SXSW Credentials may not be used as a prize or incentive in any form of promotion, contest, game, or sweepstakes without advance written approval from SXSW.

8. **No Tampering with Credentials.** Tampering with any Credentials, including, without limitation, Wristbands (e.g., stretching, tearing, cutting, taping, etc.) is not permitted. If tampering is evident, the applicable Credential will be invalidated and confiscated and Participant will not be allowed entry to any/all SXSW venues and Events where the Credential is required.

9. **SXSW Lost and Found.** SXSW is not responsible for lost or damaged items dropped off at the Registration Help Desks during the Events. Lost and Found will be located at Registration during the Events. Participants can drop off found items at the Registration Help Desks during the Events. Participants can also email a description of the item and the location it was lost/found to reg@sxsw.com. After ninety (90) days following the event, unclaimed lost and found items may be disposed of at SXSW's discretion.

10. **Image Release.** Photographs and/or audio/video recordings taken at the Events by SXSW, or others on behalf of SXSW, may include a Participant's image, name, voice and/or likeness. By attending and/or participating in the Events, Participant hereby grants SXSW permission to use, and to sublicense to third-parties, the Participant's photograph, image, likeness, voice and statements for any purpose, including, without limitation, commercial purposes, without compensation or credit to the Participant, in any and all media now known or hereafter devised. Participant further acknowledges and agrees to the Photo and Video Policy applicable to the Event that Participant is participating in or purchasing a Credential to attend, which policies are incorporated herein by this reference. (See [SXSW Attendee Photo and Video Policy] (https://www.sxsw.com/attendee-photo-video-policy/), SXSW EDU Attendee Photo and Video Policy, and the SXSW Gaming Attendee Photo and Video Policy).

11. **Code of Conduct.** Participant hereby agrees to the [Code of Conduct](https://www.sxsw.com /attend/code-of-conduct/) applicable to the Event Credentials Participant is purchasing (See the SXSW Code of Conduct, SXSW EDU Code of Conduct, SXSW Gaming Code of Conduct). If SXSW determines that a Participant violated the SXSW Code of Conduct, SXSW reserves the right, in its sole discretion, to revoke that Participant's Credentials without refund to Participant.

12. **Weapons-Free Policy.** SXSW is a private event and maintains a [Weapons-Free Policy] (https://www.sxsw.com/weapons-free-policy/) for the Events. Participant is prohibited from carrying weapons of any kind, including, without limitation, concealed or displayed firearms, and are not permitted to bring weapons onto the premises of any SXSW Events. Participant's bags may be checked prior to entering a venue by: (a) SXSW and its employees, contractors and/or representatives; (b) the venue for SXSW Events; and/or (c) SXSW clients or their representatives. SXSW reserves the right, in its sole discretion, without refund to Participant, to deactivate and/or revoke the Credentials of a Participant if such Participant violates this Weapons-Free Policy. Participant agrees that this policy is in force, and agrees to comply with the policy, regardless of whether signs prohibiting weapons are posted on the premises of any official SXSW Event.

13. **Voluntary Participation & Assumption of Risk.** Participant understands that participating in the Events is voluntary and may involve certain risks of physical injury, damage to property, and other damages or losses that may be sustained by a Participant. Participant assumes all risk of damage, property loss, and/or personal injury which may occur by participating in the Events.

14. **Additional SXSW Policies.** Participant has read, understands, and agrees to the Terms of Use, Privacy Policy and RFID Policy applicable to the Event Participant is participating in or purchasing a Credential to attend, which policies are incorporated herein by this reference. (See the SXSW [Terms of Use](https://www.sxsw.com/terms-of-use/), [Privacy Policy](https://www.sxsw.com /privacy-policy/), and [RFID Policy](https://www.sxsw.com/rfid), the SXSW EDU Terms of Use, Privacy Policy and RFID Policy, and the SXSW Gaming Terms of Use, Privacy Policy and RFID Policy).

15. **Personal Information.** The SXSW website uses cookies as a collection tool along with personal data that you share with SXSW to tailor marketing to your interests, deliver the goods/services you purchase from SXSW, and to enhance and customize your experience on the SXSW website and at the event. Be sure to review the applicable SXSW Privacy Policy (See the [SXSW Privacy Policy](https://www.sxsw.com/privacy-policy/), SXSW EDU Privacy Policy and SXSW Gaming Privacy Policy) for more information about how SXSW collects and uses personal data, and to

March 13–22, 2020 Austin, TX   ☐ Dates & Deadlines

Attendee Safety     Attend     Housing & Travel     Sponsors     Attendee Hub     Merch     SXSW Official YouTube     SXSWorld®

MENU

FOR LOSS OF BUSINESS PROFITS OR OTHER PECUNIARY LOSS, INCLUDING ANY DIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE OR SIMILAR DAMAGES, ARISING OUT OF ANY PARTICIPANT'S USE OF THE CREDENTIALS AND/OR PARTICIPATION IN THE EVENTS, EVEN IF SXSW HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

17. **NO WARRANTIES.** EXCEPT AS MAY BE EXPRESSLY SET FORTH IN THESE TERMS, PARTICIPANT'S PARTICIPATION IN THE EVENTS, AND ALL SERVICES AND PRODUCTS PROVIDED IN CONNECTION WITH THE EVENTS, ARE PROVIDED "AS IS" WITHOUT ANY WARRANTY OF ANY KIND, AND NO OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED, OR OTHERWISE, ARE MADE WITH RESPECT TO THE SAME, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR SAFETY, OR ANY WARRANTIES THAT MAY ARISE FROM COURSE OF DEALING. SXSW EXPRESSLY DISCLAIMS ANY WARRANTIES NOT EXPRESSLY STATED HEREIN.

18. **Indemnification.** Participant agrees to indemnify, defend, and hold SXSW and its officers, employees, volunteers, contractors, suppliers, and representatives harmless from and against any and all claims, demands and all other liabilities, including, without limitation, costs and attorneys' fees, made by any third party arising out of or in connection with Participant's use of the registration(s) or Credentials, or any violation of the Terms by Participant.

19. **Choice of Law.** These Terms are governed by the laws of the State of Texas, without regard to its principles of conflicts of laws. Participant and SXSW hereby irrevocably submit to the exclusive jurisdiction of the United States federal and state courts located in Austin, Texas and agrees that any such court will be the proper forum for the determination of any dispute arising hereunder.

20. **Updates to Terms.** SXSW reserves the right to make changes to the Terms at any time without notice to Participant, so please check back and review the Terms from time to time.

21. **General Provisions.** Nothing in this agreement establishes an agency, partnership or joint venture between the parties, or relationship of employer or employee, between the parties (or between either party and the other party's personnel). Headings are included for convenience only and will not be used to construe these Terms. In the event that any term or provision of these Terms is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other term or provision hereof (which will remain in effect), and the parties agree thereafter to use their best efforts to substitute a provision of similar economic intent and effect.





THE AUSTIN
CHRONICLE

## STAY TUNED

Email*

SUBSCRIBE

Sign up to receive the latest announcements, tips, networking invitations and more.

**FOLLOW US**

About
About SXSW
History
Community
Careers
SXSW Email Hub
SXSWorld® Magazine
Photo Galleries
Merch
Contact Us

SXSW Events
SXSW EDU®

Press
Press Center
Press Accreditation

Sales & Sponsorship
Marketing at SXSW
Sponsorship Opportunities
Exhibitions Opportunities
Advertising Opportunities
Custom Opportunities

Attending SXSW
Registration Info
Housing Info

March 13–22, 2020 Austin, TX    ☐ Dates & Deadlines

Attendee Safety    Attend    Housing & Travel    Sponsors    Attendee Hub    Merch    SXSW Official YouTube    SXSWorld®

MENU

SXSW Accessibility

Participation & Credentials Terms

Registration & Housing FAQ

Technology Partners

©2019-2020 SXSW, LLC. SXSW®, SXSW EDU®, and South by Southwest® are trademarks owned by SXSW, LLC. Any unauthorized
use of these names, or variations of these names, is a violation of state, federal, and international trademark laws.

Privacy Policy | Trademark Guidelines | Terms of Use | Copyright Notice

**CHUBB** **Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*$^{SM}$
*General Terms and Conditions*

**GTC DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws
of Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN  46204-1927

**Policy Number:** 8251-9627

**NOTICE: THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD.  THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.  READ THE ENTIRE POLICY CAREFULLY.**

**Item 1.**   **Parent Organization:**   SXSW LLC

 **Principal Address:**   P. O. Box 685289

 Austin, TX 78768

**Item 2.**   **Policy Period:**

 (A)  From:   August 17, 2019

 (B)  To:   August 17, 2020

 At 12:01 AM local time at the address shown in Item 1.

**Item 3.**   **A Combined Maximum Aggregate Limit of Liability applies:**

 ☐ Yes   ☒ No

 The Combined Maximum Aggregate Limit of Liability for all **Claims** under all **Liability Coverage Parts** shall be:

 Not Applicable

**Item 4.**   **Coverage applicable to this Policy:**

 ☒ Directors & Officers and Entity Liability Coverage Part

 ☒ Employment Practices Liability Coverage Part

 ☐ Fiduciary Liability Coverage Part

 ☐ Miscellaneous Professional Liability Coverage Part

 ☐ Employed Lawyers Liability Coverage Part

Exhibit 2 - Page 2 of 36

CHUBB®  **Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*General Terms and Conditions*

| X | CyberSecurity Coverage Part |
| | Crime Coverage Part |
| | Kidnap Ransom and Extortion Coverage Part |
| | Workplace Violence Expense Coverage Part |

**Item 5.**   **Extended Reporting Period:**

(A) Additional Period:        1 year

(B) Additional Premium:    100 % of Annual Premium

In witness whereof, the Company issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

**FEDERAL INSURANCE COMPANY**

_____
Secretary


08/15/2019
_____
Date

_____
President


_____
Authorized Representative

CHUBB'   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*General Terms and Conditions*

In consideration of payment of the premium and subject to the Declarations and the limitations, conditions, provisions and other terms of this Policy, the Company and the Insureds agree as follows:

## I.   TERMS AND CONDITIONS

Except for these General Terms and Conditions or unless stated to the contrary in any Coverage Part, the terms and conditions of each Coverage Part apply only to that Coverage Part. If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part. All references to "Section", "Subsection", "Paragraph" or "Subparagraph" in these General Terms and Conditions shall apply only to these General Terms and Conditions, unless otherwise stated. All references to "Section", "Subsection", "Paragraph" or "Subparagraph" in a Coverage Part, shall apply only to such Coverage Part, unless otherwise stated.

## II.   DEFINITIONS

**Anniversary Date** means the date and time exactly one (1) year after the date and time set forth in Item 2(A), Policy Period, of the GTC Declarations and each succeeding date and time exactly one (1) year after the previous **Anniversary Date**.

**Claim** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Coverage Event** means the event or loss which must occur or be sustained or discovered, in order to invoke coverage under each **Non-Liability Coverage Part**.

**Defense Costs** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Expense** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Insured** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Insured Person** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Liability Coverage Part** means:

(A)   the Directors & Officers and Entity Liability, Employment Practices Liability, Fiduciary Liability, Employed Lawyers Liability and Miscellaneous Professional Liability Coverage Parts; and

(B)   Insuring Clause (A), Cyber Liability Coverage, of the CyberSecurity Coverage Part,

if purchased as set forth in Item 4, Coverage applicable to this Policy, of the GTC Declarations.

**Loss** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Non-Liability Coverage Part** means:

(A)   the Crime, Kidnap Ransom and Extortion and Workplace Violence Expense Coverage Parts; and

(B)   Insuring Clauses (B), Privacy Notification and Crisis Management Expenses Coverage; (C), Reward Expenses Coverage; (D), E-Business Interruption and Extra Expenses Coverage; (E), E-Threat Expenses Coverage and (F), E-Vandalism Expenses Coverage, of the CyberSecurity Coverage Part,

if purchased as set forth in Item 4, Coverage applicable to this Policy, of the GTC Declarations.

**Organization** means the **Parent Organization** and any **Subsidiary**. **Organization** shall also mean any such entity as a debtor in possession under United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

**Parent Organization** means the entity named in Item 1 of the GTC Declarations.

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**[SM]
**General Terms and Conditions**

**Policy Period** means the period of time set forth in Item 2 of the GTC Declarations, subject to any prior termination in accordance with Section X, Termination of Policy.

**Policy Year** means the period, within the **Policy Period**, from the date and time set forth in Item 2(A), Policy Period, of the GTC Declarations to the first **Anniversary Date**, or the period from an **Anniversary Date** to its next succeeding **Anniversary Date**, subject to any prior termination in accordance with Section X, Termination of Policy.

**Potential Claim** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Related Claims** means all **Claims** for **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

**Securityholder Derivative Demand Evaluation Costs** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Subsidiary** means:

(A)   any entity while more than fifty percent (50%) of the outstanding securities representing the present right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers or equivalent positions of such entity are owned, or controlled, by the **Parent Organization**, directly or through one or more **Subsidiaries**;

(B)   any entity while:

  (1)   exactly fifty percent (50%) of the voting rights representing the present right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers or equivalent positions of such entity are owned, or controlled, by the **Parent Organization**, directly or through one or more **Subsidiaries**; and

  (2)   the **Parent Organization**, pursuant to a written contract with the owners of the remaining and outstanding voting stock of such entity, solely controls the management and operation of such entity; or

(C)   any foundation, charitable trust or political action committee while such entity is controlled by the **Parent Organization**.

**Voluntary Program Loss** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Voluntary Program Notice** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Wrongful Act** shall have the meaning ascribed to that term in each applicable Coverage Part.

---

**III.   LIMIT OF LIABILITY**

(A)   With respect to the **Liability Coverage Parts**:

  (1)   If the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations is elected, the amount stated in such Item 3 shall be the maximum aggregate limit of liability of the Company for all **Loss**, **Voluntary Program Loss** and **Securityholder Derivative Demand Evaluation Costs** during each **Policy Year** under all **Liability Coverage Parts** combined. However, any **Loss**, **Voluntary Program Loss** or **Securityholder Derivative Demand Evaluation Costs** paid under any **Liability Coverage Part** shall not exceed the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations of such Coverage Part.

  (2)   If the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations is not elected, the maximum aggregate limit of liability of the Company for all **Loss**, **Voluntary Program Loss**, and **Securityholder Derivative Demand Evaluation Costs** during each **Policy Year** under each **Liability Coverage Part** shall be the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations for each **Liability Coverage Part**.

(3) **Defense Costs** are part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations of each **Liability Coverage Part** and payment by the Company of **Defense Costs** shall reduce and may exhaust such Limits of Liability.

(B) With respect to the **Non-Liability Coverage Parts**, the Company's maximum liability shall be the Limits of Liability set forth in the Declarations of each **Non-Liability Coverage Part**.

## IV.  RELATED CLAIMS

With respect to the **Liability Coverage Parts**:

(A) All **Related Claims** shall be deemed a single **Claim** made in the **Policy Year** in which the earliest of such **Related Claims** was first made or first deemed to have been made in accordance with the Reporting section of the applicable **Liability Coverage Part** (the "Earliest Related Claim").

(B) All **Related Claims** shall be subject to the same Retention and Limits of Liability applicable to the Earliest Related Claim.

## V.  EXTENDED REPORTING PERIOD

With respect to the **Liability Coverage Parts**:

(A) If this Policy does not renew or otherwise terminates for a reason other than for failure to pay premium (each a "Termination of Coverage"), then an **Insured** shall have the right to purchase an Extended Reporting Period for the Additional Period and Additional Premium set forth in Item 5 of the GTC Declarations.

(B) In the event of a Termination of Coverage and upon request from an **Insured**, the Company shall, in its sole discretion, provide a quote for Additional Periods other than as set forth in Item 5, Extended Reporting Period, of the GTC Declarations. Any such additional quote offered shall be subject to such Additional Premium as the Company may require.

(C) The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

(D) This right to purchase an Extended Reporting Period shall lapse unless written notice of election to purchase the Extended Reporting Period, together with payment of the applicable Additional Premium, is received by the Company within sixty (60) days after the effective date of the Termination of Coverage.

(E) If an Extended Reporting Period is purchased, then coverage otherwise afforded by this Policy shall be extended to apply to **Claims**: (1) first made during such Extended Reporting Period; and (2) reported to the Company pursuant to the Reporting section of the applicable Coverage Part, but only to the extent such **Claims** are for **Wrongful Acts** before the effective date of such Termination of Coverage or the date of any conversion of coverage described in Section VI, Changes in Exposure, whichever is earlier. Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the **Policy Year** immediately preceding the Extended Reporting Period.

(F) The entire premium for the Extended Reporting Period shall be deemed fully earned at the inception of such Extended Reporting Period.

(G) The limit of liability for the Extended Reporting Period is part of and not in addition to any maximum aggregate limit of liability for the **Policy Year** immediately preceding the Extended Reporting Period.

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>

*General Terms and Conditions*

---

**VI.   CHANGES IN EXPOSURE**

(A)   **Acquisition of Another Organization**

(1)   If before or during the **Policy Period** an **Organization** acquires voting rights in another entity such that the acquired entity becomes a **Subsidiary**,

(2)   then coverage shall be provided for such **Subsidiary** and its **Insureds** with respect to any:

(a)   **Liability Coverage Part**, solely for **Claims** for **Wrongful Acts** after such acquisition; or

(b)   **Non-Liability Coverage Part**, solely after the effective date of such acquisition subject to the Liability for Prior Losses section of such **Non-Liability Coverage Part**.

(B)   **Cessation of Subsidiaries**

(1)   If before or during the **Policy Period** an **Organization** ceases to be a **Subsidiary**,

(2)   then with respect to any:

(a)   **Liability Coverage Part**, coverage for such **Subsidiary** and its **Insureds** shall continue until termination of this Policy in accordance with Section VI(C), Conversion of Coverage Under Certain Circumstances, or Section X, Termination of Policy, whichever occurs first, but only for **Claims** for **Wrongful Acts** while such **Organization** was a **Subsidiary**; or

(b)   **Non-Liability Coverage Part**, such **Subsidiary** and its **Insureds** shall cease to be **Insureds** as of the effective date of such cessation and coverage under this Policy shall apply as provided in such **Non-Liability Coverage Part**.

(C)   **Conversion of Coverage Under Certain Circumstances**

(1)   If during the **Policy Period** any of the following events occur:

(a)   another entity, person or group of entities or persons acting in concert, acquires more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of directors, trustees, members of the Board of Managers or management committee members of the **Parent Organization**;

(b)   the acquisition of all or substantially all of the **Parent Organization's** assets, by another entity, person or group of entities or persons acting in concert, or the merger of the **Parent Organization** into or with another entity such that the **Parent Organization** is not the surviving entity; or

(c)   the **Parent Organization** emerges from bankruptcy as of the effective date stated in the plan of reorganization,

(2)   then:

(a)   any applicable coverage under this Policy with respect to:

(i)   any **Liability Coverage Part**, shall continue until the expiration of the current **Policy Period**, solely for **Claims** for **Wrongful Acts** prior to such event;

(ii)   the Crime Coverage Part, shall terminate subject to Exclusions III(C), Loss Sustained Option, or III(D), Loss Discovered Option, of such Coverage Part;

(iii)   the Kidnap Ransom and Extortion Coverage Part, shall terminate subject to Exclusion III(A)(9), Notice, of such Coverage Part;

(iv)   the Workplace Violence Coverage Part, shall terminate subject to Exclusion III(E) Notice, of such Coverage Part; or

(v)   Insuring Clauses (B), Privacy Notification and Crisis Management Expenses Coverage; (C), Reward Expenses Coverage; (D), E-Business Interruption and

CHUBB° Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0$^{SM}$*
*General Terms and Conditions*

Extra Expenses Coverage; (E), E-Threat Expenses Coverage and (F), E-Vandalism Expenses Coverage, of the CyberSecurity Coverage Part, shall continue until the expiration of the current **Policy Period** solely for **Expense** first incurred prior to such event;

(b) the **Parent Organization** shall give written notice of such event to the Company as soon as practicable together with such information as the Company may require; and

(c) the entire premium for this Policy shall be deemed fully earned as of the effective date of such event.

## VII.   SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES

With respect to the **Liability Coverage Parts**, coverage under this Policy shall extend to **Claims** for **Wrongful Acts** of an **Insured Person** made against:

(A) the lawful spouse or domestic partner of such **Insured Person** solely by reason of such spouse or domestic partner's status as a spouse or domestic partner, or such spouse or domestic partner's ownership interest in property which the claimant seeks as recovery for an alleged **Wrongful Act** of such **Insured Person**; or

(B) the estate, heirs, legal representatives or assigns of such **Insured Person** if such **Insured Person** is deceased, or the legal representatives or assigns of such **Insured Person** if such **Insured Person** is legally incompetent, insolvent or bankrupt,

provided that no coverage afforded by this Section VII shall apply with respect to any loss arising from an act, error or omission by an **Insured Person's** spouse, domestic partner, estate, heirs, legal representatives or assigns.

## VIII.   SUBROGATION

In the event of any payment under this Policy, the Company shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery. As a condition precedent to the Company's payment under this Policy, the **Insureds** agree to execute all papers required and shall take all reasonable actions to secure and preserve such rights, including the execution of such documents necessary to enable the Company to effectively bring suit or otherwise pursue subrogation rights in the name of the **Insureds**.

## IX.   NOTICE

(A) Notice to the Company of any **Claim**, **Potential Claim**, **Voluntary Program Notice** or circumstances under any **Liability Coverage Part**, or any **Coverage Event** under any **Non-Liability Coverage Part**, shall be deemed notice under the Policy in its entirety.

(B) All notices to the Company under this Policy of any **Claim**, **Potential Claim**, **Voluntary Program Notice** or circumstances under any **Liability Coverage Part**, or any **Coverage Event** under any **Non-Liability Coverage Part**, shall be given in writing to one of the following addresses:

(1) specialtyclaims@chubb.com; or

(2) Attn: Claims Department
Chubb Group of Insurance Companies
82 Hopmeadow St.
Simsbury, CT 06070-7683

CHUBB° Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*General Terms and Conditions*

(C) All other notices to the Company under this Policy shall be given in writing addressed to:

Attn: Chubb Underwriting Department

Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

(D) Any notice described above shall be effective on the date of receipt by the Company.

## X. TERMINATION OF POLICY

(A) This Policy shall terminate at the earliest of the following times:

(1) upon receipt by the Company of written notice of termination from the **Parent Organization**, provided that this Policy may not be terminated by the **Parent Organization** after the effective date of any event described in Section VI(C), Conversion of Coverage Under Certain Circumstances;

(2) upon expiration of the **Policy Period** set forth in Item 2 of the GTC Declarations;

(3) twenty (20) days after receipt by the **Parent Organization** of a written notice of termination from the Company based upon nonpayment of premium, unless the premium is paid within such twenty (20) day period; or

(4) at such other time as may be agreed upon by the Company and the **Parent Organization**.

(B) The Company shall refund the unearned premium computed at customary short rates if this Policy is terminated by the **Parent Organization**. Under any other circumstances the refund shall be computed pro rata. Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

## XI. BANKRUPTCY

Bankruptcy or insolvency of an **Insured** shall not relieve the Company of its obligations nor deprive the Company of its rights or defenses under this Policy.

## XII. COORDINATION OF COVERAGE

Any **Loss** covered under more than one **Liability Coverage Part** shall be first covered under the CyberSecurity Coverage Part, if applicable, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** which is not paid under the CyberSecurity Coverage Part shall then be covered under the Employment Practices Coverage Part, if applicable, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** otherwise covered under any other applicable **Liability Coverage Part** which is not paid under the CyberSecurity or Employment Practices Liability Coverage Parts shall be covered under such other **Liability Coverage Part**, subject to the terms, conditions and limitations of such **Liability Coverage Part**.

Any loss covered under the CyberSecurity Coverage Part and the Kidnap Ransom and Extortion Coverage Part shall be first covered under the Kidnap Ransom and Extortion Coverage Part, subject to its terms, conditions and limitations. Any remaining portion of such loss otherwise covered under the CyberSecurity Coverage Part which is not paid under the Kidnap Ransom and Extortion Coverage Part shall be covered under the CyberSecurity Coverage Part, subject to its terms, conditions and limitations.

**CHUBB®** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*General Terms and Conditions*

---

**XIII.   VALUATION AND FOREIGN CURRENCY**

All premiums, limits, retentions, loss and other amounts under this Policy are expressed and payable in the currency of the United States of America.  Except as otherwise provided in this Policy, if a judgment is rendered, a settlement is denominated or any element of loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the rate of exchange published in *The Wall Street Journal* on the date the judgment becomes final, the amount of the settlement is agreed upon or any element of loss is due, respectively.

---

**XIV.   ACTION AGAINST THE COMPANY**

No action may be taken against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy. No person or entity shall have any right under this Policy to join the Company as a party to any action against any **Insured** to determine such **Insured's** liability nor shall the Company be impleaded by such **Insured** or legal representatives of such **Insured**.

---

**XV.   ROLE OF PARENT ORGANIZATION**

By acceptance of this Policy, the **Parent Organization** agrees that it shall be considered the sole agent of, and shall act on behalf of, each **Insured** with respect to: (A) the payment of premiums and the receiving of any return premiums that may become due under this policy; (B) the negotiation, agreement to and acceptance of endorsements; and (C) the giving or receiving of any notice provided for in this Policy (except the giving of notice to apply for an Extended Reporting Period as provided in Section V, Extended Reporting Period, the giving of notice as provided in Section VIII, Proof of Loss and Legal Proceedings, of the CyberSecurity Coverage Part and the giving of notice of **Claim**, **Potential Claim**, **Voluntary Program Notice** or circumstances as provided in the Reporting section of the applicable **Liability Coverage Part**).   Each **Insured** agrees that the **Parent Organization** shall act on its behalf with respect to all such matters.

---

**XVI.   ALTERATION AND ASSIGNMENT**

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by written endorsement to this Policy which is signed by an authorized representative of Chubb, a division of Federal Insurance Company.

---

**XVII.   TERRITORY**

This Policy shall apply anywhere in the world.

---

**XVIII.   HEADINGS**

The descriptions in the headings and subheadings of this Policy are solely for convenience and form no part of the terms and conditions of coverage.

---

**XIX.   COMPLIANCE WITH TRADE SANCTIONS**

This insurance does not apply to the extent that trade or economic sanctions or other similar laws or regulations prohibit the Company from providing insurance.

# Schedule of Forms

To be attached to and form part of
Policy No.   8251-9627

Company:   Federal Insurance Company

Issued to:   SXSW LLC


ForeFront Portfolio 3 0 General Terms and Conditions Policy

14-02-17865 (1/11 ed.)

14-02-22814 (12/17 ed.)

ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

14-02-17866 (1/11 ed.)

14-02-18059 (5/11 ed.)

14-02-19646 (2/13 ed.)

14-02-21084 (3/14 ed.)

14-02-21379 (12/14 ed.)

14-02-22161 (9/16 ed.)

ForeFront Portfolio 3 0 Employment Practices Liability Coverage Part

14-02-17292 (7/11 ed.)

14-02-17867 (1/11 ed.)

14-02-21810 (5/15 ed.)

14-02-3206 F3 (5/11 ed.)

ForeFront Portfolio 3.0 CyberSecurity Coverage Part Federal

14-02-17871 (1/11 ed.)

14-02-22815TX (10/17 ed.)

**ENDORSEMENT/RIDER**

Coverage Section:  ForeFront Portfolio 3 0 General Terms and Conditions Policy

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 1

To be attached to and
form a part of Policy No. 8251-9627

Issued to:  SXSW LLC

---

TEXAS AMENDATORY ENDORSEMENT
TO THE GENERAL TERMS AND CONDITIONS

In consideration of the premium charged, it is agreed that:

(1)     Section V, Extended Reporting Period, is amended by adding the following parenthetical immediately after the term "Additional Period":

"(which period shall be one (1) year or such other period as the **Parent Organization** and the Company agree upon)"

(2)     In addition to the extension of coverage offered in Section V, Extended Reporting Period, the **Parent Organization** shall have the right to an automatic extended reporting period of thirty (30) days in which to report **Claims** for **Wrongful Acts** committed, attempted or allegedly committed or attempted before the earlier of the effective date of termination or nonrenewal, with respect to an Extended Reporting Period purchased after an event described in Subsection (C) of Section VI, Conversion of Coverage Under Certain Circumstances, the effective date of such merger, consolidation, acquisition, or emergence from bankruptcy.   The extension of coverage described in Section V, Extended Reporting Period, if purchased, shall begin after the expiration of the automatic extended reporting period described above and Section V shall be deemed amended to the extent necessary to comply with this paragraph.

(3)     This policy shall not be non-renewed based solely on the fact that the policyholder is an elected official.

The Policy will be deemed to have been amended to the extent necessary to effect the purposes of this Amendatory Endorsement.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedence over any provisions of the Policy or any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the state of Texas.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.


Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section: ForeFront Portfolio 3 0 General Terms and Conditions Policy

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 8251-9627

Issued to:  SXSW LLC

---

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

In consideration of the premium charged, it is agreed that:

A.  If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B.  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any "loss" that is otherwise excluded under this Policy.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.


Authorized Representative

**CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
**Directors & Officers and Entity Liability**
**Coverage Part**

**D&O DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws
of Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

**NOTICE: THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.  READ THE ENTIRE POLICY CAREFULLY.**

Item 1.  **Parent Organization:**        SXSW LLC

Item 2.  **Maximum Aggregate Limit of Liability for this Coverage Part:**

$1,000,000.00

Item 3.  **Optional Coverage Applicable to this Coverage Part:**

☐  Additional Limit of Liability Dedicated for Executives

Item 4.  **Retentions:**

(A)  Insuring Clause (A)
Individual Non-Indemnified Liability Coverage:        None

(B)  Insuring Clause (B)
Individual Indemnified Liability Coverage:        $25,000.00

(C)  Insuring Clause (C)
Entity Liability Coverage:        $25,000.00

Item 5.  **Pending or Prior Proceedings Dates:**

(A)  Insuring Clauses (A) and (B):        August 17, 2018

(B)  Insuring Clause (C):        August 17, 2018

**CHUBB**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>

*Directors & Officers and Entity Liability*
*Coverage Part*

---

In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this Coverage Part, the Company and the Insureds agree as follows:

---

## I.   INSURING CLAUSES

### Insuring Clause (A):  Individual Non-Indemnified Liability Coverage

(A)   The Company shall pay, on behalf of an **Insured Person**, **Loss** on account of a **Claim** first made against the **Insured Person** during the **Policy Period**, or the Extended Reporting Period if applicable, to the extent that such **Loss** is not indemnified by an **Organization**.

### Insuring Clause (B):  Individual Indemnified Liability Coverage

(B)   The Company shall pay, on behalf of an **Organization**, **Loss** on account of a **Claim** first made against an **Insured Person** during the **Policy Period**, or the Extended Reporting Period if applicable, to the extent the **Organization** indemnifies the **Insured Person** for such **Loss** as permitted or required by law.

### Insuring Clause (C):  Entity Liability Coverage

(C)   The Company shall pay, on behalf of an **Organization**, **Loss** on account of a **Claim** first made against the **Organization** during the **Policy Period**, or the Extended Reporting Period if applicable.

---

## II.   SECURITYHOLDER DERIVATIVE DEMAND EVALUATION COVERAGE

The Company shall pay, on behalf of an **Organization**, **Securityholder Derivative Demand Evaluation Costs** incurred with the Company's prior written consent which the **Organization** becomes legally obligated to pay on account of any securityholder derivative demand that is first made during the **Policy Period**, or, if exercised, during the Extended Reporting Period, for **Wrongful Acts** by an **Executive** before or during the **Policy Period** in an aggregate amount not to exceed $500,000 per **Policy Period** which amount is part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the D&O Declarations and no Retention shall apply to such amount.

---

## III.   ADDITIONAL LIMIT OF LIABILITY DEDICATED FOR EXECUTIVES (Optional)

(A)   Notwithstanding anything in this Policy to the contrary, the Additional Limit of Liability Dedicated For Executives, if purchased as set forth in Item 3 of the D&O Declarations, shall be an additional Limit of Liability in an amount not to exceed $500,000, which amount is in addition to, and not part of, the Maximum Aggregate Limit of Liability set forth in Item 2 of the D&O Declarations.

(B)   The Additional Limit of Liability Dedicated For Executives is available solely for **Loss** resulting from any **Claim** against any **Executive** covered under Insuring Clause (A), Individual Non-Indemnified Liability Coverage.

(C)   The Additional Limit of Liability Dedicated For Executives shall be excess of any insurance available that is specifically excess to this Coverage Part and such excess insurance must be completely exhausted by payment of loss, damages or defense costs thereunder before the Company shall have any obligation to make any payment on account of the Additional Limit of Liability Dedicated For Executives.

**CHUBB**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*Directors & Officers and Entity Liability*
*Coverage Part*

---

IV.   **DEFINITIONS**

For purposes of this Coverage Part:

**Application** means:

(A)   any portion of an application given to the Company for this Policy, including any attachments, written information and materials provided to the Company by or on behalf of an **Insured** for the purposes of the Company's underwriting of this Coverage Part; and

(B)   any warranty provided to the Company within the past three years in connection with any coverage part or policy of which this Coverage Part is a renewal or replacement.

**Claim** means:

(A)   when used in reference to the coverage provided by Insuring Clauses (A), Individual Non-Indemnified Liability Coverage, or (B), Individual Indemnified Liability Coverage, any:

(1)   written demand first received by an **Insured** for monetary or non-monetary relief, including injunctive relief;

(2)   civil proceeding commenced by the service of a complaint or similar pleading;

(3)   criminal proceeding commenced by: (a) an arrest, or (b) a return of an indictment, information or similar document;

(4)   formal administrative or formal regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

(5)   arbitration or mediation proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document; or

(6)   official request for **Extradition**,

against an **Insured Person** for a **Wrongful Act**, including any appeal therefrom;

(7)   civil, criminal, administrative or regulatory investigation or interview of an **Insured Person** for a **Wrongful Act** once such **Insured Person** is identified in writing by any investigating authority as a target of such investigation or interview, including when such **Insured Person** is served with a target letter or similar document; or

(8)   written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** described in Paragraphs (A)(1) through (A)(7) above;

(B)   solely when used in reference to the coverage provided by Insuring Clause (A), Individual Non-Indemnified Liability Coverage, any service of a subpoena or other similar written request upon an **Insured Person** compelling witness testimony or document production in connection with the matters described in Paragraphs (A)(1) through (A)(7) above or with any equivalent action against an **Organization** or **Outside Entity**; in which case, the Company shall pay the **Defense Costs** incurred solely by such **Insured Person** in responding to such subpoena or written request; or

(C)   when used in reference to the coverage provided by Insuring Clause (C), Entity Liability Coverage, any:

(1)   written demand first received by an **Insured** for monetary damages or non-monetary relief, including injunctive relief;

(2)   civil proceeding commenced by the service of a complaint or a similar pleading;

(3)   criminal proceeding commenced by a return of an indictment, information or similar document;

(4)   formal administrative or formal regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document; but only while such proceeding is also pending against an **Insured Person**; or

Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**[SM]
**Directors & Officers and Entity Liability**
**Coverage Part**

---

    (5)    arbitration or mediation proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document,

against an **Organization** for a **Wrongful Act**, including any appeal therefrom; or

    (6)    written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** described in Paragraph (C)(1) through (C)(5) above.

**Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of **Insured Persons**) incurred in investigating, defending, opposing or appealing any **Claim** and the premium for appeal, attachment or similar bonds.

**Employee** means any natural person whose labor or service is, was or will be engaged and directed by an **Organization**, including a part-time, seasonal, leased and temporary employee, intern or volunteer. **Employee** shall not include any independent contractor.

**ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, and the Health Insurance Portability and Accountability Act of 1996), the English Pension Scheme Act 1993 or the English Pensions Act 1995; all as amended; any similar statutory or common law anywhere in the world; or any rule or regulation promulgated under any such Act or law.

**Executive** means any natural person who is, was or will be:

    (A)    a duly elected or appointed director, officer, member of the Advisory Board or in-house general counsel of any **Organization** incorporated in the United States of America;

    (B)    a duly elected or appointed: (1) manager or member of the Board of Managers or equivalent position; (2) member of the Advisory Board; or (3) in-house general counsel, of any **Organization** formed as a limited liability company in the United States of America; or

    (C)    a holder of an equivalent position to those described in Subsections (A) or (B) above in any **Organization** incorporated, formed or organized anywhere in the world.

**Extradition** means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation, or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

**Financial Impairment** means the status of an **Organization** resulting from:

    (A)    the appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate such **Organization**; or

    (B)    such **Organization** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country,

provided that the court or other judicial or administrative body overseeing the receivership, conservatorship, liquidation, rehabilitation, bankruptcy or equivalent proceeding has denied a request by the **Organization**, or other party determined to have standing, for authorization of the **Organization** to indemnify an **Insured Person** for **Loss**; provided further that, the Company may, in its sole discretion, waive the foregoing requirement.

**Insured** means any **Organization** and any **Insured Person**.

**Insured Person** means any **Executive** or **Employee** of an **Organization** acting either in his or her capacity as such or in an **Outside Capacity**.

CHUBB®   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**℠
**Directors & Officers and Entity Liability**
**Coverage Part**

---

**Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:

(A)  compensatory damages;

(B)  punitive, exemplary or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the Company, or to the **Claim** giving rise to such damages;

(C)  civil fines or civil penalties assessed against an **Insured Person**, including civil penalties assessed against an **Insured Person** pursuant to 15 U.S.C. §78dd-2(g)(2)(B) (the Foreign Corrupt Practices Act), if and to the extent such fines or penalties are insurable under the law of the jurisdiction in which such fines or penalties are assessed;

(D)  judgments, including pre-judgment and post-judgment interest;

(E)  settlements; and

(F)  **Defense Costs,**

provided that **Loss** does not include any portion of such amount that constitutes any:

(1)  cost of compliance with any order for, grant or agreement to provide non-monetary relief, including injunctive relief;

(2)  amount uninsurable under the law pursuant to which this Coverage Part is construed;

(3)  tax, except solely for the purposes of Insuring Clause (A), Individual Non-Indemnified Liability Coverage, any tax imposed upon an **Insured Person** in his or her capacity as such in connection with any bankruptcy, receivership, conservatorship, or liquidation of an **Organization**, to the extent that such tax is insurable under the law pursuant to which this Coverage Part is construed;

(4)  amount (other than **Securityholder Derivative Demand Evaluation Costs**) incurred by an **Insured** in the defense or investigation of any action, proceeding or demand that was not then a **Claim** even if (a) such amount also benefits the defense of a covered **Claim**; or (b) such action, proceeding or demand subsequently gives rise to a **Claim**;

(5)  amount that represents or is substantially equivalent to an increase in the consideration paid (or proposed to be paid) by an **Organization** in connection with its purchase of any securities or assets; or

(6)  cost incurred in cleaning-up, removing, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**.

**Outside Capacity** means service by an **Insured Person** in an **Outside Entity** as any: (A) director or officer; (B) manager or member of the Board of Managers; (C) trustee, regent, governor; or (D) equivalent executive position of any of the foregoing, but solely during the time that such service is with the knowledge and express consent of an **Organization**.

**Outside Entity** means:

(A)  any non-profit corporation, community chest, fund or foundation that is exempt from federal income tax as an entity described in Section 501(c)(3), 501(c)(4), 501(c)(7) or 501(c)(10) of the Internal Revenue Code of 1986, as amended, or any other entity organized for a religious or charitable purpose under any non-profit organization act or statute; or

(B)  any other entity specifically added as an **Outside Entity** by written endorsement attached to this Coverage Part,

that is not an **Organization**.

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, asbestos products or waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

**CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Directors & Officers and Entity Liability*
*Coverage Part*

**Professional Services** means services which are performed for others for a fee.

**Securityholder Derivative Demand Evaluation Costs** means reasonable costs, fees and expenses (other than regular or overtime wages, salaries, fees, or benefits of the directors, officers or employees of an **Organization**) incurred by an **Organization** (including its Board of Directors or any committee of its Board of Directors) solely with respect to an evaluation required to determine whether it is in the best interest of the **Organization** to prosecute the claims alleged in a securityholder derivative demand and prior to any **Claim** first made in connection with such securityholder derivative demand. In no event shall **Securityholder Derivative Demand Evaluation Costs** include any costs, fees or expenses incurred in a **Claim**.

**Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by:

(A)     for purposes of coverage under Insuring Clauses (A), Individual Non-Indemnified Liability Coverage, and (B), Individual Indemnified Liability Coverage, any **Insured Person** while acting in his or her capacity as such or any matter claimed against any **Insured Person** solely by reason of his or her status as such; or

(B)     for purposes of coverage under Insuring Clause (C), Entity Liability Coverage, any **Organization**.

## V.     EXCLUSIONS

### (A)     EXCLUSIONS APPLICABLE TO ALL INSURING CLAUSES

The Company shall not be liable for **Loss** on account of any **Claim**:

(1)     Prior Notice
based upon, arising from or in consequence of any fact, circumstance, situation, transaction, event or **Wrongful Act** that, before the inception date set forth in Item 2(A), Policy Period, of the GTC Declarations, was the subject of any notice accepted under any policy or coverage part of which this Coverage Part is a direct or indirect renewal or replacement;

(2)     Pending or Prior Proceedings
based upon, arising from or in consequence of any written demand, suit or other proceeding pending against, or order, decree or judgment entered for or against any **Insured**, on or prior to the applicable Pending or Prior Proceedings Date set forth in Item 5 of the D&O Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

(3)     Bodily Injury/Property Damage
for bodily injury, mental anguish, humiliation, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed, provided that this Exclusion (A)(3) shall not apply to **Loss** for any mental anguish, humiliation or emotional distress asserted in an employment-related **Claim** afforded coverage under Insuring Clauses (A), Individual Non-Indemnified Liability Coverage, or (B), Individual Indemnified Liability Coverage;

(4)     Pollution
based upon, arising from or in consequence of any:

(a)     discharge, emission, release, dispersal or escape of any **Pollutants** or any threat thereof;

(b)     treatment, removal or disposal of any **Pollutants**; or

(c)     regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**,

including any **Claim** for financial loss to an **Organization**, its securityholders or its creditors based upon, arising from or in consequence of any matter described in Subparagraphs (a), (b) or (c) of this Exclusion (A)(4),

**CHUBB**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*Directors & Officers and Entity Liability*
*Coverage Part*

provided that this Exclusion (A)(4) shall not apply to **Loss** which an **Insured Person** becomes legally obligated to pay and for which such **Insured Person** is not indemnified by an **Organization** or **Outside Entity** either because the **Organization** or **Outside Entity** is not permitted by common or statutory law to grant such indemnification or because of the **Financial Impairment** of the **Organization** or **Outside Entity**, provided that this exception shall only apply to **Claims** first made during the **Policy Period** or the Extended Reporting Period, if applicable;

(5)   ERISA
for any violation of the responsibilities, obligations or duties imposed by **ERISA**;

(6)   Insured versus Insured
   (a)   brought by an **Organization** against any other **Organization**;

   (b)   brought by an **Organization** against an **Insured Person** of such **Organization**, provided that this Subparagraph (b) shall not apply to any **Claim** brought:

      (i)   outside the United States of America or Canada;

      (ii)   in the event of **Financial Impairment** of the **Organization**; or

      (iii)   as a securityholder derivative action;

   (c)   brought by an **Insured Person** in any capacity against an **Insured,** except with respect to a **Claim**:

      (i)   for employment-related **Wrongful Acts** against an **Insured Person**;

      (ii)   brought by an **Employee**, other than an **Executive**, in his or her capacity as a shareholder of an **Organization**;

      (iii)   for contribution or indemnity arising from another **Claim** otherwise covered under this Policy;

      (iv)   brought by an **Executive** who has ceased serving in his or her capacity as an **Executive** for at least one (1) year; or

      (v)   brought by a whistleblower pursuant to any federal, state, local or foreign law against an **Insured Person**;

(7)   Publicly Traded Securities
based upon, arising from or in consequence of (a) any public offering of securities issued by any **Organization** or **Outside Entity**, or (b) the purchase or sale of any publicly traded securities for which the **Organization** is subject to the Securities Exchange Act of 1934, provided that this Exclusion (A)(7) shall not apply to **Loss**:

      (i)   based upon, arising from or in consequence of an offering, sale or purchase of securities that are not required to be registered under the Securities Act of 1933 or any similar foreign law that regulates the offering, sale or purchase of securities;

      (ii)   on account of a **Claim** made by any securityholder of an **Organization** for the failure of the **Organization** to undertake or complete the initial public offering or sale of securities of the **Organization**; or

      (iii)   for any **Wrongful Act** relating to an **Organization's** preparation for any public offering, including any road show presentation to potential investors or other similar presentation, made by the **Organization** and its **Executives** via any medium in connection with such public offering, if such offering does not occur;

(8)   Outside Entity versus Insured
for a **Wrongful Act** by an **Insured Person** while serving in an **Outside Capacity** where such **Claim** is brought:

**CHUBB**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*Directors & Officers and Entity Liability*
*Coverage Part*

    (a)    by an **Outside Entity** against an **Insured Person** who is acting in his or her **Outside Capacity** in such **Outside Entity** at the time such **Claim** is first made, except with respect to a **Claim** brought as a securityholder derivative action; or

    (b)    by a director, officer, trustee, governor or equivalent position of the **Outside Entity** in any capacity against an **Insured,** except with respect to a **Claim** for contribution or indemnity arising from another **Claim** otherwise covered under this Policy; or

  (9)    <u>Conduct</u>
based upon, arising from or in consequence of:

    (a)    any deliberately fraudulent act or omission, or any willful violation of any statute or regulation, by an **Insured**, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Company) establishes such an act or omission or violation; or

    (b)    an **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Company) establishes the gaining of such profit, remuneration or advantage,

    provided that:

    (i)    no conduct pertaining to any **Insured Person** shall be imputed to any other **Insured Person**; and

    (ii)    any conduct pertaining to any past, present, or future chief financial officer, chief executive officer or chief operating officer (or any equivalent position to any of the foregoing) of an **Organization** shall be imputed to such **Organization** and its **Subsidiaries.**

**(B)**    **EXCLUSIONS APPLICABLE TO INSURING CLAUSE (C), ENTITY LIABILITY COVERAGE, ONLY**

The Company shall not be liable for **Loss** on account of any **Claim** against an **Organization**:

  (1)    <u>Contract</u>
based upon, arising from or in consequence of any liability in connection with any oral or written contract or agreement to which an **Organization** is a party, provided that this Exclusion (B)(1) shall not apply to the extent that such **Organization** would have been liable in the absence of such contract or agreement;

  (2)    <u>Employment Practices</u>
based upon, arising from or in consequence of any employment-related **Wrongful Act**;

  (3)    <u>Third Party Discrimination or Sexual Harassment</u>
based upon, arising from or in consequence of any discrimination against, or sexual harassment of any third party;

  (4)    <u>Antitrust</u>
based upon, arising from or in consequence of price fixing, restraint of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

  (5)    <u>Personal Injury</u>
based upon, arising from or in consequence of any libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, malicious use or abuse of process, assault, battery or loss of consortium, or

C H U B B®   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
*Directors & Officers and Entity Liability*
*Coverage Part*

(6)   <u>Product Defect/Intellectual Property/Professional Services</u>
based upon, arising from or in consequence of:

(a)   any malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

(b)   any infringement of copyright, patent, trademark, trade name, trade dress, or service mark; any misappropriation of ideas, trade secrets or other intellectual property rights; any false patent marking; or any violation of a federal, state, local or foreign intellectual property law, or a rule or regulation promulgated under any such intellectual property law; or

(c)   the rendering of, or failure to render, any **Professional Services** by an **Insured**,

provided that this Exclusion (B)(6) shall not apply to **Loss** on account of any securities **Claim**, securityholder derivative demand or securityholder derivative action.

## VI.   REPORTING

(A)   An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company written notice of any **Claim** as soon as practicable after the chief executive officer, chief financial officer, in-house general counsel, or any person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**, but in no event later than:

(1)   if this Coverage Part expires (or is otherwise terminated) without being renewed with the Company, ninety (90) days after the effective date of such expiration or termination; or

(2)   the expiration date of the Extended Reporting Period, if applicable,

provided that if the Company sends written notice to the **Parent Organization** stating that this Coverage Part is being terminated for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Claim** prior to the effective date of such termination.

(B)   If during the **Policy Period**, or any applicable Extended Reporting Period, an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Year** in which such circumstances were first reported to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than 90 days after the chief executive officer, chief financial officer, in-house general counsel or any person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**.

(C)   An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company such information, assistance and cooperation as the Company may reasonably require and shall include in any notice under Subsections (A) or (B) above a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of the actual or potential claimants, and the manner in which such **Insured** first became aware of the **Claim**, circumstances or alleged **Wrongful Act**.

**CHUBB®**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Directors & Officers and Entity Liability*
*Coverage Part*

---

**VII.    RETENTION AND PRESUMPTIVE INDEMNIFICATION**

(A)    The Company's liability under this Coverage Part shall apply only to that part of each **Loss** which is in excess of the applicable Retention set forth in Item 4 of the D&O Declarations, and such Retention shall be borne by the **Insureds** uninsured and at their own risk.

(B)    If different parts of a single **Claim** are subject to different Retentions in different Insuring Clauses within this Coverage Part, the applicable Retentions shall be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(C)    If different parts of a single **Claim** are subject to different Retentions in different Coverage Parts, the applicable Retentions shall be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(D)    **Claims** shall be subject to the Retention(s) applicable to the **Policy Year** during which such **Claims** are first made or first deemed to have been made.

(E)    If an **Organization** fails or refuses, other than for reason of **Financial Impairment**, to indemnify an **Insured Person** for **Loss** to the fullest extent permitted by statutory or common law, then any payment by the Company of such **Loss** shall be excess of the Insuring Clause (B), Individual Indemnified Liability Coverage, Retention set forth in Item 4 of the D&O Declarations.

(F)    For the purposes of determining an **Organization's** indemnification obligation to any Advisory Board Member, each Advisory Board Member shall be deemed a director or officer of such **Organization**. Accordingly, the **Organization** shall be deemed to have granted indemnification to each Advisory Board Member to the fullest extent permitted by statutory or common law to the same extent as any director or officer of the **Organization**.

---

**VIII.    DEFENSE AND SETTLEMENT**

(A)    The Company shall have the right and duty to defend any **Claim** covered by this Coverage Part. Coverage shall apply even if any of the allegations are groundless, false or fraudulent. The Company's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

(B)    The Company may make any investigation it deems necessary and may, with the consent of the **Insureds**, make any settlement of any **Claim** it deems appropriate.

(C)    No **Insured** shall settle any **Claim**, incur any **Defense Costs**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's written consent, which shall not be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

(D)    The Company shall have no obligation to pay **Loss**, including **Defense Costs**, or to defend or continue to defend any **Claim** after the Company's Maximum Aggregate Limit of Liability set forth in Item 2 of the D&O Declarations or the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations, if applicable, has been exhausted by the payment of **Loss** and the premium shall be deemed fully earned.

(E)    The **Insureds** agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests and agrees to do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

(F)    The Company shall not seek repayment from an **Insured Person** of any **Defense Costs** paid by the Company that are deemed uninsured pursuant to Exclusion (A)(9), Conduct, unless the applicable determination standard (whether a final, non-appealable adjudication or other determination standard) set forth in such Exclusion has been met.

CHUBB'   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*℠
*Directors & Officers and Entity Liability*
*Coverage Part*

---

IX.   **ALLOCATION**

If an **Insured** who is afforded coverage for a **Claim** incurs an amount consisting of both **Loss** that is covered by this **Coverage Part** and also loss that is not covered by this **Coverage Part** because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

(A)   **Defense Costs**: one hundred percent (100%) of **Defense Costs** incurred by such **Insured** on account of such **Claim** shall be covered **Loss**, provided that the foregoing shall not apply with respect to any **Insured** for whom coverage is excluded pursuant to Exclusion (B)(2), Employment Practices, or Subsection XIII(C), Representations and Severability. Such **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based on the relative legal exposures of the parties to such matters; and

(B)   loss other than **Defense Costs**: all remaining loss incurred by such **Insured** from such **Claim** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

---

X.   **PRIORITY OF PAYMENTS**

(A)   In the event of **Loss** arising from a **Claim** for which payment is concurrently due under Insuring Clause (A), Individual Non-Indemnified Liability Coverage, and one or more of the other Insuring Clauses of this **Coverage Part**, the Company shall:

(1)   first, pay **Loss** for which coverage is provided under Insuring Clause (A), Individual Non-Indemnified Liability Coverage, then

(2)   with respect to whatever remaining amount of the Limit of Liability is available after payment under Subsection (A) above, pay such **Loss** for which coverage is provided under any other Insuring Clause.

(B)   Except as otherwise provided in Subsection (A) above, the Company may pay covered **Loss** as it becomes due under this **Coverage Part** without regard to the potential for other future payment obligations under this **Coverage Part**.

---

XI.   **OTHER INSURANCE OR INDEMNITY**

(A)   If any **Loss** under this **Coverage Part** is insured under any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by this **Coverage Part**), this **Coverage Part** shall be excess of and shall not contribute with such other insurance, regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

(B)   Any coverage afforded under this **Coverage Part** for a **Claim** in connection with an **Insured Person** serving in an **Outside Capacity** for an **Outside Entity** shall be specifically excess of any indemnity (other than any indemnity provided by an **Organization**) and insurance available to such **Insured Person** by reason of serving in such **Outside Capacity**.

(C)   If any **Claim** made against an **Insured Person** serving in an **Outside Capacity** gives rise to coverage both under this **Coverage Part** and under any other coverage part or policy issued by the Company or any subsidiary or affiliate of The Chubb Corporation to any other entity, then any payment under such other coverage part or policy shall reduce any applicable Limit of Liability under this **Coverage Part** by the amount of such payment.

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*Directors & Officers and Entity Liability*
*Coverage Part*

---

**XII.   SECURITIES TRANSACTIONS**

If, during the **Policy Period**, an **Organization** intends to sell or offers to sell securities that are required to be registered under the Securities Act of 1933, the **Organization** shall, no later than thirty (30) days prior to the effective date of the Registration Statement for such sale or offering, give the Company written notice of the proposed sale or offering and all information requested by the Company relating thereto.  The Company shall provide to the **Organization** a quotation for coverage with respect to such sale or offering, including for **Wrongful Acts** occurring in the course of any "road show" presentation to potential investors or other similar presentation; provided any such coverage offered shall be subject to such other terms, conditions, and limitations of coverage and such additional premium as the Company, in its sole discretion, may require.

---

**XIII.   REPRESENTATIONS AND SEVERABILITY**

(A)   In granting coverage to the **Insureds** under this Coverage Part, the Company has relied upon the declarations and statements in the **Application** for this Coverage Part.  Such declarations and statements are the basis of the coverage under this Coverage Part and shall be considered as incorporated in and constituting part of this Coverage Part.

(B)   The **Application** for coverage shall be construed as a separate **Application** for coverage by each **Insured Person**.  With respect to the declarations and statements in such **Application**, no knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person**.

(C)   However, in the event that such **Application** contains any misrepresentations made with the actual intent to deceive or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Company under this Coverage Part, then no coverage shall be afforded for any **Claim** based upon, arising from or in consequence of any such misrepresentations with respect to:

(1)   any **Insured Person** who knew of such misrepresentations (whether or not such **Insured Person** knew such **Application** contained such misrepresentations) or any **Organization** to the extent it indemnifies any such **Insured Person**; or

(2)   any **Organization** if any past or present chief executive officer or chief financial officer (or any equivalent position to any of the foregoing) of the **Parent Organization** knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations).

(D)   The Company shall not be entitled under any circumstances to void or rescind this Coverage Part with respect to any **Insured**.

**ENDORSEMENT/RIDER**

Coverage Section:  ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 1

To be attached to and
form a part of Policy No. 8251-9627

Issued to:  SXSW LLC

---

TEXAS AMENDATORY ENDORSEMENT
TO THE DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

In consideration of the premium charged, it is agreed that:

(1)    Subsection (A) of Section XIII, Representations and Severability, of this Coverage Part is deleted and replaced with the following:

(A)     In granting coverage to the **Insureds** under this Coverage Part, the Company has relied upon the declarations and statements in the **Application** for this Coverage Part.   Such declarations and statements are the basis of the coverage under this Coverage Part and shall be considered as incorporated into this Coverage Part.

The Policy will be deemed to have been amended to the extent necessary to effect the purposes of this Amendatory Endorsement.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedence over any provisions of the Policy or any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the state of Texas.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement: August 17, 2019

Company: Federal Insurance Company

Endorsement No. 2

To be attached to and
form a part of Policy No. 8251-9627

Issued to: SXSW LLC

---

AMEND BODILY INJURY/PROPERTY DAMAGE EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is agreed that Exclusion (A)(3), Bodily Injury/Property Damage, of this Coverage Part is deleted and replaced with the following:

(3)     Bodily Injury/Property Damage
        based upon, arising from, or in consequence of any bodily injury, mental anguish, humiliation, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed, provided that this Exclusion (A)(3) shall not apply to **Loss** for any mental anguish, humiliation or emotional distress asserted in an employment-related **Claim** afforded coverage under Insuring Clauses (A), Individual Non-Indemnified Liability Coverage, or (B), Individual Indemnified Liability Coverage;

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8251-9627

Issued to:  SXSW LLC

FALSE ADVERTISING ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     Subsection (B) of Section V, Exclusions, of this Coverage Part is amended to add the following:

        <u>False Advertising</u>
        based upon, arising from, or in consequence of any false advertising, misrepresentation in advertising or unfair or deceptive trade practices, with respect to the advertising of the **Insured's** own goods, publications or services; provided that this Exclusion shall not apply to **Loss** on account of any securities **Claim**, securityholder derivative demand or securityholder derivative action.

(2)     Solely with respect to the coverage afforded under this endorsement, Subsection (A) of Section IX, Allocation, of this Coverage Part is deleted and replaced with the following:

        (A)     **Defense Costs**:  one hundred percent (100%) of **Defense Costs** incurred by such **Insured** on account of such **Claim** shall be covered **Loss**, provided that the foregoing shall not apply with respect to any **Insured** for whom coverage is excluded pursuant to the Exclusion in paragraph (1) of this endorsement, False Advertising, Exclusion (B)(2), Employment Practices, or Subsection XIII(C), Representations and Severability.  Such **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based on the relative legal exposures of the parties to such matters; and

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 4

To be attached to and
form a part of Policy No. 8251-9627

Issued to:  SXSW LLC

---

JOBS ACT ENDORSEMENT

In consideration of the premium charged, it is agreed that

(1)     Exclusion (A)(7), Publicly Traded Securities, of this Coverage Part shall not apply to **Loss** on account of any **Claim**:

    (A)     based upon, arising from or in consequence of any general solicitation or general advertising by or on behalf of any **Organization** permitted pursuant to Title II, Access to Capital for Job Creators, of the JOBS Act (as defined below);

    (B)     based upon, arising from or in consequence of any offering, sale or purchase of securities that qualifies for a Securities Act registration exemption created pursuant to Title III, Crowdfunding, of the JOBS Act; or

    (C)     based upon, arising from or in consequence of any offering, sale or purchase of securities that qualifies for a Securities Act registration exemption created pursuant to Title IV, Small Company Capital Formation, of the JOBS Act ("Title IV Small Company Capital Formation Claim").

(2)     The Company's maximum aggregate Limit of Liability for **Loss** on account of all Title IV Small Company Capital Formation Claims shall be $250,000 which amount shall be part of, and not in addition to, the Company's Maximum Aggregate Limit of Liability for this Coverage Part set forth in Item 2 of the D&O Declarations.

(3)     For purposes of this Endorsement, JOBS Act means the Jumpstart Our Business Startups Act, any amendments thereto and any rules or regulations promulgated thereunder.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____

Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 5

To be attached to and
form a part of Policy No. 8251-9627

Issued to:  SXSW LLC

SERVICE INDUSTRY ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     The Company shall not be liable under this Coverage Part for **Loss** on account of any **Claim** based upon, arising from, or in consequence of the rendering of, or failure to render, any **Professional Services** by an **Insured**; provided that this Exclusion shall not apply to any **Loss** on account of any securities **Claim**, securityholder derivative demand, securityholder derivative action or **Specific Management Claim** (as defined in Paragraph (2) of this endorsement).

(2)     Section IV, Definitions, of this Coverage Part, is amended to include the following definition:

   **Specific Management Claim** means any **Claim** made against an **Executive** for a **Wrongful Act** by such **Executive** in connection with the **Executive's** management of any **Organization** or **Subsidiary**, of an **Organization**. However, **Specific Management Claim** shall not mean, and in no event shall any coverage be afforded herein for, any **Claim** made against an **Executive** for a **Wrongful Act** by such **Executive** in the direct offering of, or in supervising or assisting an **Insured Person** in direct offering of, any **Professional Services**.

(3)     Exclusion (B)(6)(c), Professional Services, of this Coverage Part is deleted.

(4)     Solely with respect to the coverage afforded under this endorsement, Section XI, Other Insurance or Indemnity, of this Coverage Part is amended to add the following:

   Subject to the provisions of this endorsement, no coverage shall be available for any **Loss** until after any or all coverage available under any policy providing professional liability or errors and omissions coverage has been exhausted.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section: ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 6

To be attached to and
form a part of Policy No. 8251-9627

Issued to:  SXSW LLC

---

AMEND DEFENSE AND SETTLEMENT ENDORSEMENT
(OPTION TO TENDER DEFENSE)

In consideration of the premium charged, it is agreed that:

(1)     Unless the **Insured** has tendered the defense of a **Claim** to the Company pursuant to paragraph (3) of this Endorsement, Section VIII, Defense and Settlement, of this Coverage Part (including any amendment by Endorsement) is deleted and replaced with the following:

VIII.     DEFENSE AND SETTLEMENT

(A)     The **Insured**:

(1)     shall have the sole duty to defend **Claims** made against the **Insured**;

(2)     agrees not to settle or offer to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's prior written consent.

(3)     agrees to provide the Company with all information, assistance and cooperation which the Company may reasonably require and agrees that, in the event of a **Claim**, the **Insured** shall not do anything that could prejudice the Company's position or its potential or actual rights of recovery; provided that the failure of any **Insured Person** to give the Company such information, assistance or cooperation shall not impair the rights of any other **Insured Person** under this Coverage Part.

(B)     The Company:

(1)     shall have the right and shall be given the opportunity to effectively associate with the **Insured** and shall be consulted in advance by the **Insured**, regarding the investigation, defense and settlement of any **Claim** that appears reasonably likely to be covered in whole or in part under this Coverage Part, including selecting appropriate defense counsel and negotiating any settlement; and

(2)    shall not be liable for any element of **Loss** incurred in excess of the amount of the applicable Retention, for any obligation assumed, or for any admission made, by any **Insured** without the Company's prior written consent, which the Company shall not unreasonably withhold.

(C)    The Company shall advance covered **Defense Costs** on account of any **Claim** reported pursuant to Section VI, Reporting, on a current basis after receipt by the Company of bills detailing such **Defense Costs** and all other information requested by the Company with respect to such bills until the applicable Limit of Liability set forth in Item 2 of the D&O Declarations has been satisfied.

(D)    Any advancement of **Defense Costs** shall be repaid to the Company by the **Insureds**, severally according to their respective interests, if and to the extent it is determined that such **Defense Costs** are not insured under this Policy.  However, the Company shall not seek repayment from an **Insured** of advanced **Defense Costs** that are uninsured pursuant to Exclusion V(A)(9), Conduct, unless a final, non-appealable adjudication has occurred.

(E)    Any advancement of **Defense Costs** by the Company shall reduce the Limit of Liability set forth in Item 2 of the D&O Declarations. If the Company recovered any such **Defense Costs** paid, the amount of such **Defense Costs** less all costs incurred by the Company to obtain such recovery shall be reinstated to the Limit of Liability set forth in Item 2 of the D&O Declarations.

(2)    Unless the **Insured** has tendered the defense of a **Claim** to the Company pursuant to paragraph (3) of this Endorsement, Section IX, Allocation, of this Coverage Part (including any amendment by Endorsement) is deleted and replaced with the following:

IX.    ALLOCATION

The **Insureds** and the Company shall use their best efforts to determine an allocation between **Loss** that is covered by this Coverage Part and loss, or any other amount, that is not covered by this Coverage Part based on the relative legal and financial exposures of the covered parties to the covered matters.

(3)    Notwithstanding paragraph (1) of this Endorsement, the **Insureds** shall have the option to tender the defense of any **Claim** to the Company by notifying the Company within a reasonable time after such **Claim** is first received by the **Insured**, but in no event later than thirty (30) days after the date such **Claim** is first received by the **Insured**.

(4)    Unless the **Insured** has tendered the defense of a **Claim** to the Company pursuant to paragraph (3) of this Endorsement, the Defense and Settlement and Allocation provisions in this Endorsement shall supersede and take precedence over any Defense and Settlement and Allocation provisions in any other Endorsement.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

 North American Financial Lines Claims
**11575 Great Oaks Way, Suite 200, Alpharetta, GA 30022, USA**
Phone: **678.795.4283**
E-mail: linda.harris@chubb.com

May 18, 2020

SXSW LLC
Attn:  Heather R. VanDyke
1400 Lavaca Street, Suite 1100
Austin, TX 78701

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

And via email:  heather@sxsw.com

|     |     |     |
|-----|-----|-----|
| RE: | Parent Organization: | SXSW LLC ("SXSW") |
|     | Policy Number: | 8251-9627 |
|     | Writing Company: | Federal Insurance Company |
|     | Claim Number: | KY20K2212914 |
|     | Matter: | *April 11, 2020 demand letter from Law Office of Joel Skinner on behalf of Steven Leventhal* (the "Demand") |

> *Maria Bromley and Kleber Pauta, on behalf of themselves and all others similarly situated v. SXSW, LLC and SXSW Holdings, Inc.;* USDC for the Western District of Texas; 10-CV-439 (the "Complaint")

Dear Ms.VanDyke:

Federal Insurance Company ("Chubb") further acknowledges receipt of the Demand on April 16, 2020, and the Complaint on April 27, 2020.  Your March 25, 2020 notice regarding layoffs within the organization will be addressed separately.  This letter is being directed to you as the contact person for SXSW.  If you are not the proper person to receive this correspondence, please immediately notify the undersigned.  After completing our investigation, for the reasons detailed below, Chubb has determined that there is no coverage for the Claim, and Chubb will neither defend nor indemnify the Insured.

Please understand Chubb has not made any determination as to liability nor do we intend to imply that any liability exists.  However, coverage for this Claim is not available based upon our review of the documents submitted in conjunction with the terms and conditions of the Policy.  If you have any additional information that you believe has a bearing on our position, please immediately forward it to me for review.

**The Claim**

The Demand:  Mr. Leventhal seeks a $1,475.00 refund, the purchase price for his ticket to the April 2020 South by Southwest event organized by SXSW, which was cancelled due to the COVID-19 pandemic.

The Complaint:  Plaintiffs,  purporting to bring a nationwide class action on behalf of all persons in the US who purchased wristbands, tickets, passes and badges ("Credentials") to the 2020 South by Southwest Festival in Austin, Texas, bring suit against the SXSW and SXSW Holdings, Inc. for breach of contract, unjust enrichment, and conversion to recover monies paid for a festival that never occurred (*See paragraph 7 of the Complaint)*.  The concert was cancelled due to the Covid19 pandemic.

## The Policy

Chubb issued ForeFront 3.0 $^{SM}$ policy, number 8251-9627 to SXSW for the August 17, 2019 to August 17, 2020 **Policy Period**[1] (the "Policy").  The Directors & Officers and Entity Liability (D&O) Coverage Part provides a $1,000,000 aggregate Limit of Liability, including **Defense Costs**, subject to a retention of $25,000.   The Policy also provides Employment Practices Liability ("EPL") coverage which is not triggered because the Claim in not an **Employment Claim** or a **Third Party Claim.**

## Coverage Analysis

The General Terms and Conditions ("GTC") state that all **Related Claims** shall be deemed a single **Claim** made in the **Policy Year** in which the earliest of such **Related Claims** is first made.  *(See GTC Section IV)*.  The  Demand and the Complaint are **Related Claims** and are deemed a single **Claim**.

The **Claim** is directed solely against SXSW and SXSW Holdings Inc. Subject to its terms and conditions, Chubb agrees to pay **Loss** on account of a **Claim** first made against the **Organization** during the **Policy Period** (*See Insuring Clause C of the D&O Coverage Part).*  SXSW Holdings, Inc is not an Insured under the Policy.

The claimants maintain that they entered into a contract with SXSW and that they performed their obligations under the contract by providing payment in consideration for Credentials.  When the concert was cancelled, SXSW refused to refund the purchase price paid for the Credentials in breach of the contract.

The Policy excludes coverage for **Loss** on account of any **Claim** based upon, arising from or in consequence of any liability in connection with any oral or written contract or agreement to which an **Organization** is a party, provided that this Exclusion (B)(1) shall not apply to the extent that such **Organization** would have been liable in the absence of such contract or agreement.  *See Section V.(B)(1) of the D&O Coverage Part.*  The contract exclusion precludes coverage for the **Claim** it its entirety because the claimants' allegations are based upon, arise from and are in consequence of liability in connection with a contract to which SXSW is a party.  The exception to the exclusion does not apply.

The Policy also precludes coverage for any **Claim** based upon, arising from, or in consequence of the failure to render any **Professional Service** by an **Insured**. *(See Endorsement 5 of the D&O Coverage Part).*  **Professional Services** are defined to mean services which are performed for others for a fee. *(See Section IV Definitions of the D&O Coverage Part.)*  The **Insured** provided a service – scheduling, overseeing, organizing and managing South by Southwest - for which it collected a fee thus precluding coverage.  We would suggest that you place all your insurance carriers, including your E&O carrier, on notice of the **Claim**.

---

[1] Bolded terms are defined in the Policy.

**Loss** as defined under the Policy and the conduct exclusion may further serve to limit/and or preclude coverage for the **Claim**. (*See Section IV Definitions and Section V 9(b) Exclusions of the D&O Coverage Part.*)

## Conclusion

Based on the foregoing analysis, there is no coverage for the **Claim** and Chubb will neither defend nor indemnify the **Insured**. This letter addresses only those Policy provisions that currently appear pertinent in light of the information currently known and available to us. Chubb reserves the right to review all coverage issues and not merely those raised by any additional information or evidence. Chubb reserves the right to deny and/or limit coverage based on any additional grounds not expressly set forth herein. Chubb also reserves the right to supplement and/or amend this letter to address additional coverage issues as they may arise based on all the insuring agreements, terms, conditions, exclusions, endorsements, and definitions found in the Policy and any additional facts that may come to Chubb's attention. By limiting Policy references to those cited, we do not waive any other Policy provisions. We will re-evaluate our coverage position if there are any material changes to the information provided. If you have additional information you would like us to consider, please forward it to my attention.

We ask that all written correspondence be sent to Chubb North American Claims, P.O. Box 5105, Scranton, PA 18505-0518, where it will be scanned and electronically transmitted to the appropriate individuals. Please include the claim number – KY20K2212914 – on all correspondence.

Should you have any questions or wish to discuss this matter further, please call me at (678) 795-4283.

Sincerely,

*Linda Krajeck Harris*

Linda Krajeck Harris
Assistant Vice President, Executive Claim Director
North American Financial Lines Claims

cc:

Higginbotham
Attn: R. Chase Laguarta, Claims Executive
Via email only: claguarta@higginbotham.net

 **HIGGINBOTHAM**®

July 8, 2020

Kathleen M. Bragg-Pebley
Direct: 818-850-7788
Kbragg-pebley@higginbotham.net

**VIA EMAIL ONLY**
Chubb North American Financial Lines Claims
11575 Great Oaks Way
Suite 200
Alpharetta, GA 30022

Attention:  Linda Krajeck Harris – linda.harris@chubb.com

RE:   Insured:   SXSW LLC
        Policy No.:   8251-9627
        Claim No.:   KY20K2212914
        Writing Co:   Federal Insurance Company
        Matter:   April 11, 2020 demand letter of Steven Leventhal and
                     *Maria Bromley etc. v. SXSW, LLC et al.*, USDC for the
                     Western District of Texas; 10-CV-439

Dear Ms. Harris,

We are writing on behalf of our client/your insured SXSW, LLC in response to your May 18, 2020 correspondence wherein Chubb denied coverage for the above referenced claims based on the contract and professional services exclusions with respect to the Directors and Officers Liability Policy coverage afforded in Chubb policy no. 8251-9627 issued to SXSW, LLC for a policy period of August 17, 2019 to August 17, 2020.

We respectfully disagree with Chubb's coverage position in refusing to provide coverage for its insured against these claims and therefore ask that you reconsider this position on the grounds that the allegations of conversion and unjust enrichment fall within the exception to the contract exclusion and the allegations fall outside the professional services exclusion as discussed more fully below.

## UNDERLYING FACTS

### *1. The Festival*

SXSW, LLC organized the South by Southwest Conference and Festivals (the "SXSW Festival") which was slated to occur from March 9-13, 2020 for the EDU portion and March 13, 2020 to March 22, 2020 for Music, Film, and Interactive.  The SXSW Festival is an annual conglomeration of parallel film, interactive media, and music festivals and conferences for the ticket buying public, which began in 1987.  SXSW, LLC expected tens of thousands of attendees from across the world for SXSW 2020, which event has historically created no less than $350



million in revenue for the City of Austin, Texas, the host city. In organizing the South by Southwest Festival, SXSW, LLC curated over 4,400 conference speakers, over 2,000 musical performances, 425 film screenings, contracted with 90+ music venues, 7 film festival venues, the Austin Convention Center, more than 60 hotels, arranged for the travel of the presenters, set up the technical operations including recording, sound equipment, command center and presentation equipment, engaged hundreds of equipment and service providers, created and printed signage, programs, merchandise, schedules and more. All of these plans had already been set in place when on March 6, 2020, the Mayor of Austin canceled the festival out of concern that the mass gathering would contribute to the spread of the coronavirus. At that time, SXSW, LLC anticipated that the Festival would be rescheduled for a later date in 2020 and provide a virtual SXSW online experience. As a result of the expenditures already incurred and the hopes of rescheduling the Festival, SXSW, LLC decided to not refund the ticket price to its patrons but to instead offer those patrons the opportunity to participate in another SXSW Festival in any of the three following years plus 50% off the walk-up rate during one of the other subsequent years.

Despite this offer to attend a future Festival in lieu of a refund, some patrons, including Steven Leventhal and Maria Bromley, demanded a refund of their ticket prices. When SXSW, LLC advised that it would not refund the ticket costs, Steven Leventhal hired an attorney who sent the demand letter and Maria Bromley and Kleber Pauta filed a class action lawsuit.

### 2. The Claims

Steven Leventhal's demand letter, sent April 11, 2020, threatened to file a lawsuit in Illinois if his $1,475 he paid for his Festival credentials were not refunded. He claims that the online contract force majeure clause is insufficient to alleviate SXSW, LLC's performance obligations and that the ticket deferral portion of the contract is ambiguous and inconsistent with other language in the contract.

On April 24, 2020, Maria Bromley and Kleber Pauta ifiled a class action lawsuit in the United States District Court for the Western District of Texas, Austin Division bearing case number 1:20-CV-439 against SXSW, LLC and SXSW Holdings, Inc. on behalf of themselves, seeking to represent a class of all purchasers of wristbands, passes, badges and tickets to the South by Southwest Festival (the "Complaint"). If certified, the proposed class would include Steven Leventhal as a member of the class.

The Complaint alleges that Ms. Bromley, a resident of Massachusetts, purchased tickets for the Festival on February 3, 2020 for a Platinum badge in the amount of $1,670, including $70 for meals and merchandise. She alleges that upon learning of the cancellation of the Festival, she called SXSW and requested a cash refund. SXSW's representative advised her that SXSW would not provide cash refunds. Ms. Bromley then sent an email on March 9, 2020 to SXSW requesting a cash refund. On April 1, 2020 Ms. Bromley received an email from SXSW offering to defer her Platinum badge to use in the 2021, 2022 or 2023 Festivals and to purchase a second badge at 50% off for one of the other years. The offer expired on April 30, 2020. Mr. Pauta, a resident of Colorado, avers that he purchased a SXSW badge on November 25, 2019 for $1,020. He then received an email on March 6, 2020 from SXSW advising that the Festival had been cancelled. He then sent an email to SXSW requesting a cash refund. SXSW responded to his



# HIGGINBOTHAM®

Chubb North American Financial Lines Claims
July 8, 2020
Page 3

email on April 23, 2020 informing him that SXSW's policy has always been that it would not issue refunds and would therefore not issue him a refund for the 2020 Festival. Mr. Pauta also received a separate email from SXSW on April 1, 2020 offering to defer his badge use to 2021, 2022 or 2023 Festivals and to purchase a second badge at 50% off for one of the other years, which offer expired on April 30, 2020.

The Complaint further alleges that in order to purchase tickets, the participants must agree to the terms and conditions. Those terms include jurisdiction provisions in the state and federal courts of Austin, Texas and a refund and revocation policy that allows SXSW to cancel, revoke or refuse credentials or other purchases through SXSW. The terms further advised that SXSW does not issue refunds under any circumstances and all payments made to SXSW are not refundable for any reason. The Complaint avers that the refund provision renders the contract unenforceable, illusory, unlawful and unconscionable. The Complaint also alleges that despite the mounting concerns of spreading COVID-19 in early 2020, on February 28, 2020, SXSW informed the public that SXSW 2020 was proceeding as planned and continued selling tickets. On March 6, 2020 City of Austin's local state of emergency declaration officially cancelled the 2020 Festival. In refusing to refund ticket sales, SXSW shifted the burden of the COVID-19 pandemic to the festivalgoers.

Despite stating that the contract is illegal and unenforceable, plaintiffs aver in Count I of the Complaint that SXSW breached the contract in not issuing refunds without citing to a single portion of the alleged contract that provides that right. In fact, the Complaint states that the Refund Policy is effectively stricken from the contract as unenforceable. In Count II Plaintiffs aver that SXSW unjustly enriched itself by willingly accepting the benefits conferred upon it by plaintiffs' purchasing tickets. These allegations are not founded in breach of contract but on equitable principles. Count III of the Complaint for conversion sounds in tort, not breach of contract, alleging that SXSW in refusing to refund the ticket money, assumed and exercised dominion and control over plaintiffs' property to the exclusion of the rights of plaintiffs.

### 3. *The Denial*

Given the City's cancellation of SXSW 2020, on March 18, 2020, SXSW put Chubb on notice of the potential for a claim before any actual claim came in. SXSW received the Leventhal demand on April 15, 2020 and tendered it to Higginbotham, who tendered the defense to Chubb on April 16, 2020. SXSW sent the Bromley Complaint to Higginbotham on April 25 2020 who tendered the defense of the claim to Chubb on April 27, 2020. On May 18, 2020, Chubb issued its denial letter. Chubb based its denial on the Contract exclusion contending that "the claimants' allegations are based upon, arise from and are in consequence of liability in connection with a contract to which SXSW is a party." Chubb further stated that the exception to the contract exclusion did not apply. Chubb also relied upon the Professional Services exclusion stating that "the **Insured** provided a service – scheduling, overseeing, organizing and managing South by Southwest – for which it collected a fee thus precluding coverage." Chubb then directed the



Chubb North American Financial Lines Claims
July 8, 2020
Page 4

Insured to file a claim against its E&O carrier, which, by the way, is also Chubb, which also denied coverage based on the Professional Services for the Insured exclusion.

## THE POLICY

SXSW, LLC purchased the Forefront Portfolio policy bearing policy number 8251-9627 with a policy period of August 17, 2019 to August 17, 2020 containing Directors and Officers Liability coverage, Employment Practices Liability coverage and Cyber Liability coverage with policy limits of $1,000,000 and $25,000 retention under the D&O coverage form Insuring Clause C Entity Liability.

The Policy is a claims made and reported policy and provides coverage subject to its terms and conditions as follows:

**Insuring Clause (C): Entity Liability Coverage**

(C)   The Company shall pay, on behalf of an **Organization**, **Loss** on account of a **Claim** first made against the **Organization** during the **Policy Period**, or the Extended Reporting Period if applicable.

---

The Policy defines the bolded terms above in pertinent part as follows:

**Organization** means the **Parent Organization** and any **Subsidiary**. **Organization** shall also mean any such entity as a debtor in possession under United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

Claim means:

. . .

(C)   when used in reference to the coverage provided by Insuring Clause (C), Entity Liability Coverage, any:

    (1)   written demand first received by an **Insured** for monetary damages or non-monetary relief, including injunctive relief;

    (2)   civil proceeding commenced by the service of a complaint or a similar pleading;

**Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:

(A)   compensatory damages;

(B)   punitive, exemplary or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the Company, or to the **Claim** giving rise to such damages;

(C)   civil fines or civil penalties assessed against an **Insured Person**, including civil penalties assessed against an **Insured Person** pursuant to 15 U.S.C. §78dd-2(g)(2)(B) (the Foreign Corrupt Practices Act), if and to the extent such fines or penalties are insurable under the law of the jurisdiction in which such fines or penalties are assessed;

(D)   judgments, including pre-judgment and post-judgment interest;

(E)   settlements; and

(F)   **Defense Costs**,

 **HIGGINBOTHAM®**

Chubb North American Financial Lines Claims
July 8, 2020
Page 5

The Loss definition is also subject to enumerated items excluded from Loss that do not pertain to the present claims.

The Policy also contains exclusions that apply to the various Insuring Clauses pertinent to the present claims. With respect to all Insuring Clauses the Policy states in pertinent part:

### (A) EXCLUSIONS APPLICABLE TO ALL INSURING CLAUSES

The Company shall not be liable for **Loss** on account of any **Claim**:

. . .

(9)    Conduct
based upon, arising from or in consequence of:

    (a)    any deliberately fraudulent act or omission, or any willful violation of any statute or regulation, by an **Insured**, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Company) establishes such an act or omission or violation; or

    (b)    an **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Company) establishes the gaining of such profit, remuneration or advantage,

With respect to Insuring Clause (C) Entity Liability Coverage, the Policy contains additional exclusions stating:

The Company shall not be liable for **Loss** on account of any **Claim** against an **Organization**:

(1)    Contract
based upon, arising from or in consequence of any liability in connection with any oral or written contract or agreement to which an **Organization** is a party, provided that this Exclusion (B)(1) shall not apply to the extent that such **Organization** would have been liable in the absence of such contract or agreement;

Endorsement 5 of the Policy added the following exclusion:

(1)    The Company shall not be liable under this Coverage Part for **Loss** on account of any **Claim** based upon, arising from, or in consequence of the rendering of, or failure to render, any **Professional Services** by an **Insured**; provided that this Exclusion shall not apply to any **Loss** on account of any securities **Claim**, securityholder derivative demand, securityholder derivative action or **Specific Management Claim** (as defined in Paragraph (2) of this endorsement).



Chubb North American Financial Lines Claims
July 8, 2020
Page 6

The Policy defines **Professional Services** to mean "services which are performed for others for a fee."

By way of endorsement No. 6, the Policy amends the Defense and Settlement section VIII. to provide that the **Insured** and not the Company shall have the duty to defend **Claims** made against the **Insureds** unless the **Insured** tendered the defense to the Company pursuant to paragraph (3) of this endorsement. Paragraph (3) provides as follows:

(3)    Notwithstanding paragraph (1) of this Endorsement, the **Insureds** shall have the option to tender the defense of any **Claim** to the Company by notifying the Company within a reasonable time after such **Claim** is first received by the **Insured**, but in no event later than thirty (30) days after the date such **Claim** is first received by the **Insured**.

If the **Insured** tenders its defense to the Company, then the standard Defense and Settlement Section VIII of the Policy applies and Endorsement No. 6 does not apply.

VIII.    DEFENSE AND SETTLEMENT

(A)    The Company shall have the right and duty to defend any **Claim** covered by this Coverage Part. Coverage shall apply even if any of the allegations are groundless, false or fraudulent. The Company's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

When the **Insured** has tendered its defense to the Company, then the standard section IX. Allocation section applies which holds in pertinent part as follows:

IX.    ALLOCATION

If an **Insured** who is afforded coverage for a **Claim** incurs an amount consisting of both **Loss** that is covered by this Coverage Part and also loss that is not covered by this Coverage Part because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

(A)    **Defense Costs**: one hundred percent (100%) of **Defense Costs** incurred by such **Insured** on account of such **Claim** shall be covered **Loss**, provided that the foregoing shall not apply with respect to any **Insured** for whom coverage is excluded pursuant to Exclusion (B)(2), Employment Practices, or Subsection XIII(C), Representations and Severability. Such **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based on the relative legal exposures of the parties to such matters; and

## COVERAGE ANALYSIS

The primary intent of contract interpretation is to ascertain the true intent of the parties as set forth in the written instrument. *See Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 158 (Tex.1999); *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). To that end, "when interpreting an insurance contract under Texas law, a court 'must read all parts of the contract together, giving effect to each word, clause, and sentence and avoid making any provision in the policy inoperative.'" *E. Rio Hondo Water Supply Corp. v. Am. Alternative Ins. Corp.*, 748 F. Supp. 2d 636, 644 (S.D. Tex. 2010) *quoting State Farm Lloyds v. Page*, 315



# HIGGINBOTHAM®

Chubb North American Financial Lines Claims
July 8, 2020
Page 7

S.W.3d 535, 527 (Tex.2010). Contract terms shall be given their generally accepted, ordinary, plain meaning unless otherwise defined in the policy. *Reserve Life Ins. V. Meadows*, 152 Tex. 559 (1953); *Bituminous Cas. Corp. v. Maxey*, 110 S.W.3d 203, 208-09 (Tex.App.-Houston 2003, pet. denied). "When a contract as worded can be given 'a definite or certain legal meaning,' then it is unambiguous as a matter of law and the court enforces it as written. [citation] If, however, the policy is susceptible to more than one reasonable interpretation, the court must resolve the ambiguity in favor of the insured." *Progressive County Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex.2003) (*quoting rain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex.1997). This rule applies even when the carrier's interpretation may seem more reasonable and in line with the parties' original intent so long as the insured's interpretation is not unreasonable. *See Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998).

### 1. The Duty to Defend Entitles SXSW to Defense of the Entire Action Once a Potential for Coverage Under Any Part of the Complaint Triggers Coverage.

Courts apply the eight corners rule to determine whether the duty to defend applies requiring the insurer to provide defense under the policy. *See Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997). Under the eight corners rule, the court only examines the four corners of the complaint and the four corners of the policy. *See id.* The duty to defend arises if the factual allegations in the complaint potentially support claims for which there is coverage. *Id.* In applying this rule, the court liberally interprets the factual allegations in the complaint without regard to the truth or falsity of those allegations. *See Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W. 2d 633, 635 (Tex.1973). The court resolves all doubts regarding coverage in favor of the insured. *See id.* The court determines whether the duty to defend is triggered by analyzing the factual allegations **originating the damages** rather than the legal theories alleged. *See Nat'l Union Fire Ins. Co. v. Merchs Fast Motor Lines, Inc.*, at 141. "If the complaint potentially includes a covered claim, the insurer must defend the entire suit. [citation] 'Typically, even if only one claim in a complaint containing multiple claims could be covered, the insurer must defend the entire action and the insurer must demonstrate that all the claims of the suit fall outside the policy's coverage to avoid defending the insured.'" *Zurich American Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487 (2008), *quoting* 14 COUCH ON INSURANCE § 200:1.

In the instant claim, the Insured tendered its defense of the demand letter and Complaint to Chubb on April 15th and April 25th respectively thereby tendering the Duty to Defend to Chubb under Endorsement No. 6 subsection (3). As a result, Chubb must defend the Insured in the entire action if any factual allegation from which damages originate trigger coverage. As discussed more fully below, the factual allegations in the Complaint do, in fact, trigger coverage. Chubb therefore has a duty to defend SXSW in the entire action.

### 2. The Contract Exclusion Does Not Preclude Coverage for the Entire Action.

A contract exclusion bars coverage for a claim only when the claim arises out of the contract itself and not simply because the parties' relationship arose out of a contract. *See Carolina Cas.*



Chubb North American Financial Lines Claims
July 8, 2020
Page 8

*Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 926 (N.D. Tex. 2009). There must be a causal relationship between the contract and the claim itself rather than simply providing the context for the claim. *See id.* If the claim could exist independent of any contract, the contract exclusion will not apply. *See id.* To hold that the contract exclusion applies simply because their relationship is a result of the alleged contract is an overly broad interpretation of the contract exclusion. *See id.*; *Admiral Ins. Co., Inc. v. Briggs*, 264 F.Supp.2d 460, 462 (N.D. Tex.2003) (holding that stock fraud claim was not barred by the contract exclusion in management liability policy where insured allegedly misrepresented the value of stock to get Landlord to accept stock in lieu of cash for payment under the lease contract).

In *Admiral Insurance Co. v. Briggs*, Admiral Insurance Company filed a declaratory relief action against its directors' and officers' liability policyholder after denying coverage for Briggs, an officer of CPI, in the underlying claim for stock fraud. In the underlying claim, Briggs misrepresented the value of its stock to its Landlord when Briggs convinced the Landlord to accept stock options in lieu of cash payment for the rent due under the lease agreement. Admiral contended that because the claim against Briggs involved the lease with its landlord, Admiral did not owe a defense to Briggs under its D&O policy due to the contract exclusion therein. The U.S. District Court of Texas Dallas Division held that Admiral's policy interpretation misapplied the contract exclusion because the claim sounded in stock fraud rather than breach of contract. In so ruling, the court noted that the lease only served as the basis of the relationship between the parties but the actual claim itself alleged that the Landlord **suffered harm** when CPI and its officers and directors made misrepresentations and misstatements regarding its future success in stock value– allegations that are clearly within the grant of coverage under the D&O policy. The Court noted that the lease was immaterial to the claim for stock fraud in holding that Admiral owed a defense to CPI's officers.

    **a. The Conversion Allegations Seek to Impose Liability Against SXSW in the Absence of a Contract.**

Here, the contract exclusion in the Policy echoes the above holding in carving back into coverage any claim that does not arise from "any liability in connection with any oral or written contract or agreement . . .." The Complaint alleges a claim of conversion, which sounds in tort, not contract. In this cause of action, the Complaint does not rely on the existence of a contract; the Plaintiffs' conversion claim does not mention the contract at all nor does it need to because conversion is the taking control of someone else's property to the exclusion of the rightful owner's property rights. The existence of a contract is irrelevant and is not an element of a conversion claim:

> Conversion is the "'unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights.'" Wells Fargo Bank Nw., N.A. v. RPK Capital XVI, LLC, 360 S.W.3d 691, 699 (Tex.App.-Dallas 2012, no pet.) (quoting Waisath v. Lack's Stores, Inc., 474 S.W.2d 444, 447 (Tex.1971)). To establish a claim for conversion, a plaintiff must prove that (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the

 **HIGGINBOTHAM®**

Chubb North American Financial Lines Claims
July 8, 2020
Page 9

property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. Grand Champion Film Prod., L.L.C. v. Cinemark USA, Inc., 257 S.W.3d 478, 485 (Tex. App. - Dallas 2008, no pet.).

Lawyers Title Co. v. J.G. Cooper Dev., Inc., 424 S.W.3d 713, 718 (Tex. App.—Dallas 2014, pet. denied).

Plaintiffs claim that SXSW took their money and refused to return it which, in doing so, constitutes conversion. If SXSW is held liable for conversion, such liability will not "aris[e] from or [be] in consequence of any liability in connection with any oral or written contract or agreement …." The conversion allegations therefore trigger Chubb's duty to defend.

> **b.   The Unjust Enrichment Allegations Seek to Impose Liability Against SXSW in the Absence of a Contract.**

The Complaint also alleges a claim for unjust enrichment. The unjust enrichment allegations in the Complaint also state that SXSW accepted and enjoyed the benefits of the ticket sales. It further alleges that SXSW's retention of those benefits is unjust and inequitable. In using the term "inequitable," Plaintiffs are acknowledging that Unjust Enrichment is an equitable doctrine not sounding in a legal basis for Plaintiffs' claim for a refund. Like conversion, a claim of unjust enrichment does not require proof of a contract. *See Bado Equip. Co., Inc. v. Bethlehem Steel Corp.*, 814 S.W.2d 464, 473 (Tex. App. – Houston [14th Dist.] 1991, no writ). Indeed, the existence of a contract *precludes* recovery for unjust enrichment. *Id.*; *TransAmerican Natural Gas Corp. v.* Finkelstein, 993 S.W.2d 591, 600 (Tex.App. – San Antonio 1996, writ denied) (there can be no recovery for unjust enrichment if the same subject is covered by an express contract).

To be clear: under Texas law, a plaintiff may recover on a theory of unjust enrichment *only if a contract does not cover the subject matter of the* claim. Therefore, the express terms of the Contract exclusion do not apply to the Plaintiffs' unjust enrichment claim because, if SXSW is held liable on the Plaintiffs' unjust enrichment, such liability will *not* be "[B]ased upon, arise[e] from, or [be] in consequence of any liability in connection with any oral or written contract or agreement to which [SXSW] is party . . . ." The policy makes this limitation on the Contract exclusion absolutely clear in its next clause, which states that "this Exclusion (b)(1) *shall not* apply to the extent that [SXSW] would have been liable *in the absence of such contract or agreement.*" Because SXSW can only be liable for the Plaintiffs' unjust enrichment *if there is no contract*, the Contract exclusion does not apply to the Plaintiffs' unjust enrichment claim.

Therefore, The Complaint's allegation of the non-contract claims of conversion and unjust enrichment trigger Chubb's duty to defend because they do not rely on the existence of, stand separate and apart from, a viable contract.



Chubb North American Financial Lines Claims
July 8, 2020
Page 10

     **c.** **The Breach of Contract Allegations Do Not Rely on Any Contract Provision from Which Plaintiffs' Damages Arose.**

For the Contract exception to apply, there must be a Loss based on a Claim "based upon, arising from or in consequence of any liability in connection with any oral or written contract or agreement" to which SXSW is a party. Although the Complaint refers to a contract between the Plaintiffs and SXSW, it does not allege facts that lead to SXSW's liability based on that contract. The Complaint alleges that the no-refund policy is not enforceable, that the venue and choice-of-law provisions are enforceable, but it does not claim that the contract contains a provision precluding SXSW from withholding badge refunds in the event the festival is cancelled by the City.

Instead, the gravamen of the Complaint is that there is no enforceable contract provision which would allow SXSW to withhold the ticket sale refunds. So, although the Complaint pleads a breach of contract cause of action, the facts alleged actually aver the absence of liability arising from a contract, contrary to Chubb's statement in its denial letter. The facts alleged in the Complaint do not constitute a breach of contract allegation at all. Instead, the Complaint avers there is no contract giving SXSW a right to retain the money. Plaintiffs' alleged damages arose out of the allegation that SXSW had no legal basis, i.e., no contractual right, to withhold their refunds. The Complaint does not point to one paragraph of the alleged contract that Plaintiffs claim SXSW breached in failing to return their money. Therefore, the Complaint does not arise out of any contract at all.

Based on all of the above, Chubb has improperly applied the "based upon, arising from or in consequence of any liability in connection with any oral or written contract" language in the overly broad manner disapproved in the Admiral Insurance holding pointing only to the contract as forming the relationship between the parties. Taking the facts, rather than the theories pled, the Complaint is not about breach of contract and does not arise out of contract. SXSW's liability, if any, to the ticket purchasers exists in the absence of the contract. As such, Chubb's duty to defend is triggered requiring Chubb to defend the entire action.

     **3.** ***The Professional Services Exclusion Does Not Preclude Coverage for the Administrative Activities of the Insured.***

Chubb contends that the Professional Services excludes coverage for SXSW's act in refusing to refund ticketholder money.  Under Texas law, "professional services" exclusions only apply to



# HIGGINBOTHAM®

Chubb North American Financial Lines Claims
July 8, 2020
Page 11

exclude those damages that directly stem from the performance of "professional services." What constitutes a "professional service" was set forth in *Atlantic Lloyd's Insurance Co. of Texas v. Susman Godfrey, L.L.P.,* 982 S.W.2d 472 (Tex.App.-Dallas 1998, pet. denied) which held:

> [I]t is clear that a professional must perform more than an ordinary task to perform a professional service. To qualify as a professional service, the task must arise out of acts particular to the individual's specialized vocation. We do not deem an act a professional service merely because it is performed by a professional. Rather, it must be necessary for the professional to use his specialized knowledge or training.

*Id.* at 513. This rule is further clarified to provide that professional services are evaluated not by the title or person performing the service but by the act itself, so that even those acts performed by professionals considered ordinary activities or administrative in nature are not considered professional services. *See Marx v. Hartford Accident & Indemn. Co.,* 183 Neb. 12, 157 N.W.2d 87, 871-72 (1968) *cited with approval by Gregg & Valby, L.L.P.,* 316 F.Supp.2d 505 (S.D. Tex. 2004); *Atlantic Lloyd's,* 982 S.W.2d at 476-77. More particularly, billing and fee-setting activities and practices are not professional services but merely administrative tasks inherent in all businesses. *See Med. Records Assocs.,* 142 F.3d at 512; *Visiting Nurse Ass'n,* 65 F.3d at 1101. Elaborating further on this distinction, the setting of the fee and billing neither required specialized learning nor special training but rather the bill "is an effect of the service provided, not part of the service itself." *Medical Records Assocs.,* 142 F.3d at 515-16. Moreover, in *Horizon West Inc. v. St. Paul Fire & Marine Insurance Co.,* 214 F. Supp.2d 1074, 1078-79 (E.D.Cal.2002), the court held that the nursing home's submission of fraudulent medicare claims for services it did not provide did not constitute professional services but the billing was only an effect of the professional services the home provided.

Turning to the claim at issue, SXSW's professional services included organizing the Festival, determining who should present at the Festival, making the travel arrangements for those presenters, and all of the arrangements for the presentations themselves at the Festival venue. Plaintiffs allege that SXSW refused to refund the money plaintiffs paid to gain access to the Festival. However, the refusal to refund Plaintiffs' money does not constitute a professional service because it does not involve a specialized skill, vocation or training. Rather, the ticket sales and any refunds for the Festival fall in the category of non-professional services as part of the billing, being the effect of the professional services but not part of the professional service itself. Therefore, the Professional Services exclusion does not bar coverage for these claims.

## CONCLUSION

SXSW purchased the Policy to provide coverage for non-contract claims made based on alleged acts and omissions rendered in organizing the South by Southwest Festival. The duty to defend requires that Chubb defend its insured if there is a potential for coverage under any allegation in the Complaint. The conversion and unjust enrichment allegations in the Complaint clearly fall



Chubb North American Financial Lines Claims
July 8, 2020
Page 12

outside the contract exclusion because they do not rely on the contract for their support.  In fact, the entire Complaint avers that there is no enforceable contract that would allow SXSW to withhold refunding the ticket price to the attendees. As such, all of the allegations fall within the exception to the contract exclusion.  The Professional Services exclusion does not exclude coverage because ticket sales, like billing statements, do not constitute "professional services." Since no other exclusion applies to bar coverage under the Policy, Chubb has a duty to defend SXSW for this entire litigation.  We therefore respectfully request that Chubb withdraw its denial letter and afford SXSW coverage under the Policy.


Respectfully submitted,

Kathleen M. Bragg-Pebley, Esquire
Director of Coverage and Litigation


Cc:  Heather Van Dyke via email only



The Chrysler Building

405 Lexington Avenue

New York, New York 10174

Telephone: 212 710 3900

Facsimile: 212 710 3950

www.clydeco.us

Edward.Kirk@clydeco.us

August 13, 2020

**VIA E-MAIL**

Ms. Kathleen M. Bragg-Pebley
Higginbotham
500 W. 13th Street
Fort Worth, Texas 76102

Re:    Parent Organization:    SXSW LLC
       Policy Number:    8251-9627
       Writing Company:    Federal Insurance Company
       Claim Number:    KY20K2212914
       Matter:    April 11, 2020 demand letter from Law Office of Joel Skinner on behalf of Steven Leventhal (the "Demand")
          *Maria Bromley and Kleber Pauta, et al. v. SXSW, LLC and SXSW Holdings, Inc.* (the "Complaint")

Dear Ms. Bragg-Pebley:

This firm represents Federal Insurance Company ("Chubb"), which issued the above-referenced policy (the "Policy") in connection with the notification of the Demand and Complaint under the Policy. We write in response to your July 8, 2020 letter disputing Chubb's May 18, 2020 letter denying coverage for these matters and to supplement Chubb's prior correspondence in this regard.

We understand that you are acting on behalf of SXSW LLC ("SXSW") with respect to insurance coverage matters and the claim for coverage under the Policy. If our understanding is not correct, please forward our correspondence to the appropriate party and advise us as soon as possible.

We have considered the arguments in your July 8, 2020 letter and the coverage provided under the Policy. As explained in Chubb's prior correspondence and further below, coverage is precluded by the Policy's Contract and Professional Services Exclusions, and Chubb will neither advance Defense Costs nor indemnify SXSW in connection with these matters. Chubb continues to reserve all other rights and defenses and we incorporate Chubb's May 18, 2020 letter into this letter.

Mr. Kathleen M. Bragg-Pebley
August 13, 2020
Page 2

### 1.      The Contract Exclusion Precludes Coverage

Exclusion B(1) of the D&O Coverage Part of the Policy provides that "[t]he Company shall not be liable for **Loss** on account of any **Claim** against an **Organization**…based upon, arising from or in consequence of any liability in connection with any oral or written contract or agreement to which an **Organization** is a party, provided that this Exclusion (B)(1) shall not apply to the extent that such **Organization** would have been liable in the absence of such contract or agreement" (the "Contract Exclusion").

Both the Demand and the Complaint are based upon, arise from and are in consequence of liability in connection with the written agreement between SXSW and the Plaintiffs governing their purchase of tickets and attendance at the SXSW Festival.  Your letter describes the Demand as alleging that "the online contract force majeure clause is insufficient to alleviate SXSW, LLC's performance obligations and that the ticket deferral portion of the contract is ambiguous and inconsistent with other language in the contract."  The Complaint asserts that "in order to purchase Credentials [for the 2020 South by Southwest Festival] SXSW requires purchasers to agree to its Participation and Credentials Terms and Conditions ("PCT&C")[.]"

The Plaintiffs allege that the PCT&C includes a "Refund and Revocation Policy" providing that "SXSW may, in its sole discretion and at any time determined by SXSW, cancel, revoke, or refuse … Credentials, purchases, and/or hotel reservations made through SXSW" and further stating that SXSW "does not issue refunds under any circumstances[.]"  According to the Complaint, "[t]hrough the Refund and Revocation Policy SXSW purports to reserve the right to retain any and all monies paid for credentials and passes regardless of whether SXSW elects to put on the festival…[but] [i]f enforced, however, the Refund and Revocation policy would render the PCT&C an unenforceable, illusory, unilateral option contract that allows SXSW to sell Credentials, cancel the Festival for any or no reason whatsoever, and retain all customer payments while leaving Plaintiffs and the Class without a remedy."  As such, the Plaintiffs allege that the Refund and Revocation Policy of the PCT&C that SXSW relied upon to refuse to refund the amounts the Plaintiffs paid for their tickets is unlawful, unconscionable and unenforceable and should be held invalid, illegal or unenforceable. Pursuant to the PCT&C's severability provision, however, the remaining provisions of the PCT&C are allegedly enforceable with respect to the dispute.

The Plaintiffs assert that they, and the putative class "entered into a contract with SXSW" and "performed their obligations under the contract by providing payment in consideration for Credentials[.]"  The Plaintiffs allege that, because the "Refund and Revocation Policy" is invalid and unenforceable, SXSW has breached the contract by failing to refund "all monies paid to SXSW for Credentials" when the SXSW Festival was cancelled.  As a result of SXSW's alleged breach of contract, each count of the Complaint seeks the identical relief, namely the return or recovery of "any amounts paid to SXSW for Credentials, as well as attorneys' fees, costs and interest."

The Contract Exclusion applies to any **Claim** based upon, arising from or in consequence of liability in connection with a written contract or agreement to which SXSW is a party, if SXSW would not be liable in the absence of such contract or agreement.  The Demand and Complaint seek to compel SXSW to return amounts the Plaintiffs paid to SXSW pursuant to the PCT&C agreement, which is attached as Exhibit A to the Complaint and governed the Plaintiffs' purchase of the Credentials and

Mr. Kathleen M. Bragg-Pebley
August 13, 2020
Page 3

attendance at the SXSW Festival. SXSW's liability to refund the Plaintiffs' money will be determined by whether SXSW can rely on the Refund and Revocation provision of the PCT&C agreement or whether it must refund the payments made by the Plaintiffs pursuant to the other valid and enforceable provisions of the PCT&C. *See Carolina Cas. Ins. Co. v. Sowell,* 603 F. Supp. 2d 914, 926 (N.D. Tex. 2009) (finding that a similar "Contract Exclusion bars coverage of the claims…[where such claims] arise out of the lease contract.").

The Complaint also alleges that "the agreement into which SXSW entered with Plaintiffs and every member of the Class [the PCT&C] contains a forum selection clause that vests exclusion jurisdiction over this action 'in the United States federal and state courts located in Austin, Texas.'"  The Plaintiffs allege further that Texas law "governs the claims of each and every Class member" pursuant to the choice-of-law provision in the PCT&C, and the PCT&C and its choice of law provision remain enforceable notwithstanding the alleged invalidity and unenforceability of the Refund and Revocation provision. Accordingly, the allegations that the dispute is governed by the jurisdiction and choice of law provisions of the PCT&C agreements confirms that the **Claim** is based upon, arises out of and in consequence of liability under a written contract or agreement.

Further, SXSW would not be liable in the absence of the PCT&C.  The Plaintiffs were required to agree to the PCT&C when they purchased their tickets, and SXSW's liability is governed by the PCT&C.

Your letter argues that the Contract Exclusion does not apply because PCT&C merely provides context for the Claim and the parties' relationship.  According to your letter, "[a] contract exclusion bars coverage for a claim only when the claim arises out of the contract itself", and "[t]here must be a causal relationship between the contract and the claim itself..."  As discussed above, the **Claim** is causally connected to and would not exist without the PCT&C.  *See Sowell, Id.* at 927 (holding that where "claims are causally connected to the lease contract and could not exist without the lease…[t]hey are all clearly based upon, arise out of, result from, are in consequence of, or involve the lease.").  Unlike the lease agreement referenced in the underlying stock fraud claim in *Admiral Ins. Co. v. Briggs*, the agreement at issue here does not merely provide the "context" for the **Claim**, but rather the **Claim** is based upon, arises from and in consequence of liability in connection with the agreement itself, and would not otherwise exist in the absence of the PCT&C agreement.  264 F. Supp. 2d 460, 462 (N.D. Tex. 2003).

Next, SXSW attempts to create coverage based on potential theories of liability relating to the conversion and unjust enrichment causes of action of the Complaint. According to your letter, the Contract Exclusion cannot apply with respect to those causes of action because they sound in tort, rather than breach of contract, and liability may be imposed for such legal claims in the absence of a contract, rather than breach of contract. As your letter acknowledges, however, coverage is determined based on "the factual allegations that show the origin of the damages rather than on the legal theories alleged." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997) (internal citations omitted).  In this respect, "[i]t is not the cause of action alleged that determines coverage but the *facts* giving rise to the alleged actionable conduct." *See also Adamo v. State Farm Lloyds Co.*, 853 S.W.2d 673, 676 (Tex.App.—Houston [14th Dist.] 1993, writ denied)(emphasis in original); *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 928 (N.D. Tex.

Mr. Kathleen M. Bragg-Pebley
August 13, 2020
Page 4

2009) (noting that "[t]he court must consider the facts DPL alleged rather than the legal theories asserted", and ultimately holding that a negligence claim fell within a contract exclusion).

The Contract Exclusion applies as the **Claim** is based upon, arises from and is in consequence of liability in connection with the PCT&C agreement. The causes of action for breach of contract, conversion and unjust enrichment all arise out of the same factual allegations. Specifically, the Plaintiffs allege that SXSW and the Plaintiffs purchased Credentials for the SXSW Festival pursuant to the PCT&C agreement, SXSW breached its contractual obligations to provide the Plaintiffs access to and services at the Festival, the Refund and Revocation provision of the PCT&C is not enforceable, and SXSW must refund the money the Plaintiffs paid to SXSW pursuant to the other enforceable terms of the PCT&C. SXSW's alleged enrichment is "unjust" only if the Refund and Revocation provision is unenforceable, and the unjust enrichment cause of action is merely an alternative theory of liability seeking the same damages the Plaintiffs contend they are entitled to under the PCT&C agreement. *See Altom Transp., Inc. v. Westchester Fire Ins. Co.*, 823 F.3d 416, 421–22 (7th Cir. 2016)(finding that coverage for unjust enrichment was precluded under a similar contract exclusion). Similarly the Plaintiffs can only establish conversion if the Refund and Revocation provision of the PCT&C agreement is found to be invalid, rendering SXSW's possession of the disputed payments unlawful and without authorization. *See Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App. 2009).

As the court explained in *Sowell*, the terms of the Contract Exclusion "cannot be reasonably read to limit it to breach of contract claims." 603 F. Supp. 2d at 931 (holding that whether a claim "could sound in tort does not change the fact that it is based on the lease" and such claims would still be precluded by the contract exclusion). The Contract Exclusion applies to any **Claim** against SXSW based upon, arising from or in consequence of *any* liability in connection with a contract or agreement to which an **Organization** is a party, unless SXSW would have been liable in the absence of such contract or agreement. It cannot be reasonably disputed that the Demand and Complaint, which repeatedly refer to the PCT&C agreement, are based upon, arise from or are in consequence of liability in connection with that agreement, or that SXSW would not be liable in the absence of that agreement as the Plaintiffs purchased the Credentials pursuant to the PCT&C.

Finally, SXSW argues that the Contract Exclusion does not apply even with respect to the breach of contract cause of action because "[t]he breach of contract allegations do not rely on any contract provision from which plaintiffs' damages arose." According to your letter, the "facts alleged actually aver the absence of liability arising from a contract." As your letter acknowledges, however, "the gravamen of the Complaint is that there is no enforceable contract provision which would allow SXSW to withhold the ticket sale refunds," and "Plaintiffs' alleged damages arose out of the allegation that SXSW had no legal basis, i.e., no contractual right, to withhold their refunds."[1] The

---

[1] SXSW itself acknowledges in the underlying litigation that the PCT&C governs the Plaintiffs' purchase of the Credentials and SXSW's liability to pay refunds to the Plaintiffs. In its Answer to the Complaint, SXSW admitted that it "is not providing cash refunds to purchasers of credentials because each purchaser agreed their purchase was non-refundable and because the City's cancellation of SXSW 2020 made it impossible for SXSW, LLC, to perform." (*See Paragraphs 4, 6, 11, 18, 45, 58 of the Defendant's Answer*). Further, SXSW stated in its Answer that "[a]lthough it is the Plaintiffs' burden to prove a breach of contract, the Plaintiffs cannot prove the essential element of breach because they knowingly assented to SXSW's Terms expressly providing that credentials were non-refundable and expressly assumed

Mr. Kathleen M. Bragg-Pebley
August 13, 2020
Page 5

Complaint specifically alleges that SXSW refused to provide refunds on grounds that the PCT&C state that SXSW "does not issue refunds under any circumstances" and "[a]ny and all payments made to SXSW are not refundable[.]" The Plaintiffs further assert that: (1) the "Refund and Revocation Policy" provision "is unlawful and unenforceable"; (2) is severed from the otherwise valid contract; and (3) the Plaintiffs and putative class are entitled to "a refund of all monies paid to SXSW for Credentials for the 2020 festival." The Plaintiffs challenge the enforceability of a contractual provision in the PCT&C agreement (i.e., the Refund and Revocation provision) and seek to recover a refund under the otherwise lawful or enforceable provisions of the PCT&C agreement. Moreover, the Plaintiffs allege that the Refund and Revocation provision is the very basis for SXSW's refusal to provide refunds. Accordingly, the **Claim** is based upon, arising from and in consequence of liability in connection with the PCT&C agreement.

Therefore, the Contract Exclusion applies to the Demand Letter and the Complaint, and coverage is precluded for the **Claim**.

### 2.    The Professional Services Exclusion Precludes Coverage

The Service Industry Endorsement to the D&O Coverage Part provides that "[t]he Company shall not be liable under this Coverage Part for **Loss** on account of any **Claim** based upon, arising from, or in consequence of the rendering of, or failure to render, any **Professional Services** by an **Insured**..." "**Professional Services**" is defined by the D&O Coverage Part to mean "services which are performed for others for a fee."

The Complaint alleges that SXSW scheduled, oversaw, organized and managed the SXSW Festival for the Spring of 2020. The SXSW Festival apparently involved tens of thousands of attendees from across the world, would have created no less than $350 million in revenue for the City of Austin, included 4,400 speakers, 2,000 musical performances, 425 film screenings and required contracting with more than 90 music venues, seven film festival venues, the Austin Convention Center and more than 60 hotels. As your letter acknowledges, "SXSW's professional services included organizing the Festival, determining who should present at the Festival, making the travel arrangements for those presenters, and all of the arrangements for the presentations themselves at the Festival venue. Plaintiffs allege that SXSW refused to refund the money plaintiffs paid to gain access to the Festival." The Plaintiffs allege that they paid to attend the Festival organized and managed by SXSW, but were deprived of these and other services for which they paid when the Festival was canceled. It is indisputable that the **Claim** is based upon, arises out of and is in consequence of SXSW's failure to render services for others for a fee, and there would be no dispute over refunds if SXSW had provided the services the Plaintiffs purchased pursuant to the PCT&C agreement.    Therefore, the Professional Services Exclusion applies as the **Claim** is based upon, arising from, and in consequence of SXSW's failure to render services performed for others for a fee.

In your letter, SXSW cites to a number of distinguishable cases and argues that "professional services" requires more than ordinary tasks, and must "arise out of acts particular to the individuals'

the risk of loss. The City of Austin cancelled SXSW 2020, thus making performance impossible, illegal, and/or impracticable and frustrating the purpose of the contract." (*See Paragraphs 2 and 3 of the Defendants' Affirmative Defenses*).

Mr. Kathleen M. Bragg-Pebley
August 13, 2020
Page 6

specialized vocation" and "us[ing] his specialized knowledge or training." *Atlantic Lloyd's Insurance Co. of Texas v. Susman Godfrey, L.L.P.*, 982 S.W.2d 472, 513 (Tex. App.-Dallas 1998, pet. denied).[2] On that basis, SXSW attempts to characterize the **Claim** as arising from "billing and fee-setting activities and practices" that "are not professional services but merely administrative tasks inherent in all business." The Policy defines **"Professional Services"** to mean "services which are performed for others for a fee." As your letter concedes, the **Claim** alleges that the Plaintiffs are entitled to a refund of the amounts they paid to attend the SXSW Festival because SXSW failed to provide the services for which the Plaintiffs' paid, specifically SXSW's organization and management of the Festival, which SXSW itself describes as professional services. The **Claim** is not merely for improper billing practices or administrative tasks, but rather SXSW's failure to provide the Plaintiffs with the services for which they paid at the SXSW Festival.

As the **Claim** is based upon, arises from and in consequence of the rendering or failure to render services performed for others for a fee, the Professional Services Exclusion also precludes coverage.

### 3.   The Insured Has the Duty to Defend

We note that SXSW asserts that Chubb has the duty to defend under the Policy. According to your letter, SXSW tendered the defense of the Demand to Chubb on April 15, 2020 and the Complaint on April 25, 2020 pursuant to Endorsement No. 6, subsection (3) and Chubb therefore has a duty to defend SXSW. Section VIII, Defense and Settlement, as amended by Endorsement No. 6 to the D&O Coverage Part, provides that SXSW "(1) shall have the sole duty to defend Claims made against the Insured…", but "[n]otwithstanding paragraph (1) of this Endorsement, the **Insureds** shall have the option to tender the defense of any **Claim** to the Company by notifying the Company within a reasonable time after such **Claim** is first received by the **Insured**, but in no event later than thirty (30) days after the date such **Claim** is first received by the **Insured**." (emphasis added) Prior to your July 8, 2020 letter, SXSW did not notify Chubb that it was tendering the defense of the **Claim** to Chubb. As SXSW did not notify Chubb that it was tendering the defense of the **Claim** within 30 days after the date the **Claim** was first received by the Insured on April 15, 2020, SXSW would have "the sole duty to defend **Claims** made against the **Insured**" irrespective of the coverage issues discussed above.

For the reasons set forth above and in Chubb's prior correspondence, Chubb reiterates its denial of coverage and will neither defend nor indemnify SXSW in connection with the Demand or the Complaint.

---

[2] The cases cited in your letter with respect to the meaning of **"Professional Services"** either involved policies that did not define "professional services" or had different definitions of "professional services" than the Policy. For example, in *Atlantic Lloyd's*, the policy defined "professional services" to mean: "LEGAL SERVICES INCLUDED BUT NOT LIMITED TO COUNSELING, ADVICE, OR ANY OTHER SERVICES REGARDLESS OF WHERE, HOW AND BY WHOM PROVIDED WHICH MAY BE OR ARE PROVIDED OR RENDERED BY LAWYERS, PARALEGALS AND OTHERS WORKING IN A LAW OFFICE AND/OR ADMINISTRATION, MANAGEMENT OR OTHER SERVICES ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE LEGAL SERVICES DESCRIBED HEREIN." 982 S.W.2d 472, 476 (Tex. App. 1998). A court's interpretation of the meaning of an entirely different definition of "professional services" has no bearing on the unambiguous meaning of the **"Professional Services"** definition in the Policy.

Mr. Kathleen M. Bragg-Pebley
August 13, 2020
Page 7


Chubb continues to reserve all rights under the Policy, at law and in equity, including the right to deny and/or limit coverage based on any additional grounds not expressly set forth herein. By issuing this letter, Chubb does not waive any rights or defenses and specifically reserves all rights, remedies and defenses under the Policy, applicable law and in equity.  Nothing contained herein should be deemed or construed to be an admission of coverage or a waiver of any of the terms or conditions of the Policy, including but not limited to the timeliness of notice and as to the validity of the Policy.


Very truly yours,


Edward J. Kirk
Clyde & Co US LLP


Cc:     Linda Harris (by email)
          Chubb

CHUBB® Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
**General Terms and Conditions**

**GTC DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws of Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN  46204-1927

**Policy Number**:   8251-9576

NOTICE: THE "CLAIMS MADE LIABILITY COVERAGE PARTS" PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD.    THE MEDIAGUARD OCCURRENCE COVERAGE PART PROVIDES OCCURRENCE COVERAGE, WHICH APPLIES TO "CLAIMS" MADE AT ANY TIME THAT ARISE FROM "WRONGFUL ACTS" OCCURRING DURING THE "POLICY PERIOD".

THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS MAY BE REDUCED OR COMPLETELY EXHAUSTED BY "DEFENSE COSTS" AND "SUBPOENA DEFENSE COSTS", AND "DEFENSE COSTS" AND "SUBPOENA DEFENSE COSTS" WILL BE APPLIED AGAINST THE APPLICABLE RETENTION.  IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS", "SUBPOENA DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.  READ THE ENTIRE POLICY CAREFULLY.

**Item 1.**   **Parent Organization:**   SXSW LLC
Principal Address:   P. O. Box 685289
Austin, TX 78768

**Item 2.**   **Policy Period:**
(A)  From:   August 17, 2019
(B)  To:   August 17, 2020
At 12:01 AM local time at the address shown in Item 1.

**Item 3.**   **Combined Maximum Aggregate Limit of Liability:**

The Combined Maximum Aggregate Limit of Liability for all **Claims** under all **Liability Coverage Parts** shall be: $1,000,000.00

**Item 4.**   **Coverage applicable to this Policy:**

[X]  Miscellaneous Professional and Technology Services Liability Coverage Part
(for Professional Service Firms)

[ ]  Technology Products and Services Liability Coverage Part
(for Technology Companies)

[X]  MediaGuard Claims Made Liability Coverage Part

[ ]  MediaGuard Occurrence Liability Coverage Part

[ ]  CyberSecurity Coverage Part

**C H U B B**' **Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*General Terms and Conditions*

**Item 5.    Extended Reporting Period:**

(A) Additional Period:          1 year

(B) Additional Premium:      100 % of Annual Premium


In witness whereof, the Company issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

**FEDERAL INSURANCE COMPANY**

| | |
|---|---|
| Secretary | President |

| | |
|---|---|
| August 15, 2019 | |
| Date | Authorized Representative |

 **CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>

*General Terms and Conditions*

---

In consideration of payment of the premium and subject to the Declarations and the limitations, conditions, provisions and other terms of this Policy, the Company and the Insureds agree as follows:

---

**I.  TERMS AND CONDITIONS**

Except for these General Terms and Conditions or unless stated to the contrary in any Coverage Part, the terms and conditions of each Coverage Part apply only to that Coverage Part.  If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.  All references to "Section", "Subsection", "Paragraph" or "Subparagraph" in these General Terms and Conditions shall apply only to these General Terms and Conditions, unless otherwise stated. All references to "Section", "Subsection", "Paragraph" or "Subparagraph" in a Coverage Part, shall apply only to such Coverage Part, unless otherwise stated.

---

**II.  DEFINITIONS**

**Claim** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Claims Made Liability Coverage Part** means all **Liability Coverage Parts**, except the MediaGuard Occurrence Liability Coverage Part.

**Covered Subpoena** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Defense Costs** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Expense** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Insured** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Insured Person** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Liability Coverage Part** means:

(A)     the Miscellaneous Professional and Technology Services Liability Coverage Part, Technology Products and Services Liability Coverage Part, MediaGuard Claims Made Liability Coverage Part, and MediaGuard Occurrence Liability Coverage Part; and

(B)     Insuring Clauses (A), Cyber Liability Coverage and (B), Privacy Regulatory Action Coverage, of the CyberSecurity Coverage Part,

if purchased as set forth in Item 4, Coverage applicable to this Policy, of the GTC Declarations.

**Loss** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Managing Partner** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Non-Liability Coverage Part** means Insuring Clauses (C), Privacy Notification and Crisis Management Expenses Coverage; (D), Reward Expenses Coverage; and (E), Additional Expenses Coverage, of the CyberSecurity Coverage Part, if purchased as set forth in Item 4, Coverage applicable to this Policy, of the GTC Declarations.

**Organization** means the **Parent Organization** and any **Subsidiary**. **Organization** shall also mean any such entity as a debtor in possession under United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

**Parent Organization** means the entity named in Item 1 of the GTC Declarations.

CHUBB®  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

***Chubb Professional Portfolio*<sup>SM</sup>**

*General Terms and Conditions*

**Policy Period** means the period of time set forth in Item 2 of the GTC Declarations, subject to any prior termination in accordance with Section IX, Termination of Policy.

**Production** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Related Claims** means all **Claims** for **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

**Related Expenses** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Subpoena Defense Costs** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Subsidiary** means:

(A)    any entity while more than fifty percent (50%) of the outstanding securities representing the present right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers or equivalent positions of such entity are owned, or controlled, by the **Parent Organization**, directly or through one or more **Subsidiaries**;

(B)    any entity formed as a partnership while more than fifty percent (50%) of the ownership interests representing the present right to vote for election of or to appoint the management or executive committee members or equivalent positions of such entity are owned, or controlled, by the **Parent Organization**, directly or through one or more **Subsidiaries**; or

(C)    any entity while:

(1)    exactly fifty percent (50%) of the voting rights representing the present right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers or equivalent positions of such entity are owned, or controlled, by the **Parent Organization**, directly or through one or more **Subsidiaries**; and

(2)    the **Parent Organization**, pursuant to a written contract with the owners of the remaining and outstanding voting stock of such entity, solely controls the management and operation of such entity.

**Wrongful Act** shall have the meaning ascribed to that term in each applicable Coverage Part.

---

**III.    LIMIT OF LIABILITY**

(A)    With respect to the **Liability Coverage Parts**:

(1)    The Company's maximum aggregate limit of liability for all **Loss** and all **Subpoena Defense Costs** during each **Policy Period** under all **Liability Coverage Parts** of this Policy, combined, shall be the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations. However, any **Loss** or **Subpoena Defense Costs** paid under any **Liability Coverage Part** shall not exceed the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations of such Coverage Part.

(2)    **Defense Costs** and **Subpoena Defense Costs** are part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations of each **Liability Coverage Part** and payment by the Company of **Defense Costs** and **Subpoena Defense Costs** shall reduce and may exhaust such Limits of Liability.

(B)   With respect to any **Non-Liability Coverage Part**, the Company's maximum liability shall be the Limits of Liability set forth in the Declarations applicable to such **Non-Liability Coverage Part**.

(C)   If the **Policy Period** is less than or greater than one year, then the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations and any applicable Limit of Liability in any Coverage Part shall apply to the entire **Policy Period**.

## IV. RELATED CLAIMS AND RELATED EXPENSES

(A)   With respect to the **Claims Made Liability Coverage Parts**, all **Related Claims** shall be deemed a single **Claim** made in the **Policy Period** in which the earliest of such **Related Claims** was first made or first deemed to have been made in accordance with the Reporting section of the applicable Coverage Part (the "Earliest Related Claim"). All **Related Claims** shall be subject to the same Retention and Limits of Liability applicable to the Earliest Related Claim.

(B)   With respect to the **Non-Liability Coverage Parts**, all **Related Expenses** shall be deemed a single **Expense** incurred or discovered, as applicable, in the **Policy Period** in which the earliest of such **Related Expenses** is incurred or discovered (the "Earliest Related Expenses"). All **Related Expenses** shall be subject to the same Retention and Limits of Liability applicable to the Earliest Related Expense.

(C)   With respect to the **Claims Made Liability Coverage Parts** and **Non-Liability Coverage Parts**, if any **Claims** and **Expenses** are based upon, arising from or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, then all such **Claims** and **Expenses** shall be deemed made, incurred or discovered, as applicable, in the earliest of the following:

(1)   the **Policy Period** in which the earliest of such **Claims** is first made or deemed to have been made; or

(2)   the **Policy Period** in which the earliest of such **Expenses** is deemed to have been incurred or discovered,

and shall be subject to the applicable Retentions and Limits of Liability of such **Policy Period**.

(D)   With respect to the MediaGuard Occurrence Liability Coverage Part, all **Related Claims** shall be deemed a single **Claim**. All **Related Claims** shall be subject to the same Retention and Limits of Liability.

## V. EXTENDED REPORTING PERIOD

With respect to the **Claims Made Liability Coverage Parts**:

(A)   If this Policy does not renew or otherwise terminates for a reason other than for failure to pay premium (each a "Termination of Coverage"), then an **Insured** shall have the right to purchase an Extended Reporting Period for the Additional Period and Additional Premium set forth in Item 5 of the GTC Declarations.

(B)   In the event of a Termination of Coverage and upon request from an **Insured**, the Company shall, in its sole discretion, provide a quote for Additional Periods other than as set forth in Item 5, Extended Reporting Period, of the GTC Declarations. Any such additional quote offered shall be subject to such Additional Premium as the Company may require.

(C)   The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

**CHUBB®**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**Chubb Professional Portfolio**[SM]
**General Terms and Conditions**

(D) This right to purchase an Extended Reporting Period shall lapse unless written notice of election to purchase the Extended Reporting Period, together with payment of the applicable Additional Premium, is received by the Company within sixty (60) days after the effective date of the Termination of Coverage.

(E) If an Extended Reporting Period is purchased, then coverage otherwise afforded by this Policy shall be extended to apply to **Claims**: (1) first made during such Extended Reporting Period; and (2) reported to the Company pursuant to the Reporting section of the applicable Coverage Part, but only to the extent such **Claims** are for **Wrongful Acts** before the effective date of such Termination of Coverage or the date of any conversion of coverage described in Section VI, Changes in Exposure, whichever is earlier.  Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the **Policy Period** immediately preceding the Extended Reporting Period.

(F) The entire premium for the Extended Reporting Period shall be deemed fully earned at the inception of such Extended Reporting Period.

(G) The limit of liability for the Extended Reporting Period is part of and not in addition to the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations.

## VI.  CHANGES IN EXPOSURE

(A) **Acquisition of Another Organization**

(1) If before or during the **Policy Period** an **Organization** acquires voting rights in another entity such that the acquired entity becomes a **Subsidiary**,

(2) then coverage shall be provided for such **Subsidiary** and its **Insureds** with respect to any:

(a) **Liability Coverage Part**, solely for **Claims** for **Wrongful Acts** after such acquisition; or

(b) **Non-Liability Coverage Part**, solely after the effective date of such acquisition subject to Section XII, Liability for Prior Losses, of the CyberSecurity Coverage Part.

(B) **Cessation of Subsidiaries**

(1) If before or during the **Policy Period** an **Organization** ceases to be a **Subsidiary**,

(2) then with respect to any:

(a) **Liability Coverage Part**, coverage for such **Subsidiary** and its **Insureds** shall continue until termination of this Policy in accordance with Section VI(C), Conversion of Coverage Under Certain Circumstances, or Section IX, Termination of Policy, whichever occurs first, but only for **Claims** for **Wrongful Acts** while such **Organization** was a **Subsidiary**; or

(b) **Non-Liability Coverage Part**, such **Subsidiary** and its **Insureds** shall cease to be **Insureds** as of the effective date of such cessation and coverage under this Policy shall apply as provided in such **Non-Liability Coverage Part**.

(C) **Conversion of Coverage Under Certain Circumstances**

(1) If during the **Policy Period** any of the following events occur:

(a) another entity, person or group of entities or persons acting in concert, acquires more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of or to appoint directors, trustees, members of the Board of Managers or management committee members of the **Parent Organization**;

(b) another entity, person or group of entities or persons acting in concert, acquires the right to vote for the election of or to appoint the **Managing Partner** or the majority of management or executive committee members of the **Parent Organization**, if the **Parent Organization** is a partnership;

(c) the acquisition of all or substantially all of the **Parent Organization's** assets, by another entity, person or group of entities or persons acting in concert, or the merger of the **Parent Organization** into or with another entity such that the **Parent Organization** is not the surviving entity; or

(d) the **Parent Organization** emerges from bankruptcy as of the effective date stated in the plan of reorganization,

(2) then:

(a) any applicable coverage under this Policy with respect to:

(i) any **Liability Coverage Part**, shall continue until the expiration of the current **Policy Period**, solely for **Claims** for **Wrongful Acts** prior to such event; or

(ii) any **Non-Liability Coverage Part**, shall continue until the expiration of the current **Policy Period**, solely for **Expense** first incurred or discovered, if applicable, prior to such event;

(b) the **Parent Organization** shall give written notice of such event to the Company as soon as practicable together with such information as the Company may require; and

(c) the entire premium for this Policy shall be deemed fully earned as of the effective date of such event.

---

## VII. SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES

With respect to the **Liability Coverage Parts**, coverage under this Policy shall extend to **Claims** for **Wrongful Acts** of an **Insured Person** made against:

(A) the lawful spouse or domestic partner of such **Insured Person** solely by reason of such spouse or domestic partner's status as a spouse or domestic partner, or such spouse or domestic partner's ownership interest in property which the claimant seeks as recovery for an alleged **Wrongful Act** of such **Insured Person**; or

(B) the estate, heirs, legal representatives or assigns of such **Insured Person** if such **Insured Person** is deceased, or the legal representatives or assigns of such **Insured Person** if such **Insured Person** is legally incompetent, insolvent or bankrupt,

provided that no coverage afforded by this Section VII shall apply with respect to any loss arising from an act, error or omission by an **Insured Person's** spouse, domestic partner, estate, heirs, legal representatives or assigns.

---

## VIII. NOTICE

(A) Notice to the Company of any **Claim**, **Expense**, or circumstances under any Coverage Part shall be deemed notice under the Policy in its entirety.

(B) All notices to the Company under this Policy of any **Claim**, **Covered Subpoena**, **Expense**, or circumstances under any Coverage Part shall be given in writing to one of the following addresses:

(1)     specialtyclaims@chubb.com; or

(2)     Attn: Claims Department

Chubb Group of Insurance Companies
82 Hopmeadow St.
Simsbury, CT 06070-7683

(C)     All other notices to the Company under this Policy shall be given in writing addressed to:

Attn: Chubb Underwriting Department

Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

(D)     Any notice described above shall be effective on the date of receipt by the Company.

## IX.    TERMINATION OF POLICY

(A)     This Policy shall terminate at the earliest of the following times:

(1)     upon receipt by the Company of written notice of termination from the **Parent Organization**, provided that:

(a)     this Policy may not be terminated by the **Parent Organization** after the effective date of any event described in Section VI(C), Conversion of Coverage Under Certain Circumstances; and

(b)     the MediaGuard Occurrence Liability Coverage Part may not be terminated by the **Parent Organization** after the first publication or broadcast of any stand alone **Production** (if a single, stand alone **Production** is insured only), in which case the portion of the premium for the MediaGuard Occurrence Liability Coverage Part shall become fully earned;

(2)     upon expiration of the **Policy Period** set forth in Item 2 of the GTC Declarations;

(3)     twenty (20) days after receipt by the **Parent Organization** of a written notice of termination from the Company based upon nonpayment of premium, unless the premium is paid within such twenty (20) day period; or

(4)     at such other time as may be agreed upon by the Company and the **Parent Organization**.

(B)     Except as stated in subparagraph (A)(1)(b) above, the Company shall refund the unearned premium computed at customary short rates if this Policy is terminated by the **Parent Organization**. Under any other circumstances the refund shall be computed pro rata. Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

## X.    BANKRUPTCY

Bankruptcy or insolvency of an **Insured** shall not relieve the Company of its obligations nor deprive the Company of its rights or defenses under this Policy.

## XI.    COORDINATION OF COVERAGE

(A)     If **Loss** on account of any **Claim** is covered under more than one **Liability Coverage Part**, such **Loss** shall be first covered under the MediaGuard Occurrence Liability Coverage Part, if applicable, subject to

CHUBB°  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*General Terms and Conditions*

its terms, conditions and limitations. Any remaining portion of such **Loss** which is not paid under the MediaGuard Occurrence Liability Coverage Part shall then be covered under the CyberSecurity Coverage Part, if applicable, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** otherwise covered under any other applicable **Liability Coverage Part** which is not paid under the MediaGuard Occurrence Liability or CyberSecurity Coverage Parts shall be covered under such other **Liability Coverage Part**, subject to the terms, conditions and limitations of such **Liability Coverage Part**.

(B)      If **Loss** on account of any **Claim** is covered under the MediaGuard Occurrence Liability Coverage Part and any other **Liability Coverage Part**, and if the **Insured** elects to retain the duty to defend such **Claim** pursuant to Section VII, Defense and Settlement of Claims, Subpoenas and Retraction Demands, of the MediaGuard Occurrence Liability Coverage Part, then the terms of such Section VII as well as the terms of Section VIII(A), Allocation, of the MediaGuard Occurrence Liability Coverage Part shall apply to such **Claim**.

## XII.   VALUATION AND FOREIGN CURRENCY

All premiums, limits, retentions, loss and other amounts under this Policy are expressed and payable in the

currency of the United States of America. Except as otherwise provided in this Policy, if a judgment is rendered, a settlement is denominated or any element of loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the rate of exchange published in *The Wall Street Journal* on the date the judgment becomes final, the amount of the settlement is agreed upon or any element of loss is due, respectively.

## XIII.   ACTION AGAINST THE COMPANY

No action may be taken against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy. No person or entity shall have any right under this Policy to join the Company as a party to any action against any **Insured** to determine such **Insured's** liability nor shall the Company be impleaded by such **Insured** or legal representatives of such **Insured**.

## XIV.   ROLE OF PARENT ORGANIZATION

By acceptance of this Policy, the **Parent Organization** agrees that it shall be considered the sole agent of, and shall act on behalf of, each **Insured** with respect to: (A) the payment of premiums and the receiving of any return premiums that may become due under this Policy; (B) the negotiation, agreement to and acceptance of endorsements; and (C) the giving or receiving of any notice provided for in this Policy (except the giving of notice to apply for an Extended Reporting Period as provided in Section V, Extended Reporting Period, and the giving of notice of **Claim**, **Covered Subpoena**, **Expense**, or circumstances as provided in the Reporting section of the applicable Coverage Part). Each **Insured** agrees that the **Parent Organization** shall act on its behalf with respect to all such matters.

## XV.   ALTERATION AND ASSIGNMENT

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by written endorsement to this Policy which is signed by an authorized representative of Chubb, a division of Federal Insurance Company.

CHUBB° Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*General Terms and Conditions*

---

XVI.   **TERRITORY**

This Policy shall apply anywhere in the world.

---

XVII.   **HEADINGS**

The descriptions in the headings and subheadings of this Policy are solely for convenience and form no part of the terms and conditions of coverage.

---

XVIII.   **COMPLIANCE WITH TRADE SANCTIONS**

This insurance does not apply to the extent that trade or economic sanctions or other similar laws or regulations prohibit the Company from providing insurance.

---

# Schedule of Forms

To be attached to and form part of
Policy No.   8251-9576

Company:   Federal Insurance Company

Issued to:   SXSW LLC

Chubb Professional Portfolio General Terms and Conditions FED

14-02-20788 (6/15 ed.)

14-02-22814 (12/17 ed.)

Chubb Professional Portfolio Miscellaneous Professional and Technology Services Liability Coverage Part FED

14-02-21026 (6/15 ed.)

14-02-21099 (6/15 ed.)

14-02-21510 (6/15 ed.)

14-02-21516 (6/15 ed.)

Chubb Professional Portfolio MediaGuard Claims Made Liability Coverage Part FED

14-02-20789 (6/15 ed.)

14-02-20984 (6/15 ed.)

14-02-21026 (6/15 ed.)

14-02-21096 (6/15 ed.)

14-02-21596 (6/15 ed.)

14-02-21759 (6/15 ed.)

**ENDORSEMENT/RIDER**

Coverage Section: Chubb Professional Portfolio General Terms and Conditions FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 1

To be attached to and
form a part of Policy No. 8251-9576

Issued to: SXSW LLC

---

TEXAS AMENDATORY ENDORSEMENT
TO THE GENERAL TERMS AND CONDITIONS

In consideration of the premium charged, it is agreed that:

(1)    Section V., EXTENDED REPORTING PERIOD, is amended by adding the following parenthetical immediately after the term "Additional Period":

"(which period shall be one (1) year or such other period as the **Parent Organization** and the Company agree upon)"

(2)    In addition to the extension of coverage offered in Section V., EXTENDED REPORTING PERIOD, the **Parent Organization** shall have the right to an automatic extended reporting period of thirty (30) days in which to report **Claims** for **Wrongful Acts** committed, attempted or allegedly committed or attempted before the earlier of the effective date of termination or nonrenewal, or with respect to an Extended Reporting Period purchased after an event described in Subsection (C) of Section VI, Conversion of Coverage Under Certain Circumstances, the effective date of such merger, consolidation, acquisition, or emergence from bankruptcy. The extension of coverage described in Section V., EXTENDED REPORTING PERIOD, if purchased, shall begin after the expiration of the automatic extended reporting period described above and Section V. shall be deemed amended to the extent necessary to comply with this paragraph.

(3)    This Policy shall not be non-renewed based solely on the fact that the **Insured** is an elected official.

(4)    The phrase "customary short rates" shall mean ninety (90) percent pro rata. Section IX, TERMINATION OF POLICY, is amended to the extent necessary to effect the foregoing.

The Policy will be deemed to have been amended to the extent necessary to effect the purposes of this Amendatory Endorsement.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedence over any provisions of the Policy or any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the state of Texas.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.


_____

Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section: Chubb Professional Portfolio General Terms and Conditions FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 8251-9576

Issued to:  SXSW LLC

CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

In consideration of the premium charged, it is agreed that:

A.  If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk
Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the
Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such
losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro
rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance
with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such
Act.  The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the
following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of
insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is
committed by an individual or individuals as part of an effort to coerce the civilian population of the
United States or to influence the policy or affect the conduct of the United States Government by
coercion.

B.  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism
exclusion, do not serve to create coverage for any "loss" that is otherwise excluded under this Policy.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

**CHUBB**

Chubb Group of Insurance
Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*Miscellaneous Professional and Technology
Services Liability Coverage Part*

**MPTS DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws
of Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

**NOTICE: THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD.**

**THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS MAY BE REDUCED OR COMPLETELY EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.   READ THE ENTIRE POLICY CAREFULLY.**

| | | |
|---|---|---|
| **Item 1.** | **Parent Organization:** | SXSW LLC |
| **Item 2.** | **Maximum Aggregate Limit of Liability for this Coverage Part**: | $1,000,000.00 |
| **Item 3.** | **Retention:** | $25,000.00 each **Claim** |
| **Item 4.** | **Retroactive Date:** | March 13, 2014 |
| **Item 5.** | **Professional Services:** | |

Event Planning, Promotional Activities, Branding, Travel Agency services, and related services

**CHUBB**   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*Miscellaneous Professional and Technology*
*Services Liability Coverage Part*

---

**In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this Coverage Part, the Company and the Insureds agree as follows:**

---

I.   **INSURING CLAUSE**

**Miscellaneous Professional and Technology Services Liability Coverage**

The Company shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made against the **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, for a **Wrongful Act** on or after the Retroactive Date set forth in Item 4 of the MPTS Declarations.

---

II.   **DEFINITIONS**

For purposes of this Coverage Part:

**Application** means:

(A)   any portion of an application given to the Company for this Policy, including any attachments, written information and materials provided to the Company by or on behalf of an **Insured** for the purposes of the Company's underwriting of this Coverage Part; and

(B)   any warranty provided to the Company within the past three years in connection with any coverage part or policy of which this Coverage Part is a renewal or replacement.

**Claim** means any:

(A)   written demand first received by an **Insured** for monetary or non-monetary relief, including injunctive relief;

(B)   civil proceeding commenced by the service of a complaint or a similar pleading; or

(C)   arbitration or mediation proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document,

against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

(D)   written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** described in Subsections (A) through (C) above.

**Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of **Insured Persons**) incurred in investigating, defending, opposing or appealing any **Claim** and the premium for appeal, attachment or similar bonds.

**Employee** means any natural person whose labor or service is, was or will be engaged and directed by an **Organization** including a part-time, seasonal, leased or temporary employee, intern or volunteer. **Employee** shall not include any independent contractor.

**Environmental Agents** means any:

(A)   bacteria;

(B)   mildew, mold, or other fungi;

(C)   other microorganisms;

**CHUBB**° Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*Miscellaneous Professional and Technology
Services Liability Coverage Part*

(D)     mycotoxins, spores, or other by-products of Subsections (A), (B) or (C) above;

(E)     viruses or other pathogens (whether or not a microorganism); or

(F)     colony or group of any of the foregoing.

**ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, and the Health Insurance Portability and Accountability Act of 1996), as amended; any similar provisions of any statutory or common law anywhere in the world; or any rule or regulation promulgated under any such Act or law.

**Executive** means any natural person who is, was or will be:

(A)     a duly elected or appointed director, officer, member of the Advisory Board or in-house general counsel of any **Organization** incorporated in the United States of America;

(B)     a duly elected or appointed: (1) manager or member of the Board of Managers or equivalent position; (2) member of the Advisory Board; or (3) in-house general counsel, of any **Organization** formed as a limited liability company in the United States of America;

(C)     a partner of any **Organization** formed as a partnership in the United States of America; or

(D)     a holder of an equivalent position to those described in Subsections (A) through (C) above in any **Organization** incorporated, formed or organized anywhere in the world.

**First Inception Date** means the inception date of the first claims made policy or coverage part insuring miscellaneous errors and omissions issued by the Company and continually renewed by the Company until the inception date of this current Policy and of which this Policy is a direct renewal or replacement.

**Insured** means any **Organization** and any **Insured Person**.

**Insured Person** means any **Executive** or **Employee** of an **Organization** acting in his or her capacity as such.

**Liquidated Damages** means a sum of money stipulated by the parties to a contract as the amount of damages to be recovered for a breach of such contract.

**Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:

(A)     compensatory damages;

(B)     punitive, exemplary, or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the Company, or to the **Claim** giving rise to such damages;

(C)     judgments, including pre-judgment and post-judgment interest;

(D)     settlements; and

(E)     **Defense Costs**,

provided that **Loss** does not include any portion of such amount that constitutes any:

(1)     cost of compliance with any order for, grant of or agreement to provide non-monetary relief, including injunctive relief;

(2)     amount uninsurable under the law pursuant to which this Coverage Part is construed;

(3)     tax, fine or penalty imposed by law against an **Insured**; except as provided in Subsection (B) above with respect to punitive, exemplary or multiplied damages;

**CHUBB®**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>

*Miscellaneous Professional and Technology*
*Services Liability Coverage Part*

---

(4)     amount incurred by an **Insured** in the defense or investigation of any action, proceeding or demand that was not then a **Claim** even if (a) such amount also benefits the defense of a covered **Claim**; or (b) such action, proceeding or demand subsequently gives rise to a **Claim**;

(5)     **Liquidated Damages**;

(6)     consideration owed or paid in connection with any **Insured's** goods, products or services, including any royalties, restitution, reduction, disgorgement or return of any payment, charges or fees;

(7)     cost of correcting, re-performing or completing any **Professional Services**, or any costs to satisfy any warranty or other obligation assumed by or on behalf of an **Insured** in connection with any **Professional Services**; or

(8)     cost incurred in cleaning-up, removing, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**.

**Managing Partner** means any natural person who is chosen or appointed to manage or direct any **Organization** that is formed as a partnership; provided that if no such individual exists, **Managing Partner** means each and every member of the management or executive committee (or similar body responsible for management) of any **Organization** that is formed as a partnership.

**Personal Injury** means:

(A)     libel, slander, product disparagement, trade libel or other form of defamation;

(B)     invasion or infringement of the right of privacy or publicity, including false light, public disclosure of private facts, intrusion and commercial appropriation of name, persona or likeness;

(C)     false arrest, detention or imprisonment; or

(D)     wrongful entry or eviction, or other invasion of the right of private occupancy.

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, asbestos products or waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**Professional Services** means:

(A)     services which are performed by or on behalf of an **Insured** for others for a fee and set forth in Item 5 of the MPTS Declarations; and

(B)     **Technology Services**.

**Securities Laws** means the Securities Act of 1933, Securities Exchange Act of 1934, Investment Advisors Act of 1940, the Investment Company Act of 1940, any state "blue sky" securities law, or any other federal, state, local securities law anywhere in the world or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the sale or purchase of securities.

**Technology Product** means any:

(A)     communication, computer, data security, electronic, information, Internet, network or website:

(1)     equipment or parts; or

(2)     programs or systems; and

(B)     software, data or other information in electronic form.

**CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*SM
*Miscellaneous Professional and Technology*
*Services Liability Coverage Part*

---

**Technology Services** means the following services performed by or on behalf of an **Insured** for others for a fee in connection with any **Technology Product**:

(A)     technology consulting services;

(B)     information systems or network analysis, design, programming or integration;

(C)     software design, distribution, servicing, installation and maintenance;

(D)     website design, programming or maintenance;

(E)     training; and

(F)     database design and the caching, collecting, compiling, processing, mining, recording or analysis of data.

**Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty or **Personal Injury** committed, attempted, or allegedly committed or attempted solely in the performance of or failure to perform **Professional Services**.

---

**III.     EXCLUSIONS**

The Company shall not be liable for **Loss** on account of any **Claim**:

(A)     Prior Notice
based upon, arising from or in consequence of any fact, circumstance, situation, transaction, event or **Wrongful Act** that, before the inception date set forth in Item 2(A), Policy Period, of the GTC Declarations, was the subject of any notice accepted under any policy or coverage part of which this Coverage Part is a direct or indirect renewal or replacement;

(B)     Pending or Prior Proceedings
based upon, arising from or in consequence of any written demand, suit or other proceeding pending against, or order, decree or judgment entered for or against any **Insured**, on or prior to the inception date set forth in Item 2(A), Policy Period, of the GTC Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

(C)     Bodily Injury or Property Damage
for bodily injury, mental anguish, humiliation, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed, provided that this Exclusion (C) shall not apply to **Loss** for any mental anguish, humiliation or emotional distress resulting from **Personal Injury**;

(D)     Pollution
based upon, arising from or in consequence of any:

    (1)     discharge, emission, release, dispersal or escape of any **Pollutants** or any threat thereof;

    (2)     treatment, removal or disposal of any **Pollutants**; or

    (3)     regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**;

(E)     ERISA
based upon, arising from or in consequence of any violation of the responsibilities, obligations or duties imposed by **ERISA** with respect to employee, pension or welfare benefit plans or programs operated or sponsored by an **Organization**, or an entity which owns or controls an **Organization**, for the benefit of **Insured Persons**;

CHUBB   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio<sup>SM</sup>*
*Miscellaneous Professional and Technology*
*Services Liability Coverage Part*

(F) <u>Employment Practices</u>
brought by or on behalf of any past, present or prospective employee, based upon, arising from or in consequence of any employment relationship or the nature, terms or conditions of employment, including claims of workplace torts, wrongful termination, dismissal or discharge, or any employment-related discrimination, harassment, breach of contract, or defamation;

(G) <u>Contract</u>
for any liability of an **Insured** under any oral or written contract or agreement, provided that this Exclusion (G) shall not apply to **Loss** to the extent that an **Insured** would have been liable in the absence of such contract or agreement;

(H) <u>Prior Knowledge</u>
based upon, arising from or in consequence of any **Wrongful Act** first committed before the **First Inception Date**, if, on or before such date, any **Insured** knew or could have reasonably foreseen that such **Wrongful Act** did or could result in a **Claim** against any **Insured**, provided that this Exclusion (H) shall only apply if coverage is afforded for **Wrongful Acts** first committed before the **First Inception Date**, as such coverage is determined by the Retroactive Date set forth in Item 4 of the MPTS Declarations;

(I) <u>Environmental Agents</u>
based upon, arising from or in consequence of any:

(1) **Environmental Agents**;

(2) request, demand, order or regulatory or statutory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of any **Environmental Agents**; or

(3) action or proceeding by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of any **Environmental Agents**;

(J) <u>Insured v. Insured</u>
brought or maintained by or on behalf of any **Insured**;

(K) <u>Professional Services for Insureds and Affiliates</u>
based upon, arising from or in consequence of the performance of or failure to perform **Professional Services** for any:

(1) **Insured**;

(2) entity which is owned or controlled by, or is under common ownership or control with, any **Insured**;

(3) natural person or entity which owns or controls any entity included within the definition of **Insured**; or

(4) entity of which any **Insured** is a director, officer, partner or principal shareholder, a manager or member of the Board of Managers, or a member of the Advisory Board;

(L) <u>Securities</u>
based upon, arising from or in consequence of any violation of **Securities Laws**;

(M) <u>Antitrust or Unfair Trade Practices</u>
based upon, arising from or in consequence of price fixing, restraint of trade, monopolization, interference with economic relations (including interference with contractual relations or with prospective advantage), unfair competition, unfair business or unfair trade practices, or any violation of the Federal Trade

**CHUBB**

Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*Miscellaneous Professional and Technology*
*Services Liability Coverage Part*

Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing, restraint of trade, unfair competition, unfair business or unfair trade practices, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes; or any similar provisions of any federal, state, or local statutory law or common law anywhere in the world;

(N)   <u>Intellectual Property</u>
based upon, arising from or in consequence of any infringement of copyright, patent, trademark, trade name, trade dress or service mark; any misappropriation of ideas, trade secrets or other intellectual property rights; any false patent marking; or any violation of a federal, state, local or foreign intellectual property law, or a rule or regulation promulgated under such intellectual property law;

(O)   <u>Unsolicited Communications</u>
based upon, arising from or in consequence of any violation of:

   (1)   the United States of America CAN-SPAM Act of 2003 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state, or local statutory law or common law anywhere in the world;

   (2)   the United States of America Telephone Consumer Protection Act (TCPA) of 1991 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state, or local statutory law or common law anywhere in the world; or

   (3)   any other law, ordinance, regulation or statute used to impose liability in connection with any unsolicited communication, distribution, publication, sending or transmission;

(P)   <u>Governmental, Regulatory or Administrative Entity</u>
brought or maintained by or on behalf of any governmental or quasi-governmental entity, regulatory or administrative agency or authority; provided that this Exclusion (P) shall not apply to **Loss** if such entity, agency or authority brings the **Claim** solely in its capacity as the client or customer of any **Insured** for **Professional Services**;

(Q)   <u>Fees, Charges or Cost Over-runs</u>
solely involving any **Insured's** fees, charges or cost over-runs;

(R)   <u>Guaranty of Costs or Value</u>
based upon, arising from or in consequence of any guaranty, promise or warranty, either express or implied, whether oral or written, with respect to:

   (1)   any costs or cost savings; or

   (2)   the future value of any real, personal or intellectual property;

(S)   <u>Investment Performance</u>
based upon, arising from or in consequence of any **Insured's** advice about, promise or guarantee of the future performance or value of investments, or rate of return or interest; or any **Loss** resulting from fluctuation in the value of any investment; or any failure of investments to perform as expected or desired;

(T)   <u>Disappearance of Money and Commingling</u>
for any loss of money or securities owned or held by any **Insured**, or for which any **Insured** is legally liable, due to disappearance, theft, injury or damage thereto; or any improper use or commingling of any funds or monies;

(U)   <u>Maintenance of Licenses</u>
based upon, arising from or in consequence of any decision by any **Insured**:

   (1)   not to effect, maintain, procure or secure; or

CHUBB° Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*Miscellaneous Professional and Technology
Services Liability Coverage Part*

(2)     to cancel, let lapse, modify, not renew, revoke, suspend or otherwise impair,

in whole or in part at any time, any lease, license, order, permit or other contract for any **Technology Product** that any **Insured** is obligated to effect, maintain, procure or secure;

(V)   Delay in Delivery or Performance
based upon, arising from, in consequence of any delay in delivery of or failure to deliver any **Technology Product** or delay in performance of, or failure to begin any analysis, design, programming, integration, installation, maintenance, repair or support services in connection with any **Technology Product**;

(W)   Ceasing Support
based upon, arising from or in consequence of any decision by any **Insured**:

(1)     not to provide or support; or

(2)     to cease to provide or support,

in whole or in part at any time, any **Technology Product** that any **Insured** is obligated to provide or support;

(X)   Adjustment, Inspection, Recall, Repair or Replacement
for any adjustment, disposal, inspection, recall, removal, repair, replacement or withdrawal of any:

(1)     **Technology Product**; or

(2)     property containing or incorporating any **Technology Product** designed, programmed, integrated, distributed, installed, maintained, repaired or serviced by or on behalf of an **Insured**,

regardless of whether any such adjustment, disposal, inspection, recall, removal, repair, replacement or withdrawal is performed by any **Insured** or others;

(Y)   Third Party Product Failures or Defects
based upon, arising from or in consequence of any defect in any product manufactured, created or installed by any person or entity other than an **Insured**, provided that this Exclusion (Y) shall not apply if such person or entity manufactured, created or installed such product while performing **Professional Services**: (1) on behalf of or at the direction of the **Insured**; and (2) in accordance with a written contract or agreement with the **Insured**;

(Z)   False Advertising
based upon, arising from or in consequence of false advertising, misrepresentation in advertising, or any unfair or deceptive trade practices, with respect to the advertising or sale of any **Insured's** own goods, products, publications or services; or any inaccurate, inadequate or incomplete description of the price of goods, products or services disseminated by, on behalf of, or with the consent of any **Insured**, or any failure of such goods, products or services to conform with advertised quality or performance;

(AA)  Unauthorized Network Access and Unlawful Collection
based upon, arising from or in consequence of any:

(1)     unauthorized or exceeded authorized access to, use of or alteration of, any computer program, software, computer, computer system or any input, output, processing, storage and communication devices that can be connected thereto; or

(2)     unauthorized or unlawful collection, use or dissemination of Internet user information;

**CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*Miscellaneous Professional and Technology*
*Services Liability Coverage Part*

(BB)   <u>Nuclear</u>
based upon, arising from or in consequence of any radioactive, toxic, explosive or other hazardous properties of any nuclear material, nuclear assembly, or nuclear component thereof; or

(CC)   <u>Conduct</u>
based upon, arising from or in consequence of:

   (1)   any deliberately fraudulent act or omission, or any willful violation of any statute or regulation, by an **Insured**, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding brought by or against the Company) establishes such an act or omission or violation; or

   (2)   an **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding brought by or against the Company) establishes the gaining of such profit, remuneration or advantage,

provided that:

   (a)   no conduct pertaining to any **Insured Person** shall be imputed to any other **Insured Person**; and

   (b)   any conduct pertaining to any past, present, or future chief financial officer, chief executive officer, chief operating officer, in-house general counsel, manager of the Board of Managers (or any equivalent position to any of the foregoing), or **Managing Partner** of an **Organization** shall be imputed to such **Organization** and its **Subsidiaries**.

---

## IV.   REPORTING

(A)   An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company written notice of any **Claim** as soon as practicable after the chief executive officer, president, chief financial officer, chief information officer, in-house general counsel, risk manager, **Managing Partner**, or any natural person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**, but in no event later than:

   (1)   if this Coverage Part expires (or is otherwise terminated) without being renewed with the Company, ninety (90) days after the effective date of such expiration or termination; or

   (2)   the expiration of the Extended Reporting Period, if applicable,

provided that if the Company sends written notice to the **Parent Organization**, stating that this Coverage Part is being terminated for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Claim** prior to the effective date of such termination.

(B)   During the **Policy Period**, or any applicable Extended Reporting Period, an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Period** in which such circumstances were first reported to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than ninety (90) days after the chief executive officer, president, chief financial officer, chief information officer, in-house general counsel, risk manager, **Managing Partner**, or any natural person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**.

CHUBB' Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*Miscellaneous Professional and Technology*
*Services Liability Coverage Part*

(C) An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company such information, assistance and cooperation as the Company may reasonably require and shall include in any notice under Subsections (A) or (B) above a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of the actual or potential claimants, and the manner in which such **Insured** first became aware of the **Claim**, circumstances or alleged **Wrongful Act**.

## V. RETENTION

(A) The Company's liability under this Coverage Part shall apply only to that part of covered **Loss** on account of each **Claim** which is excess of the applicable Retention set forth in Item 3 of the MPTS Declarations, and such Retention shall be borne by the **Insureds** uninsured and at their own risk. In the event that any **Insured** is unwilling or unable to bear the Retention, it shall be the obligation of the **Parent Organization** to bear such Retention uninsured and at its own risk.

(B) If different parts of a single **Claim** are subject to different Retentions in different Coverage Parts, the applicable Retentions will be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(C) **Claims** shall be subject to the Retention applicable to the **Policy Period** during which such **Claims** are first made or deemed to have been made.

## VI. DEFENSE AND SETTLEMENT

(A) The Company shall have the right and duty to defend any **Claim** covered by this Coverage Part. Coverage shall apply even if any of the allegations are groundless, false or fraudulent. The Company's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

(B) The Company may make any investigation it deems necessary and may, with the consent of the **Insureds**, make any settlement of any **Claim** it deems appropriate.

(C) No **Insured** shall settle any **Claim**, incur any **Defense Costs**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's written consent, which shall not be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

(D) The Company shall have no obligation to pay **Loss**, including **Defense Costs**, or to defend or continue to defend any **Claim** after the Company's Maximum Aggregate Limit of Liability set forth in Item 2 of the MPTS Declarations or the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations has been exhausted by the payment of **Loss** and the applicable premium shall be deemed fully earned.

(E) The **Insureds** agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests and agrees to do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

(F) The Company shall not seek repayment from an **Insured Person** of any **Defense Costs** paid by the Company that are deemed uninsured pursuant to Exclusion III(CC), Conduct, unless the applicable determination standard (whether a final, non-appealable adjudication or other determination standard) set forth in such Exclusion has been met.

## VII. ALLOCATION

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*Miscellaneous Professional and Technology
Services Liability Coverage Part*

If the **Insureds** who are afforded coverage for a **Claim** incur an amount consisting of both **Loss** that is covered by this Coverage Part and also loss that is not covered by this Coverage Part because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

(A)  **Defense Costs**: one hundred percent (100%) of **Defense Costs** incurred by such **Insured** on account of such **Claim** shall be considered covered **Loss**, provided that the foregoing shall not apply with respect to any **Insured** for whom coverage is excluded pursuant to Subsection X(C), Representations and Severability. Such **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based on the relative legal exposures of the parties to such matters; and

(B)  loss other than **Defense Costs**: all remaining loss incurred by such **Insured** from such **Claim** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

## VIII.    OTHER INSURANCE

If any **Loss** under this Coverage Part is insured under any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by this Coverage Part), this Coverage Part shall be excess of and shall not contribute with such other insurance, regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

## IX.    SUBROGATION

(A)  In the event of any payment under this Coverage Part, the Company shall be subrogated to the extent of such payment to all of the **Insureds**' rights of recovery. As a condition precedent to the Company's payment under this Coverage Part, the **Insureds** agree to execute all papers required and shall take all reasonable actions to secure and preserve such rights, including the execution of such documents necessary to enable the Company to effectively bring suit or otherwise pursue subrogation rights in the name of the **Insureds**.

(B)  It is understood and agreed that the Company shall have no rights of subrogation against any **Insured** under this Coverage Part and that an **Organization** may, on behalf of the Company, waive the Company's subrogation rights against any third party under this Coverage Part, provided that such waiver of subrogation is executed in writing prior to any **Wrongful Act**.

## X.    REPRESENTATIONS AND SEVERABILITY

(A)  In granting coverage to the **Insureds** under this Coverage Part, the Company has relied upon the declarations and statements in the **Application** for this Coverage Part. Such declarations and statements are the basis of the coverage under this Coverage Part and shall be considered as incorporated in and constituting part of this Coverage Part.

(B)  The **Application** for coverage shall be construed as a separate **Application** for coverage by each **Insured Person**. With respect to the declarations and statements in such **Application**, no knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person**.

(C)  However, in the event that such **Application** contains any misrepresentations made with the actual intent to deceive or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Company under this Coverage Part, then no coverage shall be afforded for any **Claim** based upon, arising from or in consequence of any such misrepresentations with respect to:

⊏ ⊓ ⊔ ⊓ ⊏ ⊏ ⊔ ⊏ ⊔ ⊔ ⊐'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

***Chubb Professional Portfolio***[SM]
***Miscellaneous Professional and Technology***
***Services Liability Coverage Part***

---

        (1)      any **Insured Person** who knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations); or

        (2)      any **Organization** if any past or present chief financial officer, chief executive officer, in-house general counsel, manager of the Board of Managers (or any equivalent position to any of the foregoing), or **Managing Partner** of the **Parent Organization** knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations).

   (D)     The Company shall not be entitled under any circumstances to void or rescind this Coverage Part with respect to any **Insured**.

---

**ENDORSEMENT/RIDER**

Coverage Section:  Chubb Professional Portfolio Miscellaneous Professional and Technology Services Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 1

To be attached to and
form a part of Policy No. 8251-9576

Issued to:  SXSW LLC

---

AMEND DEFINITION OF APPLICATION ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     The term **Application**, as defined in Section II, Definitions, is deleted and replaced with the following:

**Application** means the application attached to and forming part of this Coverage Part, including the Federal Insurance Company application form signed and dated 08/15/2019, and including any materials submitted in connection with such application, all of which are on file with the Company and are part of this Coverage Part, as if physically attached.

(2)     The Federal Insurance Company application form signed and dated 08/15/2019, and any attachments and other materials submitted therewith or incorporated therein, may have terms or phrases that differ in certain respects from the defined terms set forth in this Coverage Part.  The use of that application was for the convenience of the persons and entities seeking coverage under this Coverage Part, and no inconsistency between any of the terms or phrases used in such application and the defined terms set forth in the Coverage Part is intended, nor shall it be construed, to vary, alter or amend any of the terms, conditions and limitations of or endorsements to this Coverage Part.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  Chubb Professional Portfolio Miscellaneous Professional and Technology Services Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 8251-9576

Issued to:  SXSW LLC

---

CLAIMS MADE AND REPORTED ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)   The notice on the MPTS Declarations is deleted and replaced with the following:

> **NOTICE:  THIS COVERAGE PART PROVIDES CLAIMS MADE AND REPORTED COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE AND REPORTED DURING THE "POLICY PERIOD" OR ANY APPLICABLE EXTENDED REPORTING PERIOD.**
>
> **THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS MAY BE REDUCED AND MAY BE COMPLETELY EXHAUSTED BY "DEFENSE COSTS," AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE APPLICABLE RETENTION.  IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.  READ THE ENTIRE POLICY CAREFULLY.**

(2)   Section I, Insuring Clause, is deleted and replaced with the following:

**INSURING CLAUSE**

**Miscellaneous Professional and Technology Services Liability Coverage**

The Company shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made against the **Insured** and reported to the Company during the **Policy Period**, or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** on or after the Retroactive set forth in Item 4 of the MPTS Declarations.

(3)   Subsections (A) and (B) of Section IV, Reporting, of this Coverage Part are deleted and replaced with the following:

(A)   An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company written notice of any **Claim** as soon as practicable after the chief executive officer, president, chief financial officer, in-house general counsel, risk manager, **Managing Partner**, or any natural person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**, but in no event later than the expiration of the Policy, or any applicable Extended Reporting Period; provided that if the Company sends written notice to the **Parent Organization**, stating that this Coverage Part is being terminated

for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Claim** prior to the effective date of such termination.

(B) If during the **Policy Period**, or any applicable Extended Reporting Period, an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Period** in which such circumstances were first reported to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than sixty (60) days after the chief executive officer, president, chief financial officer, in-house general counsel, risk manager, **Managing Partner**, or any natural person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**.

(4) Subsection (C) of Section V, Retention, of this Coverage Part is deleted and replaced with the following:

(C) **Claims** shall be subject to the Retention applicable to the **Policy Period** during which such **Claims** are first made and reported to the Company or deemed to have been first made or reported to the Company.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  Chubb Professional Portfolio Miscellaneous Professional and Technology Services Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8251-9576

Issued to:  SXSW LLC

---

AMEND DEFINITION OF INSURED PERSON TO INCLUDE INDEPENDENT CONTRACTORS ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **Insured Person** in this Coverage Part shall include any natural person whose labor or service is, was or will be engaged and directed by an **Organization** in his or her capacity as an independent contractor.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  Chubb Professional Portfolio Miscellaneous Professional and Technology Services Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 4

To be attached to and
form a part of Policy No. 8251-9576

Issued to:  SXSW LLC

---

AMEND EXCLUSION (H) PRIOR KNOWLEDGE ENDORSEMENT

In consideration of the premium charged, it is agreed that Section III, Exclusion (H) Prior Knowledge of the Coverage Part identified above is deleted and replaced with the following:

(H)     <u>Prior Knowledge</u>
based upon, arising from or in consequence of any **Wrongful Act** first committed before the **First Inception Date**, if, on or before such date, any **Executive** of any **Organization** knew or could have reasonably foreseen that such **Wrongful Act** did or could result in a **Claim** against any **Insured**, provided that this Exclusion (H) shall only apply if coverage is afforded for **Wrongful Acts** first committed before the **First Inception Date**, as such coverage is determined by the Retroactive Date set forth in Item 4 of the MPTS Declarations;

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

CHUBB·  **Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*MediaGuard Claims Made
Liability Coverage Part*

**MGCM DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws
of Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN  46204-1927

**NOTICE:  THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD.**

**THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS MAY BE REDUCED OR COMPLETELY EXHAUSTED BY "DEFENSE COSTS" AND "SUBPOENA DEFENSE COSTS," AND "DEFENSE COSTS" AND "SUBPOENA DEFENSE COSTS" WILL BE APPLIED AGAINST THE APPLICABLE RETENTION.   THE COVERAGE AFFORDED UNDER THIS POLICY DIFFERS IN SOME RESPECTS FROM THAT AFFORDED UNDER OTHER POLICIES.  READ THE ENTIRE POLICY CAREFULLY.**

**Item 1.**     **Parent Organization:**  SXSW LLC

**Item 2.**     **Maximum Aggregate Limit of Liability for this Coverage Part**:        $1,000,000.00

**Item 3.**     **Limits of Liability:**
(A) Insuring Clause (A)
Media Liability Coverage:              $1,000,000.00 Each **Claim**
(B) Insuring Clause (B)                      Not Covered
Subpoena Defense Coverage:        Each **Covered Subpoena**

**Item 4.**     **Retention:**
(A) Insuring Clause (A)
Media Liability Coverage:              $25,000.00 Each **Claim**
(B) Insuring Clause (B)                      Not Covered
Subpoena Defense Coverage:        Each **Covered Subpoena**

**Item 5.**     **Covered Media:**
Advertising Materials produced or disseminated by the Insured; Promotional Activities; SXSWorld Magazine, and related content produced by the Insured.

**Item 6.**     **Internet Site(s):**
All websited owned and operated by the Insured- including Social Media sites

**Item 7.**     **Production(s):**
N/A

**CHUBB°**  **Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

***Chubb Professional Portfolio*** [SM]
***MediaGuard Claims Made***
***Liability Coverage Part***

**Item 8.**   **Retroactive Date:**   March 13, 2014

**CHUBB°** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*MediaGuard Claims Made*
*Liability Coverage Part*

In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this Coverage Part, the Company and the Insureds agree as follows:

I.   **INSURING CLAUSES**

**Insuring Clause (A): Media Liability Coverage**

(A)   The Company shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made against the **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, for a **Wrongful Act** on or after the Retroactive Date set forth in Item 8 of the MGCM Declarations.

**Insuring Clause (B): Subpoena Defense Coverage**

(B)   The Company shall pay, on behalf of an **Insured**, **Subpoena Defense Costs** on account of a **Covered Subpoena** first served on the **Insured** during the **Policy Period**.

II.   **DEFINITIONS**

For purposes of this Coverage Part:

**Activity(ies)** means **Internet Activities**, **Media Activities** and **Production Activities**.

**Application** means:

(A)   any portion of an application given to the Company for this Policy, including any attachments, written information and materials provided to the Company by or on behalf of an **Insured** for the purposes of the Company's underwriting of this Coverage Part; and

(B)   any warranty provided to the Company within the past three years in connection with any coverage part or policy of which this Coverage Part is a renewal or replacement.

**Claim** means any:

(A)   written demand first received by an **Insured** for monetary or non-monetary relief, including injunctive relief;

(B)   civil proceeding commenced by the service of a complaint or a similar pleading; or

(C)   arbitration or mediation proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document,

against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

(D)   written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** described in Subsections (A) through (C) above; or

(E)   written demand first received by an **Insured** for the retraction of **Matter** published, disseminated or released by an **Insured**.

**Confidential Source** shall mean a natural person or entity that provides information on a confidential basis to an **Insured** as a source for newsgathering, provided the **Insured** has agreed to keep confidential such natural person's or entity's identity.

Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**Chubb Professional Portfolio**<sup>SM</sup>
**MediaGuard Claims Made**
**Liability Coverage Part**

**Covered Media** means the publications, programs, broadcast or cable stations or other communications set forth in Item 5 of the MGCM Declarations which were created or acquired on or prior to the inception date set forth in Item 2(A) of the GTC Declarations, including any special editions of, or supplements to such media.

**Covered Subpoena** means a subpoena seeking documents, testimony, information, or other **Matter** in connection with a **Wrongful Act** in the course of an **Insured's** reporting of events or happenings by the **Insured's** news media organization.

**Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees, overhead or benefits of **Insured Persons**) incurred in investigating, defending, opposing or appealing any **Claim** and the premium for appeal, attachment or similar bonds. **Defense Costs** also includes reasonable legal fees incurred to prosecute a copyright or trademark declaratory relief action ("declaratory relief fees"), provided that the Company's obligation to pay declaratory relief fees: (A) shall commence only after the **Insured's** receipt of a civil proceeding alleging copyright or trademark infringement that is otherwise covered by this Coverage Part; and (B) shall continue so long as such civil proceeding is continuously maintained against the **Insured**.

**Employee** means any natural person whose labor or service is, was or will be engaged and directed by an **Organization** including a part-time, seasonal, leased or temporary employee, intern or volunteer. **Employee** shall not include any independent contractor.

**Environmental Agents** means any:

(A)     bacteria;

(B)     mildew, mold, or other fungi;

(C)     other microorganisms;

(D)     mycotoxins, spores, or other by-products of Subsections (A), (B) or (C) above;

(E)     viruses or other pathogens (whether or not a microorganism); or

(F)     colony or group of any of the foregoing.

**ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, and the Health Insurance Portability and Accountability Act of 1996), as amended; any similar provisions of any statutory or common law anywhere in the world; or any rule or regulation promulgated under any such Act or law.

**Executive** means any natural person who is, was or will be:

(A)     a duly elected or appointed director, officer, member of the Advisory Board or in-house general counsel of any **Organization** incorporated in the United States of America;

(B)     a duly elected or appointed: (1) manager or member of the Board of Managers or equivalent position; (2) member of the Advisory Board; or (3) in-house general counsel, of any **Organization** formed as a limited liability company in the United States of America;

(C)     a partner of any **Organization** formed as a partnership in the United States of America; or

(D)     a holder of an equivalent position to those described in Subsections (A) through (C) above in any **Organization** incorporated, formed or organized anywhere in the world.

**First Inception Date** means the inception date of the first claims made policy or coverage part insuring media professional liability issued by the Company and continually renewed by the Company until the inception date of this current Policy and of which this Policy is a direct renewal or replacement.

**Insured** means any **Organization** and any **Insured Person**.

Exhibit 6   Page 37 of 57

**CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*MediaGuard Claims Made
Liability Coverage Part*

**Insured Person** means any:

(A) **Executive** or **Employee** of an **Organization** acting in his or her capacity as such;

(B) natural person or entity that disseminates **Matter** where the **Organization** has entered into a written, oral or implied-in-fact indemnification or hold harmless agreement with such natural person or entity regarding **Claims** arising out of the dissemination of such **Matter**, provided that coverage is not provided for such natural person or entity for any **Matter** created, modified or furnished by such natural person or entity; or

(C) natural person or entity that is an agent or independent contractor of an **Organization**, including stringers, freelancers and photographers, but only with respect to **Claims** arising out of **Wrongful Acts** committed for or at the direction of the **Organization**, and only if and to the extent that the **Organization**, after evaluating the merits of the **Claim**:

   (1) has agreed in writing to include such agent or independent contractor as an **Insured** under this Coverage Part; and

   (2) provides the Company with written notice of such agreement within sixty (60) days of an **Insured** first becoming aware of such **Claim**.

**Internet Activities** means display or other use of **Matter**, including advertising, on an **Internet Site** which was created on or prior to the inception date set forth in Item 2(A) of the GTC Declarations.

**Internet Site(s)** means any internet site or social media platform set forth in Item 6 of the MGCM Declarations.

**Liquidated Damages** means a sum of money stipulated by the parties to a contract as the amount of damages to be recovered for a breach of such contract.

**Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:

(A) compensatory damages;

(B) punitive, exemplary, or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the Company, or to the **Claim** giving rise to such damages;

(C) judgments, including pre-judgment and post-judgment interest;

(D) settlements; and

(E) **Defense Costs**,

provided that **Loss** does not include any portion of such amount that constitutes any:

   (1) cost of compliance with any order for, grant of or agreement to provide non-monetary relief, including injunctive relief;

   (2) amount uninsurable under the law pursuant to which this Coverage Part is construed;

   (3) tax, fine or penalty imposed by law against an **Insured** including those imposed by any federal, state or local governmental body or by ASCAP, SESAC, BMI, or other similar licensing organizations anywhere in the world; except as provided in Subsection (B) above with respect to punitive, exemplary or multiplied damages;

   (4) amount incurred by an **Insured** in the defense or investigation of any action, proceeding or demand that was not then a **Claim** even if (a) such amount also benefits the defense of a covered **Claim**; or (b) such action, proceeding or demand subsequently gives rise to a **Claim**;

**CHUBB®**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*MediaGuard Claims Made*
*Liability Coverage Part*

(5) **Liquidated Damages**;

(6) consideration owed or paid in connection with any **Insured's** goods, products or services, including any royalties, restitution, reduction, disgorgement or return of any payment, charges or fees;

(7) **Insured's** production costs, lost profits, or cost of correcting, recalling, reproducing, or reprinting of **Matter**, including the costs of any services in connection therewith; or

(8) cost incurred in cleaning-up, removing, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**.

**Managing Partner** means any natural person who is chosen or appointed to manage or direct any **Organization** that is formed as a partnership; provided that if no such individual exists, **Managing Partner** means each and every member of the management or executive committee (or similar body responsible for management) of any **Organization** that is formed as a partnership.

**Matter** means the content of any communication of any kind whatsoever, regardless of the nature or form of such **Matter** or the medium by which such **Matter** is communicated, including language, data, facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical materials.

**Media Activities** means:

(A) the gathering, recording, collection, writing, editing, publication, dissemination, exhibition, broadcast or release of **Matter** in connection with the **Covered Media**; and

(B) the development, creation, production, placement or dissemination of **Matter** consisting of or relating to advertising, publicizing, promotion or sale of the goods or services of an **Insured** or others where such **Matter** is in, or directly relating to, the **Covered Media**.

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, asbestos products or waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**Production(s)** means any production set forth in Item 7 of the MGCM Declarations.

**Production Activities** means:

(A) the preparation, production, publication, dissemination, release, broadcast, telecast, exhibition, sale, licensing or distribution of **Productions**;

(B) the development, creation, production, placement, or dissemination of **Matter** consisting of or relating to advertising, publicizing, promotion or sale of **Productions**; and

(C) the licensing to any third party of any logo, symbol, trademark or other intellectual property for use in connection with the sale of goods or services directly relating to **Productions**.

**Securities Laws** means the Securities Act of 1933, Securities Exchange Act of 1934, Investment Advisors Act of 1940, the Investment Company Act of 1940, any state "blue sky" securities law, or any other federal, state or local securities law anywhere in the world or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the sale or purchase of securities.

**Subpoena Defense Costs** means reasonable legal fees and expenses incurred in connection with a **Covered Subpoena** including:

(A) seeking to quash or modify a **Covered Subpoena** or in opposing any motion to enforce a **Covered Subpoena** on any appropriate ground, including grounds of reporter's privilege or shield law or other

CHUBB' Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*MediaGuard Claims Made
Liability Coverage Part*

applicable constitutional, statutory or common-law privilege relating to the protection of newsgathering activities; and

(B)    representation of an **Insured** in connection with a **Covered Subpoena** during the document production, witness preparation, and giving of testimony in connection with such subpoena.

**Subpoena Defense Costs** does not include any remuneration, salaries, wages, tips, overhead, or expenses of any **Insured**, except with the prior written consent of the Company.

**Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty arising directly out of an **Insured's Activities**, including but not limited to, any actual or alleged:

(A)    invasion or infringement of the right of privacy or publicity, including the torts of intrusion upon seclusion, publication of private facts, false light, or misappropriation of name or likeness;

(B)    libel, slander, or any other form of defamation or harm to the character or reputation of any person or entity, including product disparagement or trade libel;

(C)    outrage, infliction of emotional distress or prima facie tort;

(D)    false arrest, detention or imprisonment, harassment, trespass, wrongful entry or eviction, eavesdropping, or other invasion of the right of private occupancy;

(E)    copyright infringement or misappropriation of property rights, information or ideas or dilution or infringement of title, slogan, trademark, trade name, service mark, or service name; or

(F)    negligence in connection with the content of **Matter**, including alleged harm to a natural person or entity who acted or failed to act in reliance upon such **Matter**.

## III.    EXCLUSIONS

The Company shall not be liable for **Loss** on account of any **Claim**:

(A)    <u>Prior Notice</u>
based upon, arising from or in consequence of any fact, circumstance, situation, transaction, event or **Wrongful Act** that, before the inception date set forth in Item 2(A), Policy Period, of the GTC Declarations, was the subject of any notice accepted under any policy or coverage part of which this Coverage Part is a direct or indirect renewal or replacement;

(B)    <u>Pending or Prior Proceedings</u>
based upon, arising from or in consequence of any written demand, suit or other proceeding pending against, or order, decree or judgment entered for or against any **Insured**, on or prior to the inception date set forth in Item 2(A), Policy Period, of the GTC Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

(C)    <u>Bodily Injury or Property Damage</u>
for bodily injury (except mental anguish, humiliation, and emotional distress), sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed, provided that this Exclusion (C) shall not apply to bodily injury or property damage resulting from a **Claim** of negligence as described in Subsection (F) in the definition of **Wrongful Act**, except as provided in Exclusion (T), Product Warranty or Guarantee;

Exhibit 6 Page 149 of 171

**CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*MediaGuard Claims Made
Liability Coverage Part*

(D)   Pollution
based upon, arising from or in consequence of any:

(1)   discharge, emission, release, dispersal or escape of any **Pollutants** or any threat thereof;

(2)   treatment, removal or disposal of any **Pollutants**; or

(3)   regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**;

(E)   ERISA
for any violation of the responsibilities, obligations or duties imposed by **ERISA**;

(F)   Employment Practices
brought by or on behalf of any past, present or prospective employee, based upon, arising from or in consequence of any employment relationship or the nature, terms or conditions of employment, including claims of workplace torts, wrongful termination, dismissal or discharge, or any employment-related discrimination, harassment, breach of contract, or defamation; provided that this Exclusion (F) shall not apply to any **Claim** that involves a dispute over the ownership or exercise of rights in any **Matter** provided by any such employee;

(G)   Contract
for any breach of any express or implied contract, agreement, warranty or guarantee, provided that this Exclusion (G) shall not apply to any:

(1)   **Claim** for liability which an **Insured** would have incurred in the absence of such contract, agreement, warranty or guarantee;

(2)   **Claim** alleging breach of a written, oral or implied-in-fact indemnification or hold harmless agreement between an **Organization** and an **Insured Person**, as described in Subsection (B) of the definition of **Insured Person**;

(3)   **Claim** alleging breach of any express or implied contract or agreement between an **Insured** and a **Confidential Source** of **Matter** supplied to the **Insured**, regarding the confidentiality to be afforded to such **Confidential Source** or such **Matter**;

(4)   **Claim** alleging breach of any express or implied contract or agreement between an **Insured** and a natural person or entity that provides **Matter** to the **Insured**, regarding the ownership or exercise of any copyrights in such **Matter**;

(5)   alleged failure to attribute authorship or provide credit under any agreement to which an **Insured** is a party; or

(6)   alleged misappropriation of ideas under implied contract;

(H)   Prior Knowledge
based upon, arising from or in consequence of any **Wrongful Act** first committed before the **First Inception Date**, if, on or before such date, any **Insured** knew or could have reasonably foreseen that such **Wrongful Act** did or could result in a **Claim** against any **Insured**, provided that this Exclusion (H) shall only apply if coverage is afforded for **Wrongful Acts** first committed before the **First Inception Date**, as such coverage is determined by the Retroactive Date set forth in Item 8 of the MGCM Declarations;

(I)   Environmental Agents
based upon, arising from or in consequence of any:

(1)   **Environmental Agents**;

CHUBB°   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
*MediaGuard Claims Made*
*Liability Coverage Part*

---

(2)   request, demand, order or regulatory or statutory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of any **Environmental Agents**; or

(3)   action or proceeding by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of any **Environmental Agents**;

(J)   Securities
based upon, arising from or in consequence of any violation of **Securities Laws**;

(K)   Disability Discrimination
for any violation by any **Insured** of the responsibilities, obligations or duties imposed by any federal, state, or local statutory or common law anywhere in the world (including the Americans with Disabilities Act or the Civil Rights Act of 1964) or amendments to or regulations promulgated under any such law that governs the prohibition of discrimination on the basis of disability;

(L)   Antitrust or Unfair Trade Practices
based upon, arising from or in consequence of price fixing, restraint of trade, monopolization, interference with economic relations (including interference with contractual relations or with prospective advantage), unfair competition, unfair business or unfair trade practices, or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing, restraint of trade unfair competition, unfair business or unfair trade practices, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes; or any similar provisions of any federal, state, or local statutory law or common law anywhere in the world;

(M)   Unsolicited Communications
based upon, arising from or in consequence of any violation of:

(1)   the United States of America CAN-SPAM Act of 2003 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state, or local statutory law or common law anywhere in the world;

(2)   the United States of America Telephone Consumer Protection Act (TCPA) of 1991 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state, or local statutory law or common law anywhere in the world; or

(3)   any other law, ordinance, regulation or statute used to impose liability in connection with any unsolicited communication, distribution, publication, sending or transmission;

(N)   Governmental, Regulatory or Administrative Entity
brought or maintained by or on behalf of any governmental or quasi-governmental entity, regulatory or administrative agency or authority;

(O)   FDCPA or FCRA
based upon, arising from or in consequence of any violation of the Fair Debt Collection Practices Act (FDCPA) or the Fair Credit Reporting Act (FCRA) or any amendments thereto or any rules or regulations promulgated thereunder, including the Fair and Accurate Credit Transactions Act (FACTA), or any similar provisions of any federal, state, or local statutory law or common law anywhere in the world;

(P)   Unlawful Collection of Personal Information
for the unlawful collection or acquisition of personal information by, on behalf of, or with the consent or cooperation of any **Insured**, if any chief financial officer, chief executive officer, chief operating officer, chief information officer, in-house general counsel, manager of the Board of Managers (or any equivalent position to any of the foregoing), or **Managing Partner** of an **Organization** knew of such unlawful collection or acquisition;

Exhibit 6   Page 42 of 57

CHUBB

Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]

*MediaGuard Claims Made*
*Liability Coverage Part*

(Q)     Consulting Services
based upon, arising from or in consequence of any professional, technology or consulting services which do not fall within the definition of **Activities**;

(R)     Contest or Lottery
based upon, arising from or in consequence of any act, error or omission in connection with any contest, lottery, promotional game or game of chance, including the printing of tickets or coupons for any of the foregoing, or the over-redemption of tickets, coupons or prizes for any of the foregoing; provided that this Exclusion (R) shall not apply to the extent that a **Claim** alleges

    (1)     invasion or infringement of the right of privacy or publicity, including the torts of intrusion upon seclusion, publication of private facts, false light, or misappropriation of name or likeness;

    (2)     libel, slander, or any other form of defamation or harm to the character or reputation of any natural person or entity, including product disparagement or trade libel;

    (3)     false arrest, detention or imprisonment, trespass, wrongful entry or eviction, eavesdropping, or other invasion of the right of private occupancy; or

    (4)     copyright infringement or misappropriation of property rights, information or ideas or dilution or infringement of title, slogan, trademark, trade name, service mark, or service name;

(S)     Production Financing or Guarantees
based upon, arising from, or in consequence of any financing of any **Production** or any warranties or guarantees with regard to the performance of any **Production**;

(T)     Product Warranty or Guarantee
based upon, arising from or in consequence of any breach of express warranties or guarantees, breach of fiduciary relationships, malfunction or failure with respect to advertised products or services, including any bodily injury or property damage resulting therefrom, regardless of whether such bodily injury or property damage arises from a **Claim** of negligence as described in Subsection (F) of the definition of **Wrongful Act**;

(U)     Merchandising
based upon, arising from or in consequence of the licensing to any third party of any logo, symbol, trademark or other intellectual property for use in connection with the sale of goods or services directly relating to **Internet Activities** or **Media Activities**; provided that this Exclusion (U) shall not apply to **Production Activities**;

(V)     False Advertising
based upon, arising from or in consequence of false advertising, misrepresentation in advertising, or any unfair or deceptive trade practices, with respect to the advertising or sale of any **Insured's** own goods, products, publications or services; or any inaccurate, inadequate or incomplete description of the price of goods, products or services disseminated by, on behalf of, or with the consent of any **Insured**, or any failure of such goods, products or services to conform with advertised quality or performance;

(W)     Unauthorized Access, Impairment, and Unlawful Collection
based upon, arising from or in consequence of any:

    (1)     unauthorized access to, alteration of, or damage to any computer, computer program, computer network or computer database, including the infection of any of the foregoing with a computer virus;

Exhibit 6 - Page 150 of 171

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*MediaGuard Claims Made*
*Liability Coverage Part*

(2)   delay, disruption or failure of any communication network, service, hardware or software, including any **Claim** for lost profits or opportunities as a result of such delay, disruption or failure; or

(3)   unauthorized or unlawful collection, use or dissemination of internet user information;

(X)   <u>Patent</u>
based upon, arising from or in consequence of any false patent marking, or any infringement of any patent, including contributing to or inducing any such infringement;

(Y)   <u>Decompilation or Reverse Engineering</u>
based upon, arising from or in consequence of any decompilation or reverse engineering of any other natural person's or entity's:

(1)   software or its source content or material;

(2)   other computer code or its source content or material; or

(3)   method or process designed to control or facilitate any operation or other use of any computer or other automated system,

that:

(a)   was committed by any **Insured**;

(b)   was committed with the consent or knowledge of any **Insured**; or

(c)   would have been expected from the standpoint of a reasonable person in the circumstances of any **Insured**,

provided that this Exclusion (Y) shall not apply to the extent that such decompilation or reverse engineering was expressly authorized by the owner of such software, code, method or process; or

(Z)   <u>Conduct</u>
based upon, arising from or in consequence of:

(1)   any deliberately fraudulent act or omission, or any willful violation of any statute or regulation, by, on behalf of, or with the consent of any **Insured**, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding brought by or against the Company) establishes such an act or omission or violation; provided that this Exclusion (Z)(1) shall not apply to news reporting of events or happenings if the **Organization**, through its in-house or outside legal counsel, approves such conduct in advance based on a good faith belief that such conduct is protected by the First Amendment to the United States Constitution or equivalent law of another jurisdiction; or

(2)   an **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding brought by or against the Company) establishes the gaining of such profit, remuneration or advantage,

provided that:

(a)   no conduct pertaining to any **Insured Person** shall be imputed to any other **Insured Person**; and

(b)   any conduct pertaining to any past, present, or future chief financial officer, chief executive officer, chief operating officer, in-house general counsel, manager of the Board of Managers (or any

Exhibit 6   Page 152 of 171

CHUBB®   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>

**MediaGuard Claims Made**
**Liability Coverage Part**

---

equivalent position to any of the foregoing), or **Managing Partner** of an **Organization** shall be imputed to such **Organization** and its **Subsidiaries**.

---

## IV.    LIMIT OF LIABILITY

(A)    The Company's maximum liability for all **Loss** on account of each **Claim** made during the **Policy Period** shall be the Each **Claim** Limit of Liability corresponding to Insuring Clause (A) Media Liability Coverage, set forth in Item 3 of the MGCM Declarations.

(B)    The Company's maximum liability for all **Subpoena Defense Costs** resulting from each **Covered Subpoena** first served during the **Policy Period** shall be the Each **Covered Subpoena** Limit of Liability corresponding to Insuring Clause (B) Subpoena Defense Coverage, set forth in Item 3 of the MGCM Declarations.

(C)    The Company's maximum liability for all **Loss** on account of all **Claims** and all **Subpoena Defense Costs** on account of all **Covered Subpoenas**, combined, shall be the Maximum Aggregate Limit of Liability set forth in Item 2 of the MGCM Declarations.

(D)    Upon exhaustion of the Maximum Aggregate Limit of Liability for all **Loss** and **Subpoena Defense Costs** set forth in Item 2 of the MGCM Declarations, or the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations, the Company shall have no further liability for **Loss** or **Subpoena Defense Costs** regardless of when a **Claim** is made or a **Covered Subpoena** is received.

---

## V.    RETENTION

(A)    The Company's liability under this Coverage Part shall apply only to that part of covered **Loss** on account of each **Claim** which is excess of the applicable Retention set forth in Item 4(A) of the MGCM Declarations.

(B)    The Company's liability under this Coverage Part shall apply only to that part of **Subpoena Defense Costs** on account of each **Covered Subpoena** which is in excess of the applicable Retention set forth in Item 4(B) of the MGCM Declarations.

(C)    The Retention shall be depleted only by **Loss** or **Subpoena Defense Costs** otherwise covered under this Coverage Part and shall be borne by the **Insureds** uninsured and at their own risk.  In the event that any **Insured** is unwilling or unable to bear the Retention, it shall be the obligation of the **Parent Organization** to bear such Retention uninsured and at its own risk.

(D)    If different parts of a single **Claim** are subject to different Retentions in different Coverage Parts, the applicable Retentions will be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(E)    **Claims** shall be subject to the Retention applicable to the **Policy Period** during which such **Claims** are first made or deemed to have been made or during which such **Covered Subpoena** is first received.

---

## VI.    REPORTING

(A)    An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company written notice of any **Claim** or **Covered Subpoena** as soon as practicable after the chief executive officer, president, chief financial officer, chief information officer, in-house general counsel, risk manager, **Managing Partner**, or any natural person with the responsibility for the

CHUBB° Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*SM
*MediaGuard Claims Made
Liability Coverage Part*

management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim** or first receives such **Covered Subpoena**, but in no event later than:

(1)     if this Coverage Part expires (or is otherwise terminated) without being renewed with the Company, ninety (90) days after the effective date of such expiration or termination; or

(2)     the expiration of the Extended Reporting Period, if applicable,

provided that if the Company sends written notice to the **Parent Organization**, stating that this Coverage Part is being terminated for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Claim** or **Covered Subpoena** prior to the effective date of such termination.

(B)     If during the **Policy Period**, or any applicable Extended Reporting Period, an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Period** in which such circumstances were first reported to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than ninety (90) days after the chief executive officer, president, chief financial officer, chief information officer, in-house general counsel, risk manager, **Managing Partner**, or any natural person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**.

(C)     An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company such information, assistance and cooperation as the Company may reasonably require and shall include in any notice under Subsections (A) or (B) above a description of the **Claim**, **Covered Subpoena**, or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of the actual or potential claimants, and the manner in which such **Insured** first became aware of the **Claim**, circumstances or alleged **Wrongful Act**.

---

**VII.     DEFENSE AND SETTLEMENT OF CLAIMS, SUBPOENAS AND RETRACTION DEMANDS**

(A)     The Company shall have the right and duty to defend any **Claim** or respond to any **Covered Subpoena** covered by this Coverage Part.  Coverage shall apply even if any of the allegations are groundless, false or fraudulent.  The Company's duty to defend any **Claim** or respond to any **Covered Subpoena** shall cease upon exhaustion of the applicable Limit of Liability.

(B)     The Company may make any investigation it deems necessary and may, with the consent of the **Insureds**, make any settlement of any **Claim** it deems appropriate.

(C)     No **Insured** shall settle any **Claim**, incur any **Defense Costs** or **Subpoena Defense Costs**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** or any **Covered Subpoena** without the Company's written consent, which shall not be unreasonably withheld.  The Company shall not be liable for any settlement, **Defense Costs**, **Subpoena Defense Costs**, assumed obligation or admission to which it has not consented.

(D)     The Company shall have no obligation to pay **Loss**, including **Defense Costs**, or **Subpoena Defense Costs**, or to defend or continue to defend any **Claim** after the applicable Limit of Liability set forth in Item 3 of the MGCM Declarations, the Maximum Aggregate Limit of Liability set forth in Item 2 of the MGCM Declarations, or the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations has been exhausted by the payment of **Loss** or **Subpoena Defense Costs** and the applicable premium shall be deemed fully earned.

(E)     If more than one **Insured** is involved in a **Claim**, the Company shall not pay for the representation by separate counsel for one or more of such **Insureds**, unless there is a material actual or potential conflict of interest among such **Insureds**.

Exhibit 6 Page 46 of 57

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>

*MediaGuard Claims Made*
*Liability Coverage Part*

(F)     The **Insureds** agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests and agree to do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

(G)    The Company shall not seek repayment from an **Insured Person** of any **Defense Costs** or **Subpoena Defense Costs** paid by the Company that are deemed uninsured pursuant to Exclusion III(Z), Conduct, unless the applicable determination standard (whether a final, non-appealable adjudication or other determination standard) set forth in such Exclusion has been met.

(H)    The **Insured** shall retain sole discretion regarding whether and under what circumstances to issue a retraction of **Matter** previously communicated, distributed or released by the **Insured**.

## VIII.   ALLOCATION

If the **Insureds** who are afforded coverage for a **Claim** incur an amount consisting of both **Loss** that is covered by this Coverage Part and also loss that is not covered by this Coverage Part because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

(A)    **Defense Costs**:  one hundred percent (100%) of **Defense Costs** incurred by such **Insured** on account of such **Claim** shall be considered covered **Loss**, provided that the foregoing shall not apply with respect to any **Insured** for whom coverage is excluded pursuant to Subsection XIII(C), Representations and Severability.   Such **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based on the relative legal exposures of the parties to such matters; and

(B)    loss other than **Defense Costs**:  all remaining loss incurred by such **Insured** from such **Claim** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

## IX.   OTHER INSURANCE

If any **Loss** under this Coverage Part is insured under any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by this Coverage Part), this Coverage Part shall be excess of and shall not contribute with such other insurance, regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

Notwithstanding the forgoing, in the event an **Insured** has, prior to any **Wrongful Act**, contractually obligated itself to provide primary and non-contributory insurance to an **Insured Person**, as set forth in Subsection (B) or (C) of the definition of **Insured Person**, this Coverage Part will be considered primary and not excess of or contributory to any other insurance provided by, or for the benefit of, such **Insured Person**.

## X.   SUBROGATION

(A)    In the event of any payment under this Coverage Part, the Company shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery. As a condition precedent to the Company's payment under this Coverage Part, the **Insureds** agree to execute all papers required and shall take all reasonable actions to secure and preserve such rights, including the execution of such documents necessary to enable the Company to effectively bring suit or otherwise pursue subrogation rights in the name of the **Insureds**.

(B)    It is understood and agreed that the Company shall have no rights of subrogation against any **Insured** under this Coverage Part and that an **Organization** may, on behalf of the Company, waive the

**CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*MediaGuard Claims Made*
*Liability Coverage Part*

Company's subrogation rights against any third party under this Coverage Part, provided that such waiver of subrogation is executed in writing prior to any **Wrongful Act**.

## XI.  CONFIDENTIAL SOURCES AND OTHER MATTER

The **Insured's** rights under this Coverage Part shall not be prejudiced by the **Insured's** refusal to reveal the identity of a **Confidential Source** or to produce reporter's notes or any other documents or information obtained by the **Insured** in the course of the **Insured's Activities** with respect to which the **Insured** has asserted a claim of reporter's privilege or other applicable constitutional, statutory or common-law privilege relating to the protection of newsgathering activities.

## XII.  CHANGES IN MEDIA EXPOSURE

(A)  **Acquired Media Asset**

(1)  If after the inception date set forth in Item 2(A) of the GTC Declarations, any **Organization** acquires any publications, programs, broadcast or cable stations, or other communications asset or Websites (each an "Acquired Asset") then coverage shall be provided for such Acquired Asset under this Coverage Part but only for **Wrongful Acts** occurring after the effective date of such acquisition as follows:

(a)  if, at the time of an acquisition, the annual revenues (or projected annual revenues) of the Acquired Asset are equal to or less than twenty-five percent (25%) of the annual revenues of all of the **Organizations**, as reflected in the **Organizations'** or **Parent Organization's** then most recently concluded fiscal year end financial statements or fiscal quarterly financial statements, then the **Parent Organization** shall provide to the Company written notice of the acquisition containing full details thereof when it next applies for renewal of this Policy.  As a condition precedent to providing coverage for such Acquired Asset upon renewal, the Company, in its sole discretion, may impose additional or different terms, conditions and limitations of coverage and require payment of additional premium; or

(b)  if, at the time of an acquisition, the annual revenues (or projected annual revenues) of the Acquired Asset exceed twenty-five percent (25%) of the annual revenues of all of the **Organizations**, as reflected in the **Organizations'** or **Parent Organization's** then most recently concluded fiscal year end financial statements or fiscal quarterly financial statements, then the **Parent Organization** shall provide to the Company written notice of the acquisition containing full details thereof, as soon as practicable, but in no event later than ninety (90) days after the date of such acquisition.  As a condition precedent to providing coverage for such Acquired Asset, the Company, in its sole discretion, may impose additional or different terms, conditions and limitations of coverage and require payment of additional premium.  If the **Parent Organization** fails to give notice within such ninety (90) day period, or fails to pay any additional premium required by the Company, coverage under this Coverage Part for such Acquired Asset shall terminate with respect to **Wrongful Acts** occurring more than ninety (90) days after such acquisition.

(2)  Section (A)(1) shall apply notwithstanding Section VI(A), Acquisition of Another Organization, of the General Terms and Conditions, regardless of whether the acquisition of any Acquired Asset involves the acquisition of voting rights in another entity such that the acquired entity becomes a **Subsidiary**.

CHUBB'   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*<sup>SM</sup>
***MediaGuard Claims Made***
***Liability Coverage Part***

(B)   **Creation of Covered Media**

If after the inception date set forth in Item 2(A) of the GTC Declarations, any **Organization** creates any new publications, programs, broadcast or cable stations, or other communications not already contemplated by **Covered Media** (each a "Created Media"), then coverage under this Coverage Part shall be provided for such Created Media but only for **Wrongful Acts** occurring after the effective date of such creation as follows:

(1)   if, at the time of creation, the projected annual revenues of the Created Media are equal to or less than twenty-five percent (25%) of the annual revenues of all of the **Organizations**, as reflected in the **Organizations'** or **Parent Organization's** then most recently concluded fiscal year end financial statements or fiscal quarterly financial statements, then the **Parent Organization** shall provide to the Company written notice of the Created Media containing full details thereof when it next applies for renewal of this Policy.  As a condition precedent to providing coverage for such Created Media upon renewal, the Company, in its sole discretion, may impose additional or different terms, conditions and limitations of coverage and require payment of additional premium; or

(2)   if, at the time of creation, the projected annual revenues of the Created Media exceed twenty-five percent (25%) of the annual revenues of all of the **Organizations**, as reflected in the **Organizations'** or **Parent Organization's** then most recently concluded fiscal year end financial statements or fiscal quarterly financial statements, then the **Parent Organization** shall provide to the Company written notice of the Created Media containing full details thereof, as soon as practicable, but in no event later than ninety (90) days after the date of such creation.  As a condition precedent to providing coverage for such Created Media, the Company, in its sole discretion, may impose additional or different terms, conditions and limitations of coverage and require payment of additional premium.  If the **Parent Organization** fails to give notice within such ninety (90) day period, or fails to pay any additional premium required by the Company, coverage under this Coverage Part for such Created Media shall terminate with respect to **Wrongful Acts** occurring more than ninety (90) days after such creation.

(C)   **Creation of Websites and Use of New Social Media Platforms**

If after the inception date set forth in Item 2(A) of the GTC Declarations, any **Organization** creates any new Websites or uses any new social media platforms (each a "New Website"), then coverage shall be provided under this Coverage Part for such New Website with respect to any **Wrongful Acts** occurring after the effective date of such creation or use. The **Parent Organization** shall provide to the Company written notice of the New Website containing full details thereof when it next applies for renewal of this Policy.   As a condition precedent to providing coverage for such New Website upon renewal, the Company, in its sole discretion, may impose additional or different terms, conditions and limitations of coverage and require payment of additional premium.

---

**XIII.   REPRESENTATIONS AND SEVERABILITY**

(A)   In granting coverage to the **Insureds** under this Coverage Part, the Company has relied upon the declarations and statements in the **Application** for this Coverage Part.  Such declarations and statements are the basis of the coverage under this Coverage Part and shall be considered as incorporated in and constituting part of this Coverage Part.

Exhibit 6   Page 49 of 57

CHUBB' Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*Chubb Professional Portfolio*[SM]
*MediaGuard Claims Made*
*Liability Coverage Part*

(B)     The **Application** for coverage shall be construed as a separate **Application** for coverage by each **Insured Person**. With respect to the declarations and statements in such **Application**, no knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person**.

(C)     However, in the event that such **Application** contains any misrepresentations made with the actual intent to deceive or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Company under this Coverage Part, then no coverage shall be afforded for any **Claim** based upon, arising from or in consequence of any such misrepresentations with respect to:

(1)     any **Insured Person** who knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations); or

(2)     any **Organization** if any past or present chief financial officer, chief executive officer, in-house general counsel, manager of the Board of Managers (or any equivalent position to any of the foregoing), or **Managing Partner** of the **Parent Organization** knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations).

(D)     The Company shall not be entitled under any circumstances to void or rescind this Coverage Part with respect to any **Insured**.

**ENDORSEMENT/RIDER**

Coverage Section: Chubb Professional Portfolio MediaGuard Claims Made Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 1

To be attached to and
form a part of Policy No. 8251-9576

Issued to: SXSW LLC

---

### TEXAS AMENDATORY ENDORSEMENT
### TO THE MEDIAGUARD CLAIMS MADE LIABILITY COVERAGE PART

In consideration of the premium charged, it is agreed that Paragraph (A) of Section X, REPRESENTATIONS AND SEVERABILITY, is deleted and replaced with the following:

(A)     In granting coverage to the **Insureds** under this Coverage Part, the Company has relied upon the declarations and statements in the **Application** for this Coverage Part. Such declarations and statements are the basis of the coverage under this Coverage Part and shall be considered as incorporated into this Coverage Part.

The Policy will be deemed to have been amended to the extent necessary to effect the purposes of this Amendatory Endorsement.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedence over any provisions of the Policy or any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the state of Texas.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____

Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  Chubb Professional Portfolio MediaGuard Claims Made Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019          Federal Insurance Company

                                                 Endorsement/Rider No. 2

                                                 To be attached to and
                                                 form a part of Policy No. 8251-9576

Issued to:  SXSW LLC

---

CLAIMS MADE AND REPORTED ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     The notice on the MGCM Declarations is deleted and replaced with the following:

        **NOTICE:  THIS COVERAGE PART PROVIDES CLAIMS MADE AND REPORTED COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE AND REPORTED DURING THE "POLICY PERIOD" OR ANY APPLICABLE EXTENDED REPORTING PERIOD.**

        **THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS MAY BE REDUCED AND MAY BE COMPLETELY EXHAUSTED BY "DEFENSE COSTS" AND "SUBPOENA DEFENSE COSTS," AND "DEFENSE COSTS" AND "SUBPOENA DEFENSE COSTS" WILL BE APPLIED AGAINST THE APPLICABLE RETENTION.  IN NO EVENT WILL THE COMPANY BE LIABLE FOR FOR "DEFENSE COSTS" OR "SUBPOENA DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.  READ THE ENTIRE POLICY CAREFULLY.**

(2)     Section I, Insuring Clauses, is deleted and replaced with the following:

        **INSURING CLAUSES**

        **Insuring Clause (A): Media Liability Coverage**

        (A)     The Company shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made against the **Insured** and reported to the Company during the **Policy Period**, or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** on or after the Retroactive Date set forth in Item 8 of the MGCM Declarations.

        **Insuring Clause (B): Subpoena Defense Coverage**

        (B)     The Company shall pay, on behalf of an **Insured**, **Subpoena Defense Costs** on account of a **Covered Subpoena** first served on the **Insured** and reported to the Company during the **Policy Period**.

(3)     Subsections (A) and (B) of Section IV, Limit of Liability, of this Coverage Part are deleted and replaced with the following:

(A)    The Company's maximum liability for all **Loss** on account of each **Claim** made and reported to the Company during the **Policy Period** shall be the Each **Claim** Limit of Liability corresponding to Insuring Clause (A) Media Liability Coverage, set forth in Item 3 of the MGCM Declarations.

(B)    The Company's maximum liability for all **Subpoena Defense Costs** resulting from each **Covered Subpoena** first served and reported to the Company during the **Policy Period** shall be the Each **Covered Subpoena** Limit of Liability corresponding to Insuring Clause (B) Subpoena Defense Coverage, set forth in Item 3 of the MGCM Declarations.

(4)   Subsection (E) of Section V, Retention, of this Coverage Part is deleted and replaced with the following:

(E)    **Claims** shall be subject to the Retention applicable to the **Policy Period** during which such **Claims** are first made and reported to the Company or deemed to have been made or reported to the Company during which such **Covered Subpoena** is first received.

(5)   Subsections (A) and (B) of Section VI, Reporting, of this Coverage Part are deleted and replaced with the following:

(A)    An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company written notice of any **Claim** or **Covered Subpoena** as soon as practicable after the chief executive officer, president, chief financial officer, chief information officer, in-house general counsel, risk manager, **Managing Partner**, or any natural person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim** or first receives such **Covered Subpoena**, but in no event later than the expiration of the Policy, or any applicable Extended Reporting Period; provided that if the Company sends written notice to the **Parent Organization**, stating that this Coverage Part is being terminated for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Claim** or **Covered Subpoena** prior to the effective date of such termination.

(B)    If during the **Policy Period**, or any applicable Extended Reporting Period, an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Period** in which such circumstances were first reported to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than sixty (60) days after the chief executive officer, president, chief financial officer, chief information officer, in-house general counsel, risk manager, **Managing Partner**, or any natural person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  Chubb Professional Portfolio MediaGuard Claims Made Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8251-9576

Issued to:  SXSW LLC

AMEND DEFINITION OF APPLICATION ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)   The term **Application**, as defined in Section II, Definitions, is deleted and replaced with the following:

**Application** means the application attached to and forming part of this Coverage Part, including the Federal Insurance Company application form signed and dated 08/15/2019, and including any materials submitted in connection with such application, all of which are on file with the Company and are part of this Coverage Part, as if physically attached.

(2)   The Federal Insurance Company application form signed and dated 08/15/2019, and any attachments and other materials submitted therewith or incorporated therein, may have terms or phrases that differ in certain respects from the defined terms set forth in this Coverage Part.  The use of that application was for the convenience of the persons and entities seeking coverage under this Coverage Part, and no inconsistency between any of the terms or phrases used in such application and the defined terms set forth in the Coverage Part is intended, nor shall it be construed, to vary, alter or amend any of the terms, conditions and limitations of or endorsements to this Coverage Part.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  Chubb Professional Portfolio MediaGuard Claims Made Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 4

To be attached to and
form a part of Policy No. 8251-9576

Issued to:  SXSW LLC

---

ABSOLUTE BI/PD EXCLUSION WITH EMOTIONAL DISTRESS CARVEBACK ENDORSEMENT

In consideration of the premium charged, it is agreed that Exclusion (C) in Section III, Exclusions, is deleted and replaced with the following:

(C)   **Bodily Injury or Property Damage**
based upon, arising from or in consequence of bodily injury, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed; provided that this Exclusion (C) shall not apply to **Claims** for emotional distress;

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section: Chubb Professional Portfolio MediaGuard Claims Made Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019

Federal Insurance Company

Endorsement/Rider No. 5

To be attached to and
form a part of Policy No. 8251-9576

Issued to: SXSW LLC

MUSIC COPYRIGHT LICENSE EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is agreed that the Company shall not be liable for **Loss** on account of any **Claim** based upon, arising from or in consequence of any failure to obtain the necessary copyright license(s), including but not limited to synchronization license(s), in connection with the use of any copyrighted musical work or composition in content or programming produced by an **Insured**.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

**ENDORSEMENT/RIDER**

Coverage Section:  Chubb Professional Portfolio MediaGuard Claims Made Liability Coverage Part FED

Effective date of
this endorsement/rider: August 17, 2019          Federal Insurance Company

                                                 Endorsement/Rider No. 6

                                                 To be attached to and
                                                 form a part of Policy No. 8251-9576

Issued to:  SXSW LLC

---

### UNLICENSED FILM CLIP EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is agreed that the Company shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or in consequence of any use of film clips or stock footage without a valid and legally binding license.


The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.


Authorized Representative

 | North American Financial Lines Claims
150 Allen Road, Suite 101
Basking Ridge, NJ 07960
Phone: 908.860.4819
E-mail: cheryl.napurano@chubb.com

June 16, 2020

**Via Email (heather@sxsw.com) and Certified Mail, Return Receipt Requested**

Heather VanDyke
SXSW LLC
1400 Lacava Street
Suite 1100
Austin, TX 78701

| Re: | Insured: | SXSW LLC |
|---|---|---|
| | Policy No.: | 8251-9576 |
| | Claim No.: | KY20K2399947 |
| | Company: | Federal Insurance Company |
| | Subject: | Maria Bromley, et al. |

Dear Ms. VanDyke:

This letter follows our previous correspondence dated May 22, 2020, which acknowledged receipt of this matter on behalf of Federal Insurance Company (the "Company"). The Company issued a Chubb Professional Portfolio Policy for the period August 17, 2019 to August 17, 2020 bearing policy number 8251-9576 (the "Policy") to SXSW LLC (the "Insured"). If the Insured is seeking coverage under any other policies issued by the Company, please let us know as soon as possible. **The purpose of this letter is to inform you that for the reasons set forth below and based on the information provided, there is no coverage for this claim under the Policy.**

**THE ALLEGATIONS**

As a preliminary matter, please understand the Company has not made any determination as to the validity of the above-referenced matter, nor do we assert that any liability exists. We reference the allegations herein only to describe the matter submitted for coverage.

The Insured organizes a series of media, film and music festivals known as South by Southwest which take place in Austin, Texas in mid-March each year. In 2020, the event was scheduled for March 13 through March 20. On March 6, 2020 the South by Southwest event was cancelled by the City of Austin due to COVID-19. The Insured did not provide refunds to registrants or participants but did offer to defer all wristbands, tickets, passes and badges (the "Credentials") to a subsequent year, in accordance with the Participation and Credentials Terms and Conditions signed at the time of purchase.

We are in receipt of a demand letter sent on behalf of Steven Leventhal dated April 11, 2020 (the "Demand Letter"). We are also in receipt of a putative class action Complaint by Maria Bromley and Kleber Pauta on behalf of all others similarly-situated which was filed against the Insured and its

parent company SXSW Holdings, Inc., in the United States District Court for the Western District of Texas on April 24, 2020 (the "Complaint"). Mr. Leventhal and the plaintiffs in the class action suit are collectively referred to as the "Claimants".

The Demand Letter seeks a full refund of the amount paid for Mr. Leventhal's ticket to the canceled event. Similarly, the Complaint seeks refunds of the amounts paid for Credentials, arguing that the Participation and Credentials Terms and Conditions' Refund and Revocation clause is illusory and unenforceable. The Complaint asserts the following causes of action: (1) Breach of Contract; (2) Unjust Enrichment; and (3) Conversion. The Complaint demands actual damages and equitable monetary relief and/or an order compelling the return of the amounts paid for Credentials; pre-judgment and post-judgment interest; injunctive or declaratory relief ordering the Insured to issue refunds to all class members; attorney's fees and costs; and such further relief that the court deems appropriate.

## THE POLICY

The Miscellaneous Professional and Technology Services ("MPTS") Liability Coverage Part of the Policy has a maximum aggregate limit of liability of $1,000,000 and is subject to a $25,000 per Claim retention. Defense costs and expenses are part of and not in addition to the limit of liability.

With respect to the above allegations, we direct your attention to the Insuring Clause, as amended by *Endorsement/Rider No. 2, Form No. 14-02021099 (06/2019)*, which provides:

### I.   INSURING CLAUSE

**Miscellaneous Professional and Technology Services Liability Coverage**

The Company shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made against the **Insured** and reported to the Company during the **Policy Period**, or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** on or after the Retroactive Date set forth in Item 4 of the MPTS Declarations.

Next, we direct your attention to the following Definitions per the Policy's General Terms and Conditions ("GTC") Definitions, Section II:

**Organization** means the **Parent Organization** and any **Subsidiary**. **Organization** shall also mean any such entity as a debtor in possession under United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

**Parent Organization** means the entity named in Item 1 of the GTC Declarations.
...

**Related Claims** means all **Claims** for **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

We further direct your attention to the following Definitions per the MPTS Coverage Part, Section II:

**Insured** means any **Organization** and any **Insured Person**.
…

**Environmental Agents** means any:
(A) bacteria;
(B) mildew, mold, or other fungi;
(C) other microorganisms;
(D) mycotoxins, spores, or other by-products of Subsections (A), (B) or (C) above;
(E) viruses or other pathogens (whether or not a microorganism); or
(F) colony or group of any of the foregoing.
…

**Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:
(A) compensatory damages;
(B) punitive, exemplary, or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the Company, or to the **Claim** giving rise to such damages;
(C) judgments, including pre-judgment and post-judgment interest;
(D) settlements; and
(E) **Defense Costs**,

provided that **Loss** does not include any portion of such amount that constitutes any:
(1) cost of compliance with any order for, grant of or agreement to provide non-monetary relief, including injunctive relief;
(2) amount uninsurable under the law pursuant to which this Coverage Part is construed;
(3) tax, fine or penalty imposed by law against an **Insured**; except as provided in Subsection (B) above with respect to punitive, exemplary or multiplied damages;
(4) amount incurred by an **Insured** in the defense or investigation of any action, proceeding or demand that was not then a **Claim** even if (a) such amount also benefits the defense of a covered **Claim**; or (b) such action, proceeding or demand subsequently gives rise to a **Claim**;
(5) **Liquidated Damages**;
(6) consideration owed or paid in connection with any **Insured's** goods, products or services, including any royalties, restitution, reduction, disgorgement or return of any payment, charges or fees;
(7) cost of correcting, re-performing or completing any **Professional Services**, or any costs to satisfy any warranty or other obligation assumed by or on behalf of an **Insured** in connection with any **Professional Services**; or
(8) cost incurred in cleaning-up, removing, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**.

Finally, please note the following Exclusions per the MPTS Coverage Part, Section III:

## III.    EXCLUSIONS

The Company shall not be liable for **Loss** on account of any **Claim**:
…

(G)    Contract
       for any liability of an **Insured** under any oral or written contract or agreement, provided that
       this Exclusion (G) shall not apply to **Loss** to the extent that an **Insured** would have been liable
       in the absence of such contract or agreement;
       …

(I)    Environmental Agents
       based upon, arising from or in consequence of any:
       (1) **Environmental Agents**;
       (2) request, demand, order or regulatory or statutory requirement that any **Insured** or others
       test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond
       to, or assess the effects of any **Environmental Agents**; or
       (3) action or proceeding by or on behalf of a governmental authority or others for damages
       because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or
       neutralizing, or in any way responding to, or assessing the effects of any **Environmental
       Agents**;
       …

(K)    Professional Services for Insureds and Affiliates
       based upon, arising from or in consequence of the performance of or failure to perform
       **Professional Services** for:
       (1) any **Insured**;
       (2) any entity which is owned or controlled by, or is under common ownership or control with,
           any **Insured**;
       (3) any natural person or entity which owns or controls any entity included within the
           definition of **Insured**; or
       (4) any entity of which any **Insured** is a director, officer, partner or principal shareholder;
       …

(Q)    Fees, Charges or Cost Over-runs
       solely involving any **Insured's** fees, charges or cost over-runs;

## COVERAGE POSITION

As an initial matter, the Company has determined that the Demand and the Complaint are Related
Claims as defined by the Policy, because they are based upon the same or related facts, circumstances,
situations, transactions or events. Therefore they shall be deemed a single Claim treated as first made
on the date the earliest of such Claims was first made, and will be handled under the same claim
number, retention and Policy limits. *See GTC Section IV(A).*

In light of the facts in our possession at this time, and based upon the Policy language referenced
above, **please be advised that there is no coverage for this matter for the following independent
reasons**:

The Complaint names SXSW LLC and SXSW Holdings, Inc. as defendants. SXSW LLC is the Parent
Organization listed on the MPTS Policy Declarations, Item 1. It is our understanding that SXSW
Holdings, Inc. is the parent company for SXSW LLC. SXSW Holdings, Inc. is not a subsidiary of
SXSW LLC nor does it otherwise qualify as an Insured Organization per the Definitions listed above.
Therefore, there is no coverage under the Policy as to SXSW Holdings, Inc.

The Insured was performing professional services including scheduling, overseeing, organizing and managing the South by Southwest event, on its own behalf. Accordingly, this matter is based upon, arises from or is in consequence of the performance of or failure to perform Professional Services for the Insured and any entity which is owned or controlled by, or is under common ownership or control with, any Insured. Therefore, the Claim is excluded from coverage pursuant to Section III(K).

The Claim solely involves a dispute over the **Insured's** fees, charges or cost over-runs. Therefore, the Claim is excluded from coverage pursuant to Section III(Q), as detailed above. Additionally, the Company shall not be liable for any amounts that do not meet the definition of Loss under the Policy. Among other things, Loss does not include consideration owed or paid in connection with any **Insured's** services, including any disgorgement or return of any payment, charges or fees. *See Section II.*

The South by Southwest event was canceled by the City of Austin in an effort to mitigate the spread of coronavirus and COVID-19. All viruses or other pathogens constitute "Environmental Agents" according to the Policy's Definitions. As this matter is based upon, arises from and/or is in consequence of Environmental Agents as defined by the Policy, it is excluded from coverage pursuant to Section III(I). Accordingly, there is no coverage available for this Claim.

Finally, the Claimants maintain that they each entered into a contract with the Insured, that they performed their obligations under the contract by providing payment in exchange for Credentials, and that the Insured is in breach of the contract by failing to refund the amounts paid for Credentials after the event was canceled. As detailed above, Exclusion G excludes coverage for liability under any oral or written contract except to the extent an Insured would have been liable in the absence of such contract.

Without prejudice to the above, the Company also reserves its rights in relation to the following:

The Complaint alleges willful and/or malicious conduct. The Company shall not be liable for Loss on account of any Claim based upon, arising from or in consequence of any willful violation of any statute or regulation, by an Insured, if a final and non-appealable judgment or adjudication establishes such a fraudulent act or omission or willful violation. Likewise, the Company shall not be liable for Loss on account of any Claim based upon an Insured having gained any profit, remuneration or advantage to which they were not legally entitled, if a final and non-appealable judgment or adjudication establishes same. *See Section III(V).*

Finally, the Complaint demands injunctive and/or declaratory relief. The Company shall not be liable for any amounts that do not meet the definition of Loss under the Policy. Among other things, Loss does not include the cost of compliance with any order for, grant of or agreement to provide non-monetary relief, including injunctive relief. *See Section II.*

Accordingly, one or more of these Policy provisions may apply to further limit or exclude coverage for the Claim.

We strongly recommend that you report this matter to any other insurance carrier that may afford coverage for this matter. Please note that you may request a re-evaluation of the coverage position. Any requests for re-evaluation should be accompanied by additional factual information, documentation, and/or legal precedent which you believe may apply. It should be directed to my

attention. In the event of a re-evaluation, the Company reserves all rights under the Policy. Nothing herein shall be construed as a waiver of such rights.

The Company reserves the right to deny coverage based upon grounds other than those expressly set forth in this letter and to supplement and/or amend this letter to address additional coverage issues as they may arise, based upon all the provisions, terms, conditions, exclusions, endorsements and definitions found in the Policy and additional facts that may come to the Company's attention. By the same token, the Company will take into consideration any additional information that you provide. Nothing stated herein and no further action taken by the Company or on its behalf should be construed as a waiver of any of its rights under the Policy. On the contrary, by providing this or any prior correspondence to the Insured, engaging in any prior or future discussions with the Insured, or paying or agreeing to pay any amount to or on or behalf of the Insured, the Company does not waive any rights that it has under the Policy at law or in equity and understands the Insured reserves its rights as well.

Should you have any questions, please feel free to contact me. Thank you for your cooperation in this matter.

Sincerely,

Cheryl A. Napurano
Claim Director
Federal Insurance Company

cc:   R. Chase Laguarta, Higginbotham
      *Via Email Only:* claguarta@higginbotham.net